ORIGINAL

Jerome P. Wallingford
Attorney at Law
CA State Bar No. 41235
PMB-297
13223-1 Black Mountain Road
San Diego, CA 92129
Tel. (858) 484-2387
Attorney for Petitioner
Richard Raymond Tuite
In Pro Bono Publico

FILED
2008 JUN 23 AM 11:08
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY RM DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD RAYMOND TUITE,<br>Petitioner,<br>v.<br>MICHAEL MARTEL, WARDEN,<br>Respondent. | Civ. No. '08 CV 1101 J CAB<br><br>PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF. |

# PETITION FOR WRIT OF HABEAS CORPUS AND SUPPORTING POINTS AND AUTHORITIES 28 U.S.C. § 2254

CR

# TABLE OF CONTENTS


Table of Authorities iv

PETITION 1

- Direct Appeal 2
- Collateral Review in State Court 4
- Grounds for Relief 4
- Prayer for Relief 8
- Verification 9

MEMORANDUM OF POINTS AND AUTHORITIES 10

Introduction 10

Statement of Facts 10

Prosecution Evidence 10

- A. The discovery of Stephanie's body 10
- B. Events at the Crowe house around the time of the homicide 11
- C. Absence of evidence linking petitioner to the Crowe house 12
- D. Petitioner's detention and release on January 21, 1998 13
- E. Evidence of petitioner's presence in the neighborhood of the homicide 14
- F. Petitioner's search for his friend Tracy before and after the homicide 16
- G. Petitioner's relationship with Tracy 18
- H. Petitioner's other contacts with police 19
- I. The blood evidence 20
  - a) DNA processing and testing 20
  - b) Evidence of blood transfer during the investigation 22
    - 1) The red shirt 22
    - 2) The white T-shirt 23
- J. The cough drop and candy bar wrappers 25
- K. Petitioner's escape 25

Defense Evidence 26

A. Evidence that Michael Crowe, Joshua Treadway and Aaron Houser committed the homicide 26

B. Defense expert testimony 31

Prosecution rebuttal 33

Jury deliberations 34

Standard of review 37

Arguments 38

I. THE TRIAL COURT VIOLATED PETITIONER'S CONFRONTATION RIGHTS WHEN IT PRECLUDED HIM FROM CROSS-EXAMINING A PROSECUTION EXPERT ABOUT HIS BIAS AGAINST A DEFENSE WITNESS HE WAS CALLED TO REBUT. 38

A. The evidence of Gregg McCrary's bias. 38

B. The California Court of Appeal ruled that the trial court violated petitioner's federal confrontation rights when it refused to let him cross-examine McCrary about his bias. 40

C. The California Court of Appeal made a harmless error decision that was contrary to, and an unreasonable application of, Supreme Court harmless error precedent. 40

II. A JURY INSTRUCTION THAT TOLD THE JURY HOW IT COULD USE EVIDENCE OF PETITIONER'S UNCHARGED ACTS CREATED AN UNREASONABLE INFERENCE OF GUILT THAT VIOLATED DUE PROCESS PRINCIPLES. 44

A. The instruction. 44

B. The instruction created an unreasonable permissive inference of guilt. 46

C. The conviction must be set aside using the *Brecht* standard. 48

III. THE TRIAL COURT'S DENIAL OF PETITIONER'S MOTION TO CONTINUE THE TRIAL, AFTER DISCOVERY OF THE VICTIM'S DNA ON PETITIONER'S WHITE T-SHIRT LESS THAN TWO MONTHS BEFORE TRIAL COMMENCED, RENDERED THE TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF FEDERAL DUE PROCESS PRINCIPLES. 49

A. Factual background leading to denial of a continuance 49

B. Denial of the request for a continuance violated petitioner's constitutional right to a fair trial and due process 52

1) The diligence of petitioner and his counsel. 53

2) Usefulness of the continuance in addressing the need for additional evidence. 53

3) Inconvenience to the court and the opposing party. 54

4) Petitioner was prejudiced by denial of a continuance. 55

IV. THE CUMULATIVE EFFECT OF ERRORS COMMITTED AT PETITIONER'S TRIAL RENDERED THE PROCEEDINGS FUNDAMENTALLY UNFAIR, IN VIOLATION OF FEDERAL DUE PROCESS PRINCIPLES. 57

CONCLUSION 58

# TABLE OF AUTHORITIES

CONSTITUTION


Sixth Amendment/ Confrontation Clause/ Right to Counsel 5, 6, 7, 8, 40, 52

Eighth Amendment 52

Fourteenth Amendment 5, 6, 7, 8, 52, 57


CASES


*Alvarado v. Hill,* 252 F.3d 1066, 1068 (9th Cir. 2001) 38

*Brecht v. Abrahamson*, 507 U.S. 619 113 S.Ct. 1710, 1731, 123 L.Ed.2d 353 (1993) 41, 48, 49, 57

*California v. Roy,* 519 U.S. 2 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) 41

*Chapman v. California,* 386 U.S. 18 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) 40

*Delaware v. Van Arsdall,* 475 U.S. 673 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) 40

*Donnelly v. DeChristoforo,* 416 U.S. 637 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) 7, 57

*Francis v. Franklin,* 471 U.S. 307 105 S.Ct. 1965; 85 L.Ed.2d 344 (1985) 46

*Fry v. Pliler,* __ U.S. __, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) 41

*Gutierrez v. McGinnis,* 389 F.3d 300 (2d Cir.2004) 40

*Inthavong v. Lamarque,* 420 F.3d 1055 (9th Cir. 2005) 41

*Matlock v. Rose,* 731 F.2d 1236 (6th Cir. 1984) 7, 57

*Mitchell v. Esparza,* 540 U.S. 12 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) 41

*Powell v. United States,* 420 F.2d 799 (9th Cir. 1969) 54

*Ungar v. Sarafite,* 376 U.S. 575 84 S.Ct. 841, 11 L.Ed.2d 921 (1964) 52

*United States v. Barrett,* 703 F.2d 1076 (9th Cir. 1983) 53

*United States v. Flynt,* 756 F.2d 1352 (9th Cir. 1985) 52, 53, 55

*United States v. Hernandez,* 608 F.2d 741 (9th Cir. 1979) 54

*United States v. Hoyos,* 573 F.2d 1111 (9th Cir. 1978) 54

*United States v. West,* 828 F.2d 1468 (10th Cir. 1987) 55

*Williams v. Taylor*, 529 U.S. 362
120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) 37

STATUTES

28 U.S.C. § 2254 37, 38

California Penal Code section 192, subdivision (a) 2

California Penal Code section 1405 7

OTHER AUTHORITY

CALJIC JURY INSTRUCTION NO. 2.50 46, 49

Jerome P. Wallingford
Attorney at Law
CA State Bar No. 41235
PMB-297
13223-1 Black Mountain Road
San Diego, CA 92129
Tel. (858) 484-2387
Attorney for Petitioner
Richard Raymond Tuite
In Pro Bono Publico

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD RAYMOND TUITE,<br><br>Petitioner,<br><br>v.<br><br>MICHAEL MARTEL, WARDEN,<br><br>Respondent. | Civ. No.<br><br>PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF. |

**PETITION**

This petition is in the same format and responds to all questions contained in this Court's recommended form.

1. Name and location of court that entered judgment of conviction: San Diego Superior Court; 220 W. Broadway, room 3102; San Diego, CA 92101.

2. The jury verdict finding petitioner guilty of the conviction under attack was entered on May 26, 2004. Judgment was imposed on August 25, 2004.
3. Case number of judgment of conviction being challenged: SCD166932.
4. Length of sentence: 13 years to be served in California State Prison.
5. Petitioner does not have a projected release date. It is anticipated his release on this case will occur in 2013.
6. Petitioner was convicted in case SCD166932 of violating one count of California Penal Code section 192, subdivision (a), voluntary manslaughter.
7. Petitioner pleaded not guilty in the California Superior Court.
8. Petitioner was convicted by a jury after trial.
9. Petitioner did not testify at trial.

**DIRECT APPEAL**

10. Petitioner litigated his appeal in the California Court of Appeal.
11. (a) Result in the Court of Appeal: The judgment was affirmed.
    (b) The Court of Appeal opinion was filed on December 14, 2006.
    (c) Case number D044943. The opinion was not published.
    (d) Justices who participated in the appeal: Justices Irion, Nares and McDonald.
    (e) Grounds raised on direct appeal:
        (1) The trial court committed error during deliberations when it refused to permit a portion of Brian Kennedy's direct testimony to be included in a read back;
        (2) The trial court committed error when it denied petitioner's motion to continue the trial;
        (3) The jury committed misconduct during deliberations when it considered evidence not presented at trial;
        (4) The trial court committed error when it instructed the jury how to use evidence of uncharged acts;

///

(5) The trial court violated petitioner's confrontation rights when it precluded him from cross-examining a prosecution witness about his efforts to prevent a defense witness from testifying;

(6) The trial court committed error by failing to give instructions on involuntary manslaughter as a lesser-included offense.

(7) Cumulative effect of errors at trial rendered the proceedings fundamentally unfair, in violation of federal due process principles.

12. Petitioner filed a petition for review in the California Supreme Court.

(a) The petition for review was denied.

(b) The petition for review was denied March 28, 2007.

(c) Supreme Court number S149654. No citation.

(d) It asserted as grounds:

(1) The trial court committed error by failing to give instructions on involuntary manslaughter as a lesser-included offense;

(2) The jury committed misconduct during deliberation when it considered evidence not presented at trial;

(3) The trial court committed error during deliberations when it refused to permit a portion of Brian Kennedy's direct testimony to be included in a read back;

(4) The trial court committed error when it denied petitioner's motion to continue the trial;

(5) The trial court committed error when it instructed the jury how to use evidence of uncharged acts;

(6) The trial court violated petitioner's confrontation rights when it precluded him from cross-examining a prosecution witness about his efforts to prevent a defense witness from testifying;

(7) Cumulative effect of errors at trial rendered the proceedings fundamentally unfair, in violation of federal due process principles.

13. Petitioner did not file a petition for writ of certiorari in the United States Supreme Court.

**COLLATERAL REVIEW IN STATE COURT**

14. Petitioner has not previously filed any collateral petitions, applications or motions with respect to this judgment in the California Superior Court.
15. Not applicable
16. Petitioner has not filed any collateral petitions, applications or motions with respect to this judgment in the California Court of Appeal.
17. Not applicable.
18. Petitioner has not filed any collateral petitions, applications or motions with respect to this judgment in the California Supreme Court.
19. Not applicable.
20. Not applicable. All grounds in this petition were presented to the California Supreme Court in the petition for review filed as case S149654.
21. This is the first federal petition for writ of habeas corpus challenging petitioner's conviction in Superior Court case SCN167991.
22. **GROUNDS FOR RELIEF**

(a) **<u>GROUND ONE</u>: THE TRIAL COURT VIOLATED PETITIONER'S CONFRONTATION RIGHTS WHEN IT PRECLUDED HIM FROM CROSS-EXAMINING A PROSECUTION EXPERT ABOUT HIS BIAS AGAINST A DEFENSE EXPERT HE WAS CALLED TO REBUT.**

**Supporting FACTS:** Petitioner called FBI Agent Mary Ellen O'Toole as an expert witness to testify regarding her crime scene analysis of the homicide scene. Her findings were inconsistent with the prosecution's theory of the case, which was that petitioner entered the Crowe home looking for his friend and committed the homicide alone on the spur of the moment. Her findings were consistent with defense evidence that the homicide was committed by Michael Crowe and his two friends Joshua Treadway and Aaron Houser.

To rebut Agent O'Toole's testimony, the prosecution called Gregg McCrary, a self-employed, former FBI agent who worked on a contract basis. Prior to trial, Mr. McCrary wrote a letter to the International Criminal Investigative Analysts Fellowship. Petitioner

herein incorporates by reference a summary of statements McCrary made in that letter, set forth at page 39 of this petition.

In the letter, Mr. McCrary suggested that Agent O'Toole's testimony at petitioner's trial would raise an ethical issue, that she was attempting to undermine the prosecution of petitioner, that law enforcement agencies were shocked that she had injected herself into petitioner's case, and that law enforcement agencies viewed her participation in the case as an attempt to obstruct justice.

Many assertions in this letter were untrue. Agent O'Toole's participation in petitioner's case did not result from her being subpoenaed by the defense, but by the prosecution's retention of her as a crime scene analyst. Law enforcement agencies had not suggested to Mr. McCrary that Agent O'Toole was attempting to obstruct justice. The tone of Mr. McCrary's letter indicates a strong bias against Agent O'Toole and appeared to be motivated by an effort to prevent her from testifying for the defense.

Defense counsel wanted to cross-examine McCrary about the contents of his letter and about his bias against Agent O'Toole. The trial court denied petitioner's request to conduct that cross-examination. A more complete statement of facts upon which this issue is based is found in the attached points and authorities, at pages 31-34 and 38-40. Petitioner incorporates those facts into ground one.

Petitioner presented this issue to the California Supreme Court in his petition for review, which was heard as case S149654 and was summarily denied on March 28, 2007.

(b) **<u>GROUND TWO</u>: A JURY INSTRUCTION ADDRESSING HOW THE JURY COULD USE EVIDENCE OF PETITIONER'S UNCHARGED ACTS CREATED AN UNREASONABLE INFERENCE OF GUILT THAT VIOLATED DUE PROCESS PRINCIPLES.**

**Supporting FACTS:** The prosecution introduced evidence of petitioner's uncharged conduct that occurred near the Crowe residence around the time of the homicide. That conduct is summarized at pages 14-20 *infra*, and that summary is incorporated herein. The trial court rejected the defense's proffered jury instruction regarding the uncharged acts and instead gave the prosecution's instruction, a modified version of CALJIC No. 2.50. Petitioner herein incorporates by reference the jury instruction given to the jury, which is

fully set forth in the attached points and authorities at pages 45-46.

Petitioner presented this issue to the California Supreme Court in his petition for review, which was heard as case S149654 and was summarily denied on March 28, 2007.

**(c) GROUND THREE: THE TRIAL COURT'S DENIAL OF PETITIONER'S MOTION TO CONTINUE THE TRIAL, AFTER DISCOVERY OF THE VICTIM'S DNA ON PETITIONER'S WHITE T-SHIRT LESS THAN TWO MONTHS BEFORE TRIAL COMMENCED, RENDERED THE TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF FEDERAL DUE PROCESS PRINCIPLES.**

**Supporting FACTS:** Trial was set for February 2, 2004. In December 2003, petitioner's counsel learned that a prosecution forensic analyst had found Stephanie Crowe's DNA on petitioner's white T-shirt. Defense counsel requested a continuance at a hearing held on December 18, 2003. The prosecution agreed to the request. The trial court denied the continuance.

Defense counsel renewed the request for a continuance in January 2004. The prosecution had no objection, but the trial court nevertheless denied the continuance.

Upon learning of the new DNA evidence on the white t-shirt, the defense was diligent in beginning to investigate this evidence in order to obtain analysis of the evidence by defense experts. A continuance was necessary in order to afford defense counsel sufficient time to obtain all discovery regarding the new evidence, to present the discovery to the defense experts, and to allow defense experts to analyze the evidence and report their findings to defense counsel. Defense counsel also needed to obtain a DNA expert who could rebut the opinion of prosecution expert Faye Springer that Stephanie's blood was placed on the white shirt in wet or semi-wet form. After trial concluded, petitioner's trial counsel was able to locate a well-qualified expert witness who could provide the needed opinion. However the trial court denied petitioner's motion for new trial, which was based upon a declaration of that witness.

A reasonable continuance would not have inconvenienced the court or the prosecution. The prosecution agreed to both defense requests for a continuance. No witness would have been inconvenienced by a continuance.

Petitioner presented this issue to the California Supreme Court in his petition for re-

view, which was heard as case S149654 and was summarily denied on March 28, 2007.

**(d) GROUND FOUR: THE CUMULATIVE EFFECT OF ERRORS COMMITTED AT PETITIONER'S TRIAL RENDERED THE PROCEEDINGS FUNDAMENTALLY UNFAIR, IN VIOLATION OF FEDERAL DUE PROCESS PRINCIPLES.**

**Supporting FACTS:** The trial court committed multiple errors, discussed in the points and authorities that follow. The impact of those errors should be considered cumulatively.

Petitioner presented this issue to the California Supreme Court in his petition for review, which was heard as case S149654 and was summarily denied on March 28, 2007.

23. Petitioner does not now have a petition or appeal pending in any other court, state or federal, other than this petition.

24. Not applicable.

25. The attorneys who represented petitioner at all stages of the superior court proceedings were C. Bradley Patton, 1808 Aston Ave #240, Carlsbad, CA, 92008-7364, and William Fletcher, who is deceased. Mr. Fletcher died in 2006, after the trial proceedings concluded. Mr. Patton and Mr. Fletcher were appointed to represent petitioner.

26. Petitioner was represented on direct appeal by Jerome P. Wallingford, P.O. Box 501108, San Diego, CA 92150-1108, under appointment by the Court of Appeal. Mr. Wallingford is representing petitioner in this 28 U.S.C 2254 matter pro bono publico.

27. Petitioner was sentenced in a separate case for the escape that is described at page 25 of the attached points and authorities. Petitioner is serving a consecutive term for the escape. It is believed the term for the escape is three years. Petitioner pleaded guilty to the escape and does not contemplate attacking that judgment.

28. Petitioner requests that a district judge be designated to decide dispositive matters and any trial in this case.

29. This petition will be hand-delivered to the United States District Court for filing.

## PRAYER FOR RELIEF

Petitioner has no adequate remedy other than by this petition. Petitioner respectfully requests that this court:

1. Take judicial notice of all records in *People v. Richard Raymond Tuite*, Superior Court case number SCD 166932, and *People v. Richard Raymond Tuite*, Court of Appeal No. D044943, pursuant to Federal Rules of Evidence, § 201 (b) and (c);

2. Issue an order to the respondent to show cause why petitioner is not entitled to relief;

3. Vacate the judgment and sentence imposed on petitioner or, in the alternative;

4. Order an evidentiary hearing at which petitioner will offer further proof in support of the allegations herein; and

5. Grant petitioner whatever further relief is just and proper.

Respectfully submitted,

DATED: June 23, 2008

JEROME P. WALLINGFORD
Attorney for Petitioner,
Richard Raymond Tuite

## VERIFICATION

I, Jerome P. Wallingford, declare:

1. I am an attorney admitted to practice before the courts of the State of California and this Court. My office is in San Diego, California.

2. I represent petitioner, Richard Raymond Tuite, in filing and arguing his petition for writ of habeas corpus.

3. In my capacity as attorney for petitioner, I am making this verification because he is incarcerated in Mule Creek State Prison, Ione, California, and because the matters alleged herein are more within my knowledge than the knowledge of petitioner.

4. The statement of record facts included in this petition was prepared from review of the appellate record in this case. I believe the statement of facts to be true and correct.

5. I have read the attached petition for writ of habeas corpus and its supporting memorandum of points and authorities and I believe the contents to be true.

I declare under penalty of perjury that the above statements are true and correct. Executed on June 23, 2008, in San Diego, California.

Respectfully submitted,

JEROME P. WALLINGFORD
Attorney for Petitioner,
Richard Raymond Tuite

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The family of 12-year-old Stephanie Crowe awoke on January 21, 1998 to discover that she had been stabbed to death in her bedroom. The family was barred from the home for 10 days while law enforcement examined the entire house and removed such a quantity of evidence that it was necessary to store it in a forty-foot container in the Escondido Police Department parking lot.

Law enforcement officers quickly focused on family members as suspects. There was no physical evidence—no weapon, no fingerprints, no footprints, no hairs, no clothing--that indicated anyone outside the family had been in the house. The condition of the doors and windows provided no reasonable way an intruder could have entered and then left the house.

Police interrogated Michael Crowe, Stephanie's 14-year-old brother, and his two friends, Joshua Treadway and Aaron Houser. Treadway confessed to police that he acted as a lookout while Michael and Houser killed Stephanie. Michael also made admissions of guilt. The three boys were prosecuted for Stephanie's murder. This prosecution was dismissed in February 1999 after forensic analysis revealed Stephanie's DNA on a red shirt petitioner had worn when he was detained following the discovery of Stephanie's body. This clothing had been examined and tested in 1998 with negative results. Petitioner was charged with murder in May 2002.

## STATEMENT OF FACTS

### PROSECUTION EVIDENCE

### A. <u>The discovery of Stephanie's body</u>

On the morning of January 21, 1998, Stephanie Crowe's family discovered Stephanie had been stabbed to death in her bedroom during the night. (Vol.26: RT 3596-3597, 3684-3686) Emergency personnel responded shortly after 6 a.m. (Vol 17: RT 2155, 2195, 2212-2213) Stephanie's body was in the doorway of her bedroom, with her head and shoulders in the hallway. The position made it impossible to shut the bedroom door. (Vol.

17: RT 2146, 2215-2217; Vol. 19: RT 2433) Matted blood in Stephanie's hair was attached to the carpet. (Vol. 17: RT 2198, 2204) A pathologist located at least nine stab wounds. (Vol. 18: RT 2377-2383) One wound severed a major artery and caused external bleeding. Another perforated a lung and caused blood to accumulate in the chest cavity. Those wounds were fatal. (Vol. 18: RT 2382-2383) No stab wounds were below the chest. (Vol. 18: RT 2372) The condition of the body indicated Stephanie died at least six hours before paramedics arrived. Partially digested food in her stomach indicated death occurred two to three hours after eating. (Vol. 18:RT 2385, 2387)

Evidence in Stephanie's room provided clues to what happened. She was in bed when the attack started. (Vol. 19: RT 2415, 2429) The locations of wounds indicated she changed positions during the attack. (Vol. 18: RT 2399; Vol. 22: 3000) Stephanie sat on her bed after the attack and bled onto the bedpost, the floor and her jeans. (Vol. 18: RT 2388; Vol. 22: RT 2934, 2998-2999) Blood pooling in the middle of the bed suggested she moved and then slid to the floor. She hit the dresser and stayed there awhile. (Vol. 22: RT 2999, 3013) Then she moved to the doorway. A bloody hand opened the bedroom door. (Vol. 22: RT 2999) The pathologist believed Stephanie lost consciousness near the door and lay against the doorjamb. A pool of blood near her left ear indicated Stephanie was alive and bleeding when she reached the position where family members found her body. (Vol. 18: RT 2370-2371, 2389; Vol. 19: 2432)

**B. <u>Events at the Crowe house around the time of the homicide</u>**

During January 1998, 12-year-old Stephanie Crowe lived at home with her father Stephen, mother Cheryl, older brother Michael, then a high school freshman, younger sister Shannon, and maternal grandmother Judith. (Vol. 24: RT 3289; Vol. 26: RT 3588-3589, 3674-3675, 3699-3700) Shannon was in fifth grade and shared a bedroom with her grandmother. Michael and Stephanie had their own rooms. (Vol. 24: RT 3275, 3290)

The evening before the homicide, Stephanie ate salad and watched a "Home Improvement" episode in the living room. (Vol. 24: RT 3305, 3330-3334, 3346) Her father had a headache when he got home from work. He went to bed early and did not leave the master bedroom that night. (Vol. 26: RT 3594) Shannon and Judith went to bed about

9:00 p.m. (Vol. 24: RT 3307.) Cheryl went to bed about 10:00 p.m. (Vol. 27: RT 3745-3746.) Family members shut their bedroom doors at night as a fire precaution. (RT Vol. 24: RT 3310; Vol. 26: RT 3596, 3685)

Stephanie's Uncle Michael Kennedy visited the Crowe residence that evening. (Vol. 26: RT 3682) He departed about 9:00 p.m. through the laundry room door. He left it unlocked. (Vol. 24: 3255-3266) Stephanie talked on the telephone that evening with her friend, 13-year-old Amanda. Their conversation ended a few minutes past 10:00 p.m., after Amanda's mother said to get off the telephone. (Vol. 13: RT 1442-1451)

During the night Stephen Crowe heard nothing that caused concern. (Vol. 26: RT 3653) Cheryl heard knocking or pounding on the wall. Then the door to her room "was opened and shut and opened." She did not investigate. (Vol. 26: RT 3697, 3717) The next morning family members discovered the homicide and called 911. (Vol. 26: RT 3601-3602, 3686-3687) Stephen Crowe ran to the laundry room door to guide first responders. (Vol. 26: RT 3603) He considered the laundry room door the front door to the house. He was surprised to find it locked by both the knob lock and deadbolt. (Vol. 26: RT 3605-3606, 3640) It was normally unlocked. (Vol. 24: RT 3240-3241, 3255, 3256) Stephen unlocked the door, exited and waved paramedics inside. (Vol. 26: RT 3605-3608)

### C. <u>Absence of evidence linking petitioner to the Crowe house</u>

Investigators thoroughly searched the Crowe house, including the attic and garage, for days after the homicide. (Vol. 18: RT 2320, 2322, 2326-2327; Vol. 19: RT 2475, 2477, 2499-2501, 2507-2509, 2639, 3056, 3528-3530) They processed the house extensively for fingerprints. (Vol. 25: RT 3456) Investigators used a fluorescein process to locate and document small latent bloodstains throughout the house. (Vol. 18: RT 2321, 2323, 2325, 2328-2335; Vol. 20: RT 2643-2644; Vol. 21: RT 2862, 2779-2780) They seized and impounded numerous items including knives, tools, carpets, and even parts of walls. (Vol. 19: RT 2507, 2512-2514; Vol. 20; RT 2641; Vol. 25: RT 3465) The Escondido Police Department maintained a 40-foot storage container in the police department's parking lot to store the massive amounts of evidence from this case. (Vol. 20: RT 2644-2645, 2682)

Police examined the Crowe residence for evidence of someone entering and leav-

ing. They found no sign of forced entry. (Vol. 18: RT 2264; Vol. 19: RT2454-2457, 2481-2482; Vol. 19: RT 2495, 2496-2498) Nothing seemed out of place. (Vol. 18: RT 2292) Detective Sweeney examined the window in Stephanie's room but found nothing noteworthy. (Vol. 18: RT 2283) A kitchen screen was partly open but ripe avocados just inside were not disturbed. (Vol. 18: RT 2298) Cobwebs were attached to the front double doors. Some of them extended from the stucco to the wooden door. (Vol. 18: RT 2260, 2271-2273, 2279; Vol. 20: RT 2587-2589, 2628) Officer Ray unsuccessfully tried to open the double doors. They were stuck shut. (Vol. 20: RT 2612-2613, 2626; Vol. 19: RT 2456; Vol. 24: RT 3281) Officer Ray also examined the sliding glass door in the master bedroom. It was difficult to open, moved roughly and made noise. (Vol. 20: RT 2608, 2627) The blinds on that door made noise when moved. (RT 2611) A sliding door in the kitchen was locked. (Vol. 26: RT 3643) A sliding door in the computer room did not work. (Vol. 26: RT 3645) Officers observed a dog in the garage that barked when people came around. (Vol. 16: RT 2026; Vol. 19: RT 2510; Vol.20: RT 2623; Vol. 24: RT 3280)

Police kept the Crowe family out of the house for ten days. (Vol. 26: RT 3627) After the family returned, they observed the words, "kill, kill" written in pencil on the windowsill of Stephanie's room. They notified police. (Vol. 20: RT 2689-2690; Vol. 19: 2522-2523) Police were not able to determine when these words were written, or who wrote them. (Vol. 20: RT 2722)

Investigators sent trace evidence, such as strands of hair, to Thomas Fedor, a serologist with the Serological Research Institute, for DNA analysis. (Vol. 23: RT 3172-3173) Fedor excluded petitioner as the donor of DNA found on any of 37 items he was asked to analyze in his first report. (Vol. 23: RT 3174-3175) Later, Fedor analyzed petitioner's fingernail scrapings. DNA in those samples came from petitioner, but not from any other person Fedor was asked to consider. (Vol. 23: RT 3179-3180) No fingerprints in the house matched petitioner. (Vol. 25: RT 3460, 3464; Vol. 55: RT 7070-7072)

**D. <u>Petitioner's detention and release on January 21, 1998</u>**

Several local residents made 911 calls the evening before the homicide and said petitioner knocked on their door and asked for someone. (Vol. 17: RT 2183; Vol. 18: RT

2234) Detectives assembled a photo lineup with petitioner's photo. (Vol. 20: RT 2571) Police showed neighbors the photo lineup on January 21. Then they found petitioner at a nearby strip mall. (Vol. 17: RT 2124-2125; Vol. 20: RT 2574-2575) He agreed to go the police station. (Vol. 17: RT 2126-2127; Vol. 18: RT 2239-2240, 2312-2314)

Police took hair samples and fingernail scrapings. Petitioner was searched for wounds and was photographed. (Vol. 16: RT 1971-1972, 1974, 1986, 1988-1989, 1998, 2007, 2013, 2033, 2239; Vol. 18: RT 2245-2246; Vol. 26: RT 3622) Petitioner's clothing, including a long-sleeved red turtleneck and a white T-shirt, were impounded. (Vol. 16: RT 2032-2033; Vol. 26: RT 3583-3584) Police then released him. (Vol. 18:RT 2249)

**E. <u>Evidence of petitioner's presence in the neighborhood of the homicide</u>**

On January 20, 1998, the day before the homicide, Rebecca McCaslin saw petitioner at a bus stop about 6:00 p.m. He appeared to be engaged in an animated conversation with someone who was not there. (Vol. 11: RT 1102, 1113-1114, 1139-1141) He wore a green army-type jacket, a grayish-reddish sweatshirt, a white shirt under the sweatshirt and sweatpants. (Vol. 11: RT 1112, 1120) McCaslin later learned about the homicide and told police she had seen petitioner. (Vol. 11:RT 1109-1111, 1113)

That same evening Danette Mogelinski and Frank Romanelli were at home in Escondido near Valley Center Road and a Lutheran church. (Vol. 12: RT 1332, 1353) About 7:00 p.m. petitioner knocked on the door. Mogelinski said, "Come in." Petitioner opened the door but did not step inside. He asked for Tracy. (Vol. 12: RT 1335-1336, 1345, 1354-1355) Mogelinski said Tracy did not live there. Tracy Nelson had lived there previously, but Mogelinski did not say that. (Vol. 12: RT 1338; Vol. 13: RT 1469) Petitioner shut the door. Seconds later, he reopened it and asked Mogelinski to tell Tracy that Richard stopped by. As petitioner closed the door Mogelinski locked it. (Vol. 12: RT 1338-1339, 1355) Petitioner spoke slowly. He was not loud, angry or forceful. (Vol. 12: RT 1345-1346, 1348) The next evening, police officers came by. Mogelinski and Romanelli told them about petitioner's visit. (Vol. 12: RT 1343-1344, 1355-1357)

About 7:15 p.m. on January 20th, Sharon Thomas saw a man that could have been petitioner near a church at Lake Wohlford Road and Valley Center Road. (Vol. 11: RT

1147-1148, 1150, 1152, 1161-1163) He walked through the church parking lot saying loudly, "You better never do that again. I'm going to kill you, you fucking bitch." He appeared to be under the influence. (Vol. 11: RT 1152-1155, 1165, 1169-1170)

Sheldon Homa, who lived up the hill from the Crowe residence, saw petitioner nearby about that same time. Petitioner pressed his face against a window and looked into Homa's house. (Vol. 11: RT 1178-1179, 1183-1185, 1194-1198) Petitioner said he was looking for a girl named Tracy. A girl named Tracy used to live in the area. Homa told petitioner to leave. He left. (Vol. 11: RT 1185-1188) Homa's son Shannon lived nearby. (Vol. 11: RT 1182-1183, 1204-1205.) Shannon called police, got into his truck, followed petitioner and lost sight of him. (Vol. 11: RT 1206-1208, 1210, 1219, 1220) Later, he saw petitioner standing near the center of a road spinning in a circle several times.

Between 9:00 and 10:00 that night, Patrick Green and his wife were in their trailer parked near Gary West's home. West is Patrick's father-in-law. (Vol. 12: RT 1251, 1257, 1370-1371) Petitioner pounded on the door and said, "This is Richard. I want to see your daughter." He seemed angry. Patrick Green replied there was no one there by that name. He told petitioner to leave, and he did. (Vol. 12: RT 1258-1260, 1270, 1275-1276, 1296)

Misty Green, Patrick's wife, called Gary West, her father, and learned petitioner was there. (Vol. 12: RT 1297; Vol. 13: RT 1376) West told petitioner to leave. (RT 1379) Petitioner was fidgety and did not speak in a normal manner. Patrick Green thought he was drunk or on drugs. (Vol. 12: RT 1267) Petitioner backed down the driveway, then walked over a hill 70 or 80 feet away. (Vol. 12: RT 1270-1271, 1302; Vol. 13: RT 1380) The Crowe home was about 400 yards away in that direction. (Vol. 12: RT 1254-1255, 1276-1277, 1280; Vol. 13: RT 1383; Vol. 27: RT 3856) West called police. Officer Walters arrived 45 minutes later and drove to the Crowe residence. (Vol. 12: RT 1276-1278, 1304-1305, 1383, 1386, 1406, 1408-1409) The laundry room door was open. A security light activated as he approached. (Vol. 13: RT 1414-1415, 1418-1419) Then the door closed. (Vol. 13: RT 1420-1421, 1438-1439) Walter reported the suspect was "gone on arrival." (Vol. 13: RT 1426)

About 11:00 to 11:30 p.m. that night, Elizabeth Jean Miller and Cindy Ames drove to Miller's home; both were using methamphetamines. (Vol. 13: R.T. 1476, 1507-1508) A man that looked like petitioner stood across the street from Miller's residence, near the road that leads to the Crowe's house. (Vol. 11: RT 1113-1114; Vol. 13: 1459, 1461, 1465-1471, 1475, 1501, 1512-1513, 1515, 1518-1521, 1530-1533)

The morning of January 21, 1998, Mark Doig drove to work through Escondido shortly before 5:00 a.m. (Vol. 13: RT 1540-1541) He saw petitioner walking fast, almost spastically. His shirt looked sweaty. His hair looked "stringy." (Vol. 13: RT 1542, 1547-1548) Doig reported his observation to police a day or two later. (Vol. 13: RT 1544-1545) Hope Trickey, who had known petitioner for about 15 years, saw him at Von's grocery on the morning of January 21, 1998. He came into the store about 7 a.m. He did not look sweaty. He moved slowly and minded his own business. (Vol. 14: RT 1565-1568)

**F. <u>Petitioner's search for his friend Tracy before and after the homicide</u>**

In September 1997, petitioner was at the Hogan residence in Oceanside. (Vol. 17: RT 2054-2057) When petitioner looked through a screen door, Mrs. Hogan asked what he wanted. He said nothing and walked away. (Vol. 17: RT 2068-2069) Mrs. Hogan shut and locked the inner door. Petitioner returned minutes later, ripped the latched screen door out of the molding and smashed glass high on the inner door. (Vol. 17: RT 2070-2073)

Cecilia Jachna saw petitioner on her apartment doorstep in Escondido a week or two before the homicide. (Vol. 15: RT 1813) He knocked on her front door during the day. The handle turned and the door started to open. Jachna shut it, threw the dead bolt and asked who was trying to open her door. Petitioner said, "Oh, I'm sorry, Ma'am." (Vol. 15: RT 1814) Jachna went to a balcony and asked what he wanted. He asked if Tracy was there. Jachna told no one by that name lived there. Petitioner looked confused. Jachna told him to leave. (Vol. 15: RT 1815)

On January 21, 1998, about 8:15 a.m., hours after Stephanie's body was discovered, Noralee Dremin was walking toward her apartment when petitioner came up to her. (Vol. 15: RT 1832-1834, 1843-1845) She went into her apartment, shut the door and threw the

deadbolt. She testified that if she had not done that, he would have come into her apartment. Petitioner knocked after Dremin closed the door and said, "We could get to be friends. We could talk more." He spoke in a quiet monotone and talked about a friend living in Dremin's apartment or in the area. (Vol. 15: RT 1835-1838) He did not seem angry or hostile. (Vol. 15: RT 1841) Dremin called 911. When police arrived they saw no blood on petitioner's clothing and he did not have any weapons. (Vol. 15: RT 1840, 1844-1847) The responding officer testified that petitioner was cooperative. (Vol. 15: RT 1847)

Daryl and Sandra Freitas lived next door to Dremin. (Vol. 16: RT 1873-1874) Sandra saw petitioner knocking on the door of a vacant unit. (Vol. 16: RT 1875, 1880-1881) She told him no one lived there. Petitioner said he was looking for Tracy and then left. (Vol. 16: RT 1876-1879, 1899-1900, 1900)

Victor Schroeder, who was a maintenance man at the Padre Gardens apartments in Escondido, saw petitioner on January 22 at the apartment complex banging on the door of a vacant apartment. Someone named Tracy had lived there until the end of November, when she was evicted. Schroeder told petitioner that Tracy went to Washington to get married. Petitioner mumbled incoherently and walked down the stairs. A police officer talked to petitioner behind the complex. He had no weapons and he seemed disoriented. (Vol. 13: RT 1391; Vol. 14: RT 1609-1616, 1744-1746)

On January 25, 1998, Frank Santibanez was at home when a motion detector light activated outside his house. Petitioner seemed unconcerned about the light. He went to the front door and tried to turn the doorknob on the security door. When he found it locked, he stayed on the porch. Santibanez called police, who briefly detained petitioner. Petitioner said he was looking for a friend. He had no weapons. (Vol. 14: RT 1727-1742)

On January 27, 1998, Joyce Fisher was at home in Escondido, when petitioner opened her front screen and turned the doorknob. Petitioner said he was looking for someone named Richard, or he was Richard. Fisher told him to leave but he kept trying to open the door. Fisher called police. (Vol. 16: RT 1891-1894)

Petitioner knocked on Meredith Vezina's door in February 1998. When she asked what he wanted, he said he was looking for someone. Vezina said she was the only person there. Petitioner backed off apologetically and left. (Vol. 15: RT 1807-1811)

In February 1998, petitioner was detained by police after following a 13-year-old girl and her friends from a bus stop, while calling her Tracy. Petitioner did not have a weapon. (Vol. 17: RT 2087-2114)

On the morning of February 17, 1998, Petitioner pounded on Patsy Walker's door in Escondido. She looked through the peephole and saw petitioner, whom she described as a "shaggy, transient-looking fellow." Walker asked him who he was. He said, "Tracy. Tracy," and seemed aggressive. Walker told him Tracy did not live there. She called police. Police arrived and talked to petitioner. (Vol. 15: RT 1851-1855)

On February 24, 1998, Robert Ellis, who was the property manager at the Heritage Park Apartments in Escondido saw petitioner looking in an apartment window. Petitioner told him he was looking for a friend. Ellis told him to leave. Petitioner left. Later, a resident told the assistant manager about a man in the hallway. Bishop found petitioner, whom he described as "out of it." Bishop walked him off the property. A few minutes later, petitioner returned. He seemed determined and aggressive. Bishop again walked him off the property. A few minutes later, petitioner was led into the office in handcuffs. He had been arrested after trying to push his way into the office. (Vol. 15: RT 1857-1866)

Roxanne Neal testified that on February 25, 1998, after hearing a faint knock on her door, she realized someone was turning the handle. Petitioner pressed his face against the window and looked inside. Neal hit the front door to scare him and called police. Petitioner left. (Vol. 16: RT 1912-1914)

**G. <u>Petitioner's relationship with Tracy</u>**

Tracy Nelson met petitioner around 1988 when they were teenagers. Tracy was one of petitioner's only friends, but they were never intimate. They socialized during the next few years. After that, she did not see him for several years. In 1994, she saw him at her grandfather's house. That year Tracy moved to the area in Escondido where Beth Miller

lived. Tracy saw petitioner there once. Petitioner left after Tracy's ex-husband told him to go. She said petitioner seemed a little out of it, as if he had not slept in several days. She did not see him again after that. However, her relatives occasionally received telephone calls from him. (Vol. 14: RT 1622-1634)

Tracy testified that petitioner showed up at her grandfather's house in January 1998, asking for her. Petitioner left, but returned the next day. Her grandfather told him he would call police if he came back. (Vol. 14: RT 1677-1681)

Tracy later saw petitioner on television while she was in Anaheim at a drug rehabilitation center. She talked to relatives in Escondido and learned there had been a murder and a guy named Richard was looking for a girl named Tracy. Tracy called a detective and said she might be the person Richard had been looking for. Sometime after this, petitioner telephoned Tracy at her grandfather's house. They talked about five minutes. When Tracy asked if he killed Stephanie Crowe, the line went dead. (Vol. 14: RT 1636-1653)

Tracy said petitioner was never violent and did not carry knives. (Vol. 14: RT 1667)

**H. Petitioner's other contacts with police**

On April 7, 1990, a deputy sheriff contacted petitioner in Valley Center about 11:30 p.m. (Vol. 14: RT 1591-1592, 1595-1596) He had several knives in his backpack, including folding knives.

On August 4, 1993, an Oceanside police officer contacted petitioner in Buccaneer Park and discovered that he possessed a steak knife. (Vol. 14: RT 1598-1600, 1602-1603)

On January 6, 1996, a Carlsbad police officer contacted petitioner on Carlsbad Boulevard. Petitioner possessed a steak knife with duct tape around the handle. The officer seized it. (Vol. 14: RT 1604-1606)

On January 3, 1998, about two and a half weeks before the homicide, a San Diego County deputy sheriff conducted a field interrogation of petitioner in Encinitas. Petitioner was not carrying a knife. (Vol. 15: RT 1776-1781)

Escondido police officer Steven Sanders testified for the defense that when he stopped petitioner on January 16 and January 20, 1998, he did not have a knife. (Vol. 40: RT 5113-5118)

On January 19, 1998, the day before the homicide, Officer Erdelyi stopped petitioner in Escondido. There was no notation in his report that petitioner had a weapon. (Vol. 16: RT 1921-1925)

On October 29, 2001, David Douglas contacted petitioner in Sacramento. Petitioner had a 7-inch folding knife with a 3-inch, serrated single-edged blade in his right front pants pocket. (Vol. 14: RT 1619-1621)

## I. <u>The blood evidence</u>

### a) DNA processing and testing

Investigators began processing evidence and looking for bloodstains on April 28, 1998. (Vol. 20: RT 2643, 2328-2330, 2863-2864) They moved about twenty boxes from the Crowe case storage container in the police parking lot to the main building. (Vol. 20: RT 2643, 2645-2647) Investigators examined petitioner's red shirt for visible bloodstains. Then they used an alternative light source and goggles. Finally, they applied fluorescein in an effort to detect latent stains. (Vol. 25: RT 3440) That process required the shirt to be completely wet. (Vol. 25: RT 3442) The investigators found no bloodstains on the red shirt. (Vol. 25: RT 2726-2727, 3487-3488) At the conclusion of the processing the investigators placed the red shirt in a paper bag while it remained wet. (Vol. 25: RT 3443-3444)

Investigators visually inspected petitioner's white T-shirt on April 28, 1998. They did not process it with fluorescein, a substance used to detect the presence of blood, because it had visible bloodstains. (Vol. 20: RT 2661, 2664, 2882) Those stains were given a presumptive test that indicated positive for blood. (Vol. 21: RT 2885) Police sent the white T-shirt to serologist Thomas Fedor on May 1, 1998 for DNA testing. (Vol. 23: RT 3128-3129) It was placed in a freezer until Fedor analyzed it on May 18th. (Vol. 23: RT 3132) Each bloodstain Fedor examined matched petitioner's genetic type. (Vol. 23: RT 3140) He ran additional tests on the white T-shirt in July and October 1998, with the same results. (Vol. 23: RT 3152-3154) Stephanie Crowe was excluded as a donor of DNA on that shirt. (Vol. 23: RT 3169) Stains on the lower hem of the white T-shirt were present when Fedor analyzed it in May 1998. Fedor did not test them because he did not under-

stand they were of interest. (Vol. 23: RT 3158, 3194) He returned the T-shirt to Detective Durgin in June 1999. (Vol. 23: RT 3156-3157)

Criminalist Jennifer Mihalovich examined petitioner's clothing during December 1998. (Vol. 21: RT 2730, 2739-2740, 2793-2794) She received blood samples of petitioner and Stephanie Crowe. (Vol. 21: RT 2755, 2854) She located possible bloodstains on petitioner's red shirt at the lower hem on the right front, on the right arm, and the inside right shoulder. (Vol. 21: RT 2740) They were small and had to be combined for testing. (Vol. 21: RT 2758-2760, 2763-2764) Mihalovich compared stains on the red shirt to known samples. She could exclude petitioner as a donor in area B, but could not exclude Stephanie Crowe. It was virtually certain she was the donor. (Vol. 21: RT 2776, 2779)

During 1999, petitioner's red shirt was tested by the Orchid Cellmark DNA testing firm. (Vol. 25: RT 3355-3356, 3361-3362) Mark Stolorow examined it and located five areas to be tested. He sent the shirt to Tia Fenton, a DNA analyst from Orchid Cellmark, for DNA analysis. (Vol. 25: RT 3365, 3367, 3369, 3372, 3375) Fenton combined tiny bloodstains from an area of the shirt not previously tested. The sample revealed a mixture of DNA from female and male sources. Stephanie Crowe could not be excluded as a major donor. Fenton excluded petitioner, Michael Crowe, Aaron Houser[1] and Joshua Treadway as primary sources. Petitioner was not excluded as a secondary source. (Vol. 25: RT 3417, 3419) Another stain had a DNA combination from which Stephanie Crowe was not excluded as a primary source. (Vol. 25: RT 3421)

During April 2003, Faye Springer, a criminalist with the Sacramento County Forensic Services laboratory, examined all of petitioner's clothing. (Vol. 23: RT 3202) She

---

[1] There is an apparent error, either in the testimony or in its transcription. The witness appears to say Aaron Houser can be excluded as a secondary source of bloodstain "C," then adds, "Aaron Houser cannot be definitively included or excluded as the source of the DNA obtained from stain 'C.'" (Vol. 25: RT 3422, 3427) There is no plausible theory that would place Aaron Houser's DNA on petitioner's red shirt. The problem appears again where Detective Durgin said he did not know if his tripod touched "Aaron Hauser's" shirt during the April 28, 1998, processing. (Vol. 25: RT 3499) It seems certain he meant petitioner's red shirt.

found blood on the red shirt but not enough to determine if it was spatter. (Vol. 23 RT 3203-3204) On a white T-shirt Springer observed what appeared to be three blood smears near the bottom front hem. (Vol. 23: RT 3209-3211) She recommended they be tested for DNA. (Vol. 23: RT 3234) Criminalist Connie Melton conducted the tests. Two of the smears appeared to have shared DNA of petitioner and Stephanie Crowe. (Vol. 26: RT 3532, 3547-3549, 3551-3553) Melton's calculations established to a virtual certainty that Stephanie Crowe's blood appeared on the white T-shirt. (Vol. 26: RT 3554-3555, 3581)

**b) Evidence of blood transfer during the investigation**

**1) The red shirt**

At the April 28, 1998 processing session, Detective Durgin photographed each item before fluorescein was applied. (Vol. 20: RT 2653, 2654) He used the Escondido Police Department's only tripod. That tripod was also used at the Crowe residence after the homicide. (Vol. 18: RT 2344-2345, 2661, 2725; Vol. 21: RT 2868, 2880-2881; Vol. 25: RT 3443) When Durgin photographed results of fluorescein testing inside the Crowe residence, he mounted the camera on the tripod. (Vol. 18: RT 2336, 2868) He did not use booties on it. (Vol. 20: RT 2721) Investigators started looking for bloodstains in the carpet in Stephanie's room, then worked through the house. (Vol. 18: RT 2335) Durgin could not recall if he placed a tripod leg in a bloodstain. He tried to avoid doing that, and did not believe he did. (Vol. 25: RT 3446) Rulers used by Escondido Police were also present at both the homicide scene and the April 28 processing. (Vol. 25: RT 3488)

On April 28, 1998, investigators processed petitioner's red shirt. (Vol. 20: RT 2658, 2659) That shirt is depicted in photograph number 1291, taken April 28th. A leg of the tripod appears in the photograph. (RT 2701, 2717, 3442) Durgin could not say with certainty the tripod did not touch the red shirt on April 28th. (Vol. 25:RT 3489, 3500)

After Jennifer Mihalovich, a criminalist at Forensic Science Associates, examined petitioner's red shirt in December 1998, she thought the stain in area B was "a very small drop, not a transfer." (Vol. 21: RT 2845-2846) Subsequently George Lincoln Reis, a crime scene investigator for the Newport Beach police department, conducted an examination of

photos of the red shirt taken by police on April 28, 1998 and by Mihalovich's firm later that year. Reis testified that stains located by Mihalovich were observable in the photos Durgin took in April. (Vol. 22: RT 2906-2907, 2911, 2912)

When Mark Stolorow examined the red shirt during 1999, he formed no firm opinion whether bloodstains on it resulted from direct blood spatter or from transfer. (Vol. 25: RT 3355-3356, 3378) However, he testified the stains were not really consistent with dried flecks of blood that were saturated with liquid and then penetrated the garment. He testified it was more likely the blood was wet when applied. (Vol. 25: RT 3379-3380)

**2) The white T-shirt**

Faye Springer examined petitioner's clothing during April 2003. (Vol. 23: RT 3197, 3202) She noted the white T-shirt had mirror image ink marks on each shoulder. It appeared the shirt had been folded from left to right and ink transferred from one shoulder to the other. (Vol. 23: RT 3206-3207, 3226-3227) The ink transfer was not present when Thomas Fedor examined that shirt during 1998. (Vol. 23: RT 3132, 3164-3165, 3167) Fedor believed the transfer required the presence of a solvent, like water. Moisture could have condensed on the shirt after it was removed from the freezer. (Vol. 23: RT 3167)

Springer found what appeared to be blood smears on the lower hem of the white T-shirt. (Vol. 23: RT 3209-3211, 3213) In her opinion the blood was placed on the garment while the blood was wet or at least partially wet. (Vol. 23: RT 3213, 3216) The smears were inconsistent with a defense theory that detectives tracked dried blood into petitioner's holding cell on January 21, 1998, that it was re-hydrated and smeared onto the white T-shirt when petitioner sat on the floor. (Vol. 23: RT 3219-3221; CT 2284)

The prosecutor presented evidence addressing the defense theory that blood was transferred to petitioner's clothing after the homicide. (Vol. 21: RT 2872, 2878) When Detective Sweeney initially arrived at the homicide scene he squatted down next to the body. He placed his feet carefully to avoid stepping in blood. (Vol. 17: RT 2166-2167, 2170-2175, 2306) He wore no protective clothing at the scene and wore the same clothing all day. (Vol. 18: RT 2288) Sweeney was with petitioner that evening, first at the shop-

ping mall and later at the police station. (Vol. 18: RT 2242, 2244) Sweeney stayed in the holding cell with petitioner about 15 to 20 minutes, and stood near him. (Vol. 18: RT 2247) The holding cell had a concrete floor and no seats. Sweeney never saw petitioner sit on the floor. (Vol. 18: RT 1984-1985, 2244-2245)

Officer Christensen processed petitioner at the holding cell. (Vol. 18: RT 2248) Christensen had been in the Crowe residence while the body remained at the scene. (Vol. 18: RT 1926-1927, 1930-1933) After leaving Stephanie's room, he walked around the house and to an evidence van outside. He tried to avoid stepping in blood. (RT 1957-1958) Christensen wore the same clothes all day. (Vol. 16: RT 1954) He never wore protective booties. (Vol. 16: RT 2011) He did not notice leaving tracks in or around the scene. (Vol. 16: RT 1960, 1965)

After leaving the homicide scene Christensen returned to the police station. He helped process several members of the Crowe family for evidence. (Vol. 16: RT 1970, 1972, 1974, 1976, 1980, 3622) Then he went to petitioner's holding cell. Christensen did not recall petitioner sitting on the holding cell floor. (Vol. 16: RT 2005) He did not believe he directly handled petitioner's clothing. (Vol. 16: RT 1990)

Two investigators came into contact with blood at the homicide scene. Officer Field inadvertently stepped on a bloodstain and transferred it to a piece of paper in Stephanie's room. (Vol. 21: RT 2877, 3450) Detective Merritt knelt on the carpet and got dampness on his knees. (Vol. 22: RT 3002-3003, 3069-3070) He assumed it was blood. (RT 3073, 3086-3087)

Craig Ogino, from the San Bernardino Sheriff's Department crime laboratory, testified that investigators can step on blood inadvertently. Blood seeps into the padding under a carpet. The stain on the bottom of the carpet is larger than the visible stain on top. (Vol. 22: RT 3019-3020) Pressure exerted on blood under the carpet causes it to move upward, leaving a trace on the surface. (Vol. 22: RT 3030-3032, 3400) Thus, investigators can step on blood because of the seepage without realizing it. (Vol. 22: RT 3021)

Detective Merritt testified that wetting a bloodstained garment could alter the stain's appearance. If a dried blood flake contacted a wet surface it would produce a stain. The re-hydrated flake would be lighter around the edges and darker in the center. (Vol. 23: RT 3081-3083)

**J. The cough drop and candy bar wrappers**

Officer Nowak took photos of Michael Crowe's room. One photo showed a Smith Brother's cough drop wrapper that matched a container on the kitchen counter. (Vol. 19: RT 2467) Police located a similar wrapper in Stephanie's bedroom. They did not seize these items as evidence. (Vol. 19: RT 2524, 2526, 2538) Four years later, Nowak noted for the first time a similarity between photos of Smith Brothers items in the Crowe residence and photos of items in petitioner's pockets on January 21, 1998. (Vol. 19: RT 2527-2528, 2539-2542) That brand of cough drops was not widely distributed in Southern California around the time of the homicide. (Vol. 22: RT 2918-2920, 3039-3040, 3433)

A photo of items found in petitioner's pocket on January 21, 1998 depicted a torn Snicker's candy bar wrapper. (Vol. 16: RT 1999; Vol. 23: RT 3107) It had been torn lengthwise, consistent with the way the packaging is manufactured. A Snickers wrapper in Stephanie Crowe's closet also appeared to have been torn lengthwise. (Vol. 23: RT 3095, 3115, 3119-3120.) However, an executive from the company that manufactures Snickers wrappers testified the wrapper in petitioner's pocket was different from the one in Stephanie's room. (Vol. 23: RT 3096, 3102, 3104, 3107, 3114-3115, 3122-3123)

**K. Petitioner's escape**

Jury selection started on February 2, 2004. During the lunch hour, a deputy sheriff handcuffed one of petitioner's hands to a bench and left to do paperwork. Five minutes later petitioner was gone. (Vol. 27: RT 3788-3791, 3793, 3797-3798) Petitioner left the courthouse, boarded a bus downtown, and rode it to Clairemont. (Vol. 27: RT 3828-3829, 3835-3836, 3841-3843) About 4:30 p.m., officers arrested him at a telephone booth in Clairemont. (Vol. 27: RT 3845-3847, 3949)

## DEFENSE EVIDENCE

### A. Evidence that Michael Crowe, Joshua Treadway, and Aaron Houser committed the homicide

Investigators interviewed Michael Crowe shortly after the homicide. His statements made them suspicious. (Vol. 28: RT 3994, 3996, 3999, 4008-4009; Vol. 32: RT 4337) Michael said he awoke about 4:30 a.m. on January 21st, turned on his TV, went to the kitchen to get milk and Tylenol, and returned to his room. Stephanie's door was shut. He did not see her body. (Vol. 32: RT 4330, 4336-4337, 4345-4346, 4355) This contradicted evidence that Stephanie died about midnight and her body was positioned in the open door to her room. (Vol. 19: RT 2433, 4337, 4343-4344) Subsequently, Detective Ralph Claytor learned about a milk glass in Michael's bedroom. It corroborated that Michael got up during the night. Claytor viewed Michael as a homicide suspect. (Vol. 32: RT 4340-4341)

Detectives interrogated Michael on January 23, 1998. They started before 6:00 p.m. and concluded around midnight. (Vol. 32: RT 4355; Vol. 35: 4470-4474; Vol. 36: RT 4618-4619; Vol. 38: RT 4805-4807; CT 1645) Detectives falsely claimed they found Stephanie's blood in Michael's room and repeatedly accused him of killing her. Michael denied it. (CT 1669-1670, 1673, 1684, 1700-1701, 1706) He said he loved Stephanie and was a good brother. (CT 1688-1689, 1691) A detective suggested there were "two Michaels" -- one that loved his sister, and one that needed to confront and kill an opponent. (CT 1700-1701) The bad Michael could have done the homicide. (CT 1706, 1711-1713) A detective said once people understood the bad part of Michael, the homicide would be viewed as an unconscious act. Michael could get help if people understood him. (CT 1714) Michael repeatedly denied having any memory of the homicide. (CT 1706, 1711-1713, 1716-1721, 1723, 1725-1726, 1736-1740, 1743-1744, 1761-1765, 1768, 1772)

Eventually, Michael said he knew he committed the homicide because detectives said he did it. He had no memory of it. (CT 1773-1775, 1777) A detective claimed that if law enforcement had to prove Michael did it, he would go to jail. Otherwise, he would get help. (CT 1780, 1789, 1795-1797) Michael said everything was a blur, but he had an

overwhelming feeling he killed Stephanie. (CT 1794, 1795) A detective described what prison is like and told Michael to provide details. (CT 1799-1800) Michael said it would be a lie. The detective persisted. Michael made several inculpatory statements, but ended each one by saying it was a lie. (CT 1801-1802)

Michael then said he started to resent Stephanie in the seventh grade. He blamed her for making him unpopular. (CT 1804-1806, 1813) When Stephanie had a slumber party he could hear Stephanie and her friends making fun of him. (CT 1807-1809, 1812) Michael felt unwanted. He told his parents about that. They looked at him like he was crazy. Michael felt he was "just slime." He wore black to call attention to himself. When someone referred to Michael as Stephanie's brother, he wanted to go out and kill everyone. He wished he did not have his family. (CT 1812-1813, 1815) Michael said he knew he killed Stephanie. He thought the reason he did not remember was rage. (CT 1814, 1872)

Michael had a fantasy world with three main people. One, named after the Norse god Odin, was evil, and would kill anyone. The second was neutral and fair. The third was a female character, very nice. The three people were Michael. (CT 1816-1817) He built his fantasy world to get away from Stephanie. She was a threat because she could match everything Michael did. (CT 1818, 1821) Odin gave Michael a way to vent his anger. Odin was an army general, constantly slaughtering people. Odin wanted peace but never got it. Everyone constantly fought around him. (CT 1822-1823) Michael wanted to be like Odin, who was calm and intelligent. Another fantasy character, "Dark Lord," was evil. He killed for the fun of it. (CT 1823-1824)

Michael did not remember details of the homicide, except for "pure rage." (CT 1825) On a scale of one to ten, he described the intensity of his rage that night as ten. Michael retreated into his mind and let his body take over. (CT 1826) He had horrible nightmares that night. People were being slaughtered, with blood everywhere. He awoke with a headache. His head felt as if it would explode. (CT 1827) When the rage subsided the next morning, he did not want to believe what he had done. (CT 1829) He completely

"blocked [himself] off." It could have been a dream that never happened. (CT 1871) After the interrogation concluded, the police transported Michael to juvenile hall. (CT 1877)

On January 22nd, Sergeant Lanigan went to Joshua Treadway's home to interview him. (Vol. 28: RT 4027-4028) Lanigan entered the house and saw a survival style knife on the couch. Joshua said it belonged to his brother, picked it up and took it from the room. Joshua's brother said the knife belonged to Joshua. (Vol. 28: RT 4030-4031)

On January 27, Aaron Houser's mother reported one of Aaron's knives was missing. (Vol. 28: RT 4031-4032) Police obtained warrants and searched the Treadway and Houser residences that day. (Vol. 31: RT 4173) They found two knifes under Joshua Treadway's bed. (Vol. 28: RT 4040, 4104, 4106, 4032-4033) One of them looked like the knife Lanigan saw on the couch on January 22. It was called the "Best Defense Knife." (Vol. 28: RT 4034; Vol. 31: RT 4107) Aaron identified it as the missing knife. (Vol. 28: RT 4035, 4180) Claytor arrested Joshua for stealing it. (Vol. 31: RT 4184) Joshua's mother said he obtained it about January 16. (Vol. 31: RT 4108)

Detective Claytor considered the Best Defense Knife important evidence. During the autopsy he noticed that two bones were crisply and sharply incised -- almost "scalpel-like." Claytor believed the homicide weapon was an extremely sharp knife having measurements described by the forensic pathologist. When Claytor saw the Best Defense Knife it "pretty much fit that criteria." (Vol. 31: RT 4111-4112; Vol. 32: RT 4198)

Detectives started interrogating Joshua Treadway on January 27 and continued for ten to twelve hours into the next morning. (Vol. 31: RT 4117, 4160; Vol. 32: RT 4231-4232) At times Joshua said he was tired, but the questioning proceeded. (CT 1123, 1125, 1155) Joshua initially said Michael Crowe was sometimes mad at Stephanie. Later, he said Michael often talked about killing Stephanie; everything she did made him angry. Joshua thought Michael was kidding when he said he wanted to kill his sister or mother. (CT 922-923, 943, 972, 984-985, 1056, 1057, 1112) Joshua denied involvement in the homicide. (CT 1073, 1075-1076, 1081-1085) He said the Best Defense Knife was not the murder weapon because it had been under his bed since early January. (CT 1078) He gave

several versions of how he obtained it; one version claimed he stole it from Houser. (CT 929, 934-935, 986, 1074-1075, 1081, 1096, 1136-1137; Vol. 32: RT 4259-4260)

Detectives used a pseudo lie detector they called a Computer Voice Stress Analyzer (CVSA) in the interrogation. (CT 1070) Detective McDonough claimed the CVSA detected many "challenges" to Joshua's story. (CT 1088-1089, 1097-1101) He said it indicated Joshua did not steal the knife from Houser. (CT 1095-1096)

Joshua continued to deny participation in the homicide. (CT 1102-1103, 1105-1106, 1119-1120, 1126) Detectives challenged his veracity. (CT 1106, 1119-1121, 1124, 1136-1139, 1144) They said they sensed he was the "small guy," and urged him to tell the truth so he could get a "passing grade" on the CVSA. (CT 1140-1141, 1145) Joshua changed his story and said Aaron Houser gave him the knife. (CT 1146-1147) Aaron told Joshua to dispose of it because Michael Crowe used it to kill Stephanie. Joshua took the knife home and put it under his bed. (CT 1148, 1153, 1161, 1166-1167, 1178, 1180-1181) A detective gave Joshua a CVSA "lie detector" test and said he passed. (CT 1186-1188, 1191)

Detectives interrogated Joshua Treadway a second time on February 10. (CT 1236; Vol. 33: RT 4393-4396, 4398-4400) A detective said he had questions about the first interrogation. (CT 1275) This time, Joshua claimed Aaron Houser admitted that he helped Michael kill Stephanie. (CT 1287-1288) Michael held Stephanie and kept her quiet while Aaron "took care of the rest." (CT 1295, 1300, 1307, 1313) Aaron told Joshua to prove his friendship by disposing of the knife and staying quiet. (Vol. 12: RT 1297, 1305, 1309) Joshua maintained he was not aware of a plan to kill Stephanie prior to the homicide. He learned that Michael and Aaron committed the homicide a few days after it happened. (CT 1310, 1314) Joshua said he was involved in disposing of the knife but denied any other participation. (CT 1299, 1303, 1315)

The detective expressed doubts. Joshua then said Aaron and Michael talked at school about killing Stephanie. He did not think they would do it. (CT 1316-1318, 1321) Michael said, "God, I'd love to kill my sister." Aaron said he would be happy to help. This occurred two or three weeks before the homicide. (CT 1339-1340) There was a plan.

Michael would go into Stephanie's room first to avoid scaring her. Then Aaron would do the rest. Joshua would get rid of the knife afterwards. (CT 1319-1320)

The detective said he thought Joshua was present during the homicide. Joshua denied it. (CT 1319-1320, 1322, 1325-1326) Joshua agreed to take another CVSA test. (CT 1348, 1381, 1400-1403) He continued to say Aaron Houser and Michael Crowe killed Stephanie, and Aaron gave him the knife on Super Bowl Sunday. (CT 1428) Joshua claimed Aaron threatened to kill him if he told anyone. (CT 1416) The detective continued to ask Joshua if he was present during the homicide. (CT 1388, 1409, 1432-1433, 1440, 1446, 1449) Joshua denied it. (CT 1438-1440)

The detective suggested Joshua acted as a lookout. Joshua initially denied that role, then admitted he was at the Crowe residence when the homicide occurred. (CT 1447-1450) He called Michael the evening of January 20th. Michael said to come over. (CT 1453-1454) Joshua talked to Aaron Houser on the telephone. He sneaked out and walked to Aaron's house, arriving about 11:30 p.m. (CT 1445-1448) Aaron and Joshua walked to the Crowe residence. It took about an hour. (CT 1465) While they walked, Aaron told Joshua to be a lookout. (CT 1533, 1544) Michael opened the door when they arrived. Aaron and Michael went inside. Joshua initially stayed outside, then went to the kitchen. (CT 1469, 1472, 1506, 1531, 1555-1556)

After the homicide, Michael went to the kitchen and asked why Joshua was inside. Joshua replied he did not want to stay outside in the cold. (CT 1517) Michael rinsed the knife in the sink and gave it to Aaron. Then Joshua and Aaron left together. (CT 1520) Aaron told Joshua that Michael went into Stephanie's room first and covered her mouth. Then Aaron entered the room and stabbed her. (CT 1483-1484, 1510, 1520, 1544) Aaron took the knife home to clean it thoroughly. (CT 1518, 1527, 1561) He gave it to Joshua a few days later, on Super Bowl Sunday. (CT 1484, 1511, 1519, 1572) Joshua took it home, washed it and put it under his bed. (CT 1575-1576)

///

///

**B. Defense expert testimony**

Brian Kennedy, a forensic consultant and blood stain analyst who was originally hired by the prosecution in 1998, testified for the defense. (Vol. 37: RT 4637-4639) Kennedy assembled Stephanie's bed and used a forensic mannequin to analyze the attack. The number of cuts in the comforter was roughly equal to the number of stab wounds. Cuts in the comforter were confined to a relatively small area. In contrast, stab wounds were scattered around the front, back and sides of Stephanie's upper body. Kennedy moved the mannequin to match Stephanie's wounds with cuts in the comforter. He could match cuts in the comforter with stab wounds by holding the comforter stationary relative to the bed frame while the victim rolled underneath. (Vol. 37: RT 4647, 4649-4650) Kennedy role-played ways the comforter could be held to restrain the victim. It would likely take more than one person, although it could have been only one. (Vol. 37: RT 4652, 4660, 4702, 4711) He testified that one person likely held the comforter while the other stabbed Stephanie. (Vol. 37: RT 4735)

The District Attorney also arranged to have Special Agent Mary Ellen O'Toole of the FBI behavioral science unit investigate the homicide scene in 1998 and determine whether she believed it was "organized" or "disorganized." (Vol. 38: RT 4883-4885) O'Toole's services are only available to law enforcement. (Vol. 39: RT 4934) O'Toole investigated the case thoroughly; she worked on it about 500 hours. (Vol. 38: RT 4888; Vol. 39: RT 4934)

O'Toole determined that Stephanie Crowe was a targeted victim. O'Toole based her opinion on the totality of the circumstances. Of six people in the residence, only Stephanie was attacked. Stephanie's room was in the middle of the house. The attacker had to pass other rooms to reach her. There was no evidence of sexual assault or theft. These factors, along with the nature of the injuries, indicated the perpetrator targeted Stephanie for homicide. (Vol. 38: RT 4896; Vol. 39: RT 4973-4977)

O'Toole's analysis also revealed that the crime scene was "organized." The crime involved planning. (Vol. 38: RT 4895) All wounds occurred before death. (RT 4927) The perpetrator came with the weapon and did not leave it or other evidence behind. (Vol. 39:

RT 4897, 4908-4910, 4926) The perpetrator showed familiarity with the layout of the house and left no clue as to points of entry or exit. (Vol. 39: RT 4912-4913, 4915-4918, 4920-4921) The attacker maintained control. Others in the residence were not aroused. There were no self-inflicted injuries. (Vol. 38: RT 4897-4898, 4908, 4926) In O'Toole's opinion there were likely multiple perpetrators, although it was possible for one person to have committed the homicide. (Vol. 39: RT 4928)

Gene Lawrence, a criminalist in the Sheriff's crime laboratory, specializes in trace evidence analysis of hairs, fibers, glass, paint chips, shoe prints and other crime scene evidence. (Vol. 40: RT 5119-5120) He spent about 600 hours over two years examining the trace evidence in this case. (Vol. 40: RT 5123-5128) Lawrence found nothing that connected petitioner with the inside of the Crowe residence. (Vol. 40: RT 5129)

Brian Kennedy examined petitioner's red shirt in 1999. He looked at a photo of the bloodstain in area "B" and believed that it appeared to be physically altered, like it had been diluted. The stain looked like a dry clot, "and is actually a dried piece of blood sitting on top of the material and then its been diluted and fused into the material." (Vol. 37: RT 4668, 4675) The blood was either semi-dry when it was applied, or a water-based liquid contacted the shirt and the blood was reconstituted and diffused into the material. (Vol. 37: RT 4676)

Kennedy also examined blood on area "C" of the red shirt. At first he thought it was a drip pattern. On closer examination he believed it had been transferred onto the shirt. (Vol. 37: RT 4678) The blood appeared to be diluted and diffused into the material, unlike fresh blood. If dried blood came into contact with a wet garment, or was deposited onto a garment that later became wet, Kennedy would expect this type of pattern. (Vol. 37: RT 4679) Kennedy believed that dried blood on the foot of a tripod could be transferred to a nearby garment without coming into contact with it. (Vol. 37: RT 4685-4686)

Kennedy reviewed photographs of petitioner's white T-shirt taken in 1998 and in 2003. It appeared that ink marks on the left shoulder had transferred to the right shoulder in the more recent photos. A water-based product on the shirt could have caused the transfer. In Kennedy's opinion a water-based product could change the appearance of blood-

stains. (Vol. 37: RT 4684) Freezing and thawing a garment would cause condensation that would reconstitute bloodstains and affect an analysis of those stains. (Vol. 37: RT 4685)

Psychiatrist Mark Kalish, M.D. examined Petitioner's psychiatric records from state mental institutions where he received treatment since 1994. (Vol. 39: RT 5034-5035, 5037-5038) In Dr. Kalish's opinion petitioner suffers from schizophrenia, organic brain syndrome, and methamphetamine abuse. (Vol. 39: RT 5038) Schizophrenia typically causes hallucinations, usually auditory. (Vol. 39: RT 5039-5040) The disease also frequently causes delusions, that is, false beliefs such as paranoia or grandiosity. (Vol. 39: RT 5041-5042) Other common symptoms are disorganized speech and grossly disorganized behavior. (Vol. 39: RT 5042, 5044)

PROSECUTION REBUTTAL

The prosecution presented a lengthy rebuttal to evidence that Michael Crowe, Joshua Treadway and Aaron Houser committed the homicide. Richard Leo testified as an expert on interrogations. (Vol. 49: RT 6434-6435, 6445) He explained how techniques used in this case were coercive. (Vol. 49: RT 6454, 6456-6460, 6462, 6464, 6468) Michael Crowe, Joshua Treadway and Aaron Houser denied involvement in the homicide and explained why they made inculpatory statements. (Vol. 40: RT 5135-5766; Vol. 48: RT 6290)

Gregg McCrary was called to rebut expert Mary Ellen O'Toole. He disagreed with her approach and conclusions. (Vol. 52: RT 6939, 6941-6942) At the time of trial, McCrary was a self-employed consultant. (Vol. 52: RT 6939) Until 1994 he had worked with the FBI. (Vol. 52: RT 6939-6940) He started working in the FBI's behavioral science unit when it formed in 1985 and remained there until he retired. He conducted crime scene assessments. (Vol. 52: RT 6943-6944, 6946, 6950) McCrary developed and taught methodology used by the behavioral science unit. O'Toole had been one of his students. (Vol. 52: RT 6952-6953)

McCrary agreed with O'Toole that Stephanie was a targeted, low-risk victim. (Vol. 52: RT 6955, 6964, 6979, 7009) However, he disagreed with O'Toole on nearly every other point. He believed the crime scene was more disorganized than organized. (Vol. 52:

RT 6986, 7007) He saw no evidence of control by the perpetrator. McCrary said a controlled crime scene is typically low risk for the perpetrator and high risk for the victim. Also, the perpetrator will typically conceal the victim's body. This crime scene was the opposite. (Vol. 52: RT 6965, 6967, 6972, 6978-6979.) An organized crime scene exhibits "evidence consciousness," like wiping down fingerprints or manipulating the scene to mislead investigators. McCrary saw no indication of that. (Vol. 52: RT 6968-6970, 6977) In his opinion, the Crowe homicide was a "blitz" attack, involving immediate application of force, indicating a disorganized crime scene. (Vol. 52: RT 6973-6976)

Psychologist Paul G. Mattiuzzi testified in rebuttal to the defense mental health evidence. He met twice with petitioner and reviewed his mental health records back to 1990. (Vol. 51: RT 6773-6774, 6777-6778) Mattiuzzi believed that petitioner has suffered from chronic schizophrenia for at least 15 years. (Vol. 51: RT 6779) He testified that the diagnosis does not mean petitioner has all of the symptoms that can be associated with schizophrenia. Petitioner could receive that diagnosis if he exhibited two of them. (Vol. 51: RT 6785) Mattiuzzi disagreed with Dr. Kalish that Petitioner had been diagnosed with organic brain damage. (Vol. 51: RT 6779-6781, 6783)

JURY DELIBERATIONS

On the third day of deliberations, the jury sent a note asking if lack of physical evidence placing petitioner at the Crowe residence could be a determining factor in creating reasonable doubt. The court told the jury to make that determination. (9CT 1960, 11CT 2582) Later the same day, the jury requested a partial read back of testimony given by Faye Springer, Brian Kennedy and Mark Stolorow. (9CT 1962, 11CT 2583) The read back request submitted on May 18th asked:

May we please have the following testimony read:

1) Faye Springer ¶ - Findings regarding what form blood was in when it got on white tee shirt

2) Brian Kennedy ¶ - Testimony regarding Faye Springer's findings (immed before re-direct) ¶ Testimony of how blood got on red shirt

3) Mark Stolorow ¶ - Entire testimony

(9CT 1962; 11CT 2583) The read back started the next day about 9:30 a.m. and concluded at noon. Shortly after the jury returned from lunch it sent a note indicting it was deadlocked. The note said,

> [W]e as a group of 12, cannot come to a unanimous agreement on certain blood evidence on Mr. Tuite's shirts. We have spent a majority of our time on this issue and appear to be deadlocked with no solution to be found. Without the agreement on this evidence there can be no unanimous verdict given.

(9CT 1963, 11CT 2584-2585) The jury was divided eight to four. The court ordered the jury to resume deliberations. (11CT 2585-2586; Supp. RT May 19, proceedings, 48-52)

The next day -- day five of deliberations -- the jury sent more notes. One note asked for definitions of seven words related to blood evidence. Another requested re-play of a crime scene video. (9CT 1966, 11CT 2588) The court started replaying the video that afternoon and concluded it on May 24th -- day six of deliberations. The court also provided the definitions. (11CT 2406, 2589)

On May 24, the sixth day of deliberations, the jury sent a note to the court as follows:

> May we please hear the following testimony again:
> 1) Faye Springer ¶ - portion regarding in what state blood got on white tee shirt (wet, transfer) - portion re: theory of contamination.
> 2) Brian Kennedy ¶ - Portion regarding Faye Springer's findings.
> 3) Mark Stolorow ¶ - Opinion as to how blood stains got on red shirt.

(CT 1969, 2407.) The prosecutor and defense counsel met with the court reporter to identify testimony to be read back. (Vol. 62: RT 7521-7522) There was no dispute concerning Faye Springer's testimony. The dispute concerned Brian Kennedy's testimony. The prosecution and defense each selected short portions of Kennedy's testimony for read back. (Vol. 62: RT 7523, 7528; 9CT 2000-2003) The defense did not object to the testimony selected by the prosecutor. (Vol.62: RT 7523) That testimony occurred on cross-examination. Under questioning by the prosecutor, Kennedy had conceded that Faye Springer has an outstanding reputation. (Vol. 37: RT 4765-4766, Vol.62: 7529-7530.) The prosecutor asked Kennedy about blood smears on the front hem of the white T-shirt and how they came to be there. (Vol. 37: RT 4767) The following colloquy occurred:

[Prosecutor]: Do you agree with her opinion?

[Kennedy:]: Yes, I do.

[Prosecutor]: All Right. And in all respects as to the application of the blood, either wet or semi-wet, and the way it was applied?

[Kennedy]: That's how it appears [emphasis added].

[Prosecutor]: Thank you…I have no further questions.

(Vol. 37: RT 4767)

The trial court refused to also include in the read back Kennedy's direct-examination testimony in which he testified about his review of photos of the white T-shirt which were taken in 1998 and 2003. Those photos showed that, between those dates, the ink transfer from the left shoulder to the right shoulder had occurred. (Vol. 37: RT 4684; CT 2002) Kennedy testified as follows:

[Defense Counsel:] Now, with respect to bloodstain pattern interpretations, if the item that you are examining with the bloodstain on it, if there has been an alteration of that garment in some fashion, does that hinder your ability to say what the pattern of that bloodstain was at the time it was deposited?

[Kennedy:] It depends on what you mean by "altered."

[Defense Counsel:] If--if there has been some change to the garment, such as causing ink to go from left to right, could that affect the ability to examine bloodstains on that garment?

[Kennedy:] If there is an introduction of any water-based product into that garment, yes, it would change your -- the appearance of the blood.

[Defense Counsel:] All right. Now, did--how--how would that happen? ¶ I mean, what could-- if water or water-based product is introduced to a bloodstain, can it alter that bloodstain?

[Kennedy:] Yes, it can.

(Vol. 37: RT 4684-4685; 9CT 2003) The trial court refused a defense request to have this portion of Kennedy's testimony read back to the jury. Thus, in the read back the jury did not hear portions of Kennedy's testimony that contradicted Springer's opinion about how

bloodstains were placed on the white T-shirt. (Vol. 62: RT 7522-7527, 7529)

The jury deliberated about four hours after receiving the read back transcript and before announcing its verdict. (11CT 2401, 2405)

**STANDARD OF REVIEW**

This petition is governed by 28 U.S.C. § 2254. It says:

> "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - -
>
> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Section 2254 further states that:

> "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254(e)(1).

In *Terry Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1518-1525 146 L.Ed.2d 389 (2000), the Supreme Court held that a state court decision contradicts clearly established federal law,

> "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts."

*Id.* at p. 1523. A state court decision is an unreasonable application of clearly established federal law:

> "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

*Id.*

> "Stated simply, a federal habeas court making the `unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."

*Id.* at p. 1521.

The Supreme Court need not have addressed a factually identical case to warrant relief. 28 U.S.C. 2254(d) only requires the Supreme Court has clearly determined the law. (*Alvarado v. Hill,* 252 F.3d 1066, 1068 (9th Cir. 2001).)

## ARGUMENTS

## I.

## THE TRIAL COURT VIOLATED PETITIONER'S CONFRONTATION RIGHTS WHEN IT PRECLUDED HIM FROM CROSS-EXAMINING A PROSECUTION EXPERT ABOUT HIS BIAS AGAINST A DEFENSE EXPERT HE WAS CALLED TO REBUT.

### A. The evidence of Gregg McCrary's bias

Petitioner called FBI Special Agent Mary Ellen O'Toole as a witness to provide expert crime scene analysis of the homicide scene. (Vol. 38: RT 4877) The San Diego District Attorney's office had retained O'Toole in 1998 to review the crime scene and to render an opinion about the homicide based upon the crime scene. (Vol. 38: RT 4884) O'Toole reviewed reports, photographs, and videotapes, conducted an on site viewing of the Crowe home, and spoke with investigators in-person. (Vol. 38: RT 4886-4888.) In total, O'Toole spent 500 hours working on the Crowe case. (Vol. 39: RT 4934 [O'Toole's testimony commences at Vol. 38: RT 4877].) O'Toole opined that Stephanie was a targeted victim, that the crime scene was organized, and that the murder was likely carried out by multiple assailants. These conclusions refuted the prosecution's theory of the case, which was that petitioner entered the Crowe home looking for his friend Tracy and com-

mitted the homicide alone on the spur of the moment.

In order to rebut Agent O'Toole's findings, the prosecution called former FBI Special Agent Gregg McCrary to testify. At the time of trial, McCrary was self-employed and worked on a contract basis. He had previously worked at the FBI behavioral science unit where O'Toole worked. (Vol. 52: RT 6939-6941, 6950) McCrary had helped to develop the FBI unit's methodology and had on at least one occasion taught it to O'Toole. (Vol. 52: RT 6952-6953) McCrary spent between 30 and 50 hours on the case. (Vol. 50: RT 6744) While McCrary agreed with O'Toole's characterization of Stephanie as a targeted, low-risk victim, (Vol. 52: RT 6964; 7007), he disagreed with her on nearly every other point. (Vol. 52: RT 6986, 7007)

At a pretrial hearing on the admissibility of McCrary's testimony, he was questioned about the contents of a letter he wrote to the International Criminal Investigative Analysts Fellowship, a professional organization to which he and Agent O'Toole belonged, about Agent O'Toole's participation in the Tuite case. (Vol. 50: RT 6747)

The letter, dated February 24, 2004 stated in pertinent part:

> I view the ethical issue inherent in this case to be the fact that an ICIAF member and an FBI Supervisory Special Agent, Ms. Mary Ellen O'Toole is attempting to undermine the successful prosecution of Richard Tuite who has been charged and is being tried for the murder of 12-year-old Stephanie Crowe.

(CT 646) The letter continued:

> The office of the Attorney General for the State of California and the San Diego County Sheriff's Office are working jointly to see that justice is done . . . . After a thorough and meticulous investigation they have identified the true killer, Richard Tuite . . . Both agencies are shocked and dismayed that Mary Ellen O'Toole, a representative of both the FBI and ICIAF, has injected herself into this case in what they view as an attempt to obstruct justice and undermine the successful prosecution of Richard Tuite.

(CT 646)

McCrary admitted that he knew when he wrote the letter that Agent O'Toole had been subpoenaed to testify at petitioner's trial and that she could not have testified without the approval of the FBI. (Vol. 50: RT 6748-6749, 6756, 6757) He also conceded that no one had told him they believed Agent O'Toole was obstructing justice. McCrary stated

"that was the sense" of his conversations. (Vol. 50: RT 6752)

Defense counsel argued that the letter showed McCrary had "crossed the line from being a witness to being an advocate." (Vol. 50: RT 6760-6763; Vol.52: RT 6981-6982) The trial court denied defense counsel's request to cross-examine McCrary regarding his letter and his efforts to prevent O'Toole from testifying. The court ruled the letter was "irrelevant." (Vol. 52: RT 6983) The trial court's decision barring petitioner from cross-examining McCrary about the letter violated petitioner's constitutional rights of confrontation, to a fair jury trial, and to due process under the Sixth and Fourteenth Amendments to the Constitution. (U.S. Const., 6th & 14th Amends.)

**B. <u>The California Court of Appeal ruled that the trial court violated petitioner's federal confrontation rights when it refused to let petitioner cross-examine McCrary about his bias, but found the error harmless.</u>**

The California Court of Appeal ruled that the trial court violated petitioner's confrontation rights under the federal constitution when it denied the request to impeach McCrary, citing *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). (Opinion 40.) However, the Court of Appeal found the error harmless beyond a reasonable doubt. (Opinion 41-43.)

**C. <u>The California Court of Appeal made a harmless error decision that was contrary to, and an unreasonable application of, Supreme Court harmless error precedent.</u>**

When a state court conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied the harmless error standard in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). (*Gutierrez v. McGinnis,* 389 F.3d 300, 306 (2d Cir.2004).) A federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. (*Williams v. Taylor,* 529 U.S. at p. 413, 120 S.Ct. 1495.) In petitioner's case the California Court of Appeal correctly recognized that the confrontation clause error would be harmless if it was harmless beyond a reasonable doubt. However, it applied that legal principle incorrectly and unreasonably. (Court of Appeal opinion, pp. 41-43.)

A federal court sitting in habeas jurisdiction may not grant relief on an error determined to be harmless by a state court unless the state court applied harmless-error review in an objectively unreasonable manner. (*Mitchell v. Esparza,* 540 U.S. 12, 18, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) (per curiam); *see also Inthavong v. Lamarque,* 420 F.3d 1055, 1058-1059 (9th Cir. 2005) [Under AEDPA, the federal habeas court must defer to a state appellate court's harmless error holding unless it was in conflict with the reasoning or the holdings of Supreme Court precedent or if it applied harmless-error review in an objectively unreasonable manner].) However, if the federal habeas court determines under AEDPA that the state court's harmless error holding is contrary to Supreme Court precedent or objectively unreasonable, then no deference is owed and the federal court reverts to the harmless error analysis it would apply had there been no state court holding. (*Inthavong v. Lamarque,* 420 F.3d at 1059; also see *Fry v. Pliler*, __ U.S. __, 127 S.Ct. 2321, 2327, 168 L.Ed.2d 16 (2007). Thus, to grant relief where a state court has determined a constitutional error was harmless, the Court must both determine (1) that the state court's decision was "contrary to" or an "unreasonable application" of Supreme Court harmless error precedent, and (2) that the petitioner suffered prejudice under the *Brecht v. Abrahamson* harmless error standard as a result of the error. (*Inthavong,* 420 F.3d at 1059; *Brecht v. Abrahamson*, 507 U.S. 619, 629, 113 S.Ct. 1710, 1731, 123 L.Ed.2d 353 (1993).)

The test for harmless error under AEDPA is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." (*Brecht v. Abrahamson, supra,* 507 U.S. at p. 637, 113 S.Ct. 1710; *Fry v. Pliler*, *supra,* __ U.S. __, 127 S.Ct. 2321, 2327.) An error is prejudicial and requires the state court judgment be set aside if the habeas court has "grave doubt as to the harmlessness of [the] error." (*California v. Roy,* 519 U.S. 2, 5, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996).)

Under the facts in this case, the trial court's ruling cannot be held harmless under the applicable AEDPA standard. McCrary claimed that O'Toole misapplied FBI methodology in this case and thus reached erroneous conclusions. (Vol. 52: RT 6942) The jury therefore heard testimony of two experts, using the same methodology, yet reaching contrary conclusions as to how the homicide occurred. The prosecutor encouraged the jury to

believe McCrary, who developed the methods and taught them to O'Toole. The prosecutor argued to the jury in closing:

> And you recall Mr. McCrary described to you his experience with the FBI and crime scene assessment, had I would say phenomenal, extensive, international, the number of cases he's been involved with, the number of crime scene assessments he's been involved with, and the number of times that he has testified. ¶ Ms. O'Toole doesn't have the benefit of that, of that experience. And I would submit to you that it was reflected in the work done and conclusions drawn.

(Vol. 56: RT 7233-7234)

The expert opinions proffered by Agent O'Toole and McCrary went to the heart of the issue the jury had to decide in this case – did petitioner enter the house, conceal himself from the many residents, kill Stephanie, then exit without detection, or was the homicide an "inside job" committed by a family member?

The defense asserted two factors that cast doubt on the prosecutor's theory of the case. First, although police thoroughly investigated the homicide scene, they found no evidence that petitioner had been there. (Vol. 23 RT 3179-3180, Vol. 40 5129, Vol. 55: 7070-7072, 7288.) Second, the condition of doors and windows at the Crowe residence on January 21, 1998 provided no reasonable way for petitioner to exit if he committed the homicide. (Vol. 56: RT 7282.) The prosecutor argued to the jury that petitioner exited either through the double front doors or through a sliding door in the master bedroom. (Vol. 56: RT 7250.) There were problems with both choices. Stephanie's parents slept in the master bedroom that night. (Vol. 26: RT 3653, 3697, 3717.) An investigator noted that the sliding door in the master bedroom was noisy and difficult to open. (Vol. 20: RT 2608, 2627.) Cobwebs attached to the front double doors extended from the stucco to the wooden door. (Vol. 18: RT 2260, 2271-2273, 2279, Vol. 20: 2587-2589, 2628.) An investigator testified the double doors were stuck shut. (Vol. 20: RT 2612-2613, 2626.)

The jury deliberated for seven-plus days, and more than 37 hours. (11CT 2579-2583, 2585-2589, 2404-2407.) The strongest aspect of the prosecutor's case was bloodspot evidence on petitioner's shirts, but the jury did not find it compelling. After about four and a half days of deliberations, a note to the court said the jury had spent most of its time on

the blood evidence and was deadlocked because of disagreement concerning blood on petitioner's shirts. (9CT 1963, 11CT 2584-2585.) The court inquired, learned the jury was split 8 to 4, and let deliberations proceed. (11CT 2585-2586.)

The court and counsel met with jurors in the deliberation room after the verdict. (Vol.64: RT 7551.) Juror 6 indicated that on May 24 -- day six of deliberations -- he continued to entertain doubts about petitioner's guilt. That day he noticed several charts leaning against the wall. (9CT 2005.) He examined them and believed that two lines on one of them indicated petitioner's hair was found on Stephanie's bed. Juror 6 showed other jurors what he had found. Several jurors commented on it and discussed why the chart had no exhibit tag. (9CT 2006.) The chart had not been admitted into evidence. It had been accidentally placed in the deliberation room. (Vol.64: RT 7578.)

The chart juror 6 examined was a spreadsheet prepared by Gene Lawrence, a Sheriff's Department criminalist. Called as a defense witness, he provided uncontested testimony that no trace evidence connected petitioner with the homicide scene. (Vol.40: RT 5123-5129, Vol. 63: 7560, 7576, 7589.) Lawrence prepared spreadsheets that summarized his work. Petitioner's counsel enlarged them, mounted them on poster board and used them when Lawrence testified and during argument. (9CT 2021, Vol.64; RT 7576-7577.)

A juror who will be identified as "M.J." said that after juror 6 brought the chart to the jury's attention, the jury discussed that some hairs found in the Stephanie's room were consistent with petitioner. (10CT 2350.) She added that "mitochondrial DNA was discussed, and we assumed that it meant that that was possible but that had not been done." (10CT 2350.) No evidence had been presented at trial concerning mitochondrial DNA, other than cryptic entries on a couple of areas of the chart that said, "mit DNA poss." There was no expert testimony on that topic. (10CT 2254, 2270, 2304.) When asked what caused the jury to discuss mitochondrial DNA, juror M.J. referred to the entries that said, "mit DNA poss." (10CT 2270.) M.J. works in a biology-related field and knows a little bit about mitochondrial DNA. She shared her knowledge with the jury. The jurors then discussed mitochondrial DNA. M.J. said the jurors were not sure if the testing had not been

done on the hairs, as there were no results noted. (10CT 2270.) She told a prosecution investigator.

> [W]e discussed the fact, you know, like I said, that the mitochondrial DNA possible, and I know that that's umm, a little bit about it, that it determines, umm, some DNA evidence and it's based on the mother's genetics, but that it appeared that it had not been done so that what -- how conclusive that consistency was, we talked a little bit about what -- you know, how consistent they were. And I believe we talked about that mitochondrial DNA was possible, but it appeared that it hadn't been done and that that might have been more conclusive. ¶ Because I remember I said that that's a fairly -- it's not 100 percent conclusive, but it's a little bit more narrow.

(10CT 2351.)

The post-verdict evidence described above demonstrates that jurors were literally grasping at straws in an effort resolve this difficult case. Had petitioner been permitted to impeach McCrary with the evidence of his personal bias against Agent O'Toole, his standing in the eyes of the jurors would have been significantly diminished. Had the jury understood that McCrary had a hidden agenda, and that Agent O'Toole's diligent work on this case did not contradict FBI protocol, the jury would have given O'Toole's opinions substantial weight. The California Court of Appeal made an unreasonable decision when it failed to recognize that McCrary's unimpeached opinion effectively deprived the jury of important evidence that would have helped it correctly resolve this incredibly close case in petitioner's favor. The judgment should be set aside.

## II.

## A JURY INSTRUCTION THAT TOLD THE JURY HOW IT COULD USE EVIDENCE OF PETITIONER'S UNCHARGED ACTS CREATED AN UNREASONABLE INFERENCE OF GUILT THAT VIOLATED DUE PROCESS PRINCIPLES.

### A. <u>The instruction</u>

At trial the prosecutor presented evidence of uncharged acts. It consisted of two types. One category involved petitioner's ongoing search for "Tracy." (Opinion pp. 4-6, 9-11.) The other involved evidence that petitioner sometimes possessed a knife when de-

tained by police during years before and after the homicide. (Opinion 14 and 14RT 1591-1592, 1594-1596, 1598-1600, 1602-1606, 1619-1621.) However, evidence of several detentions during January 1998 indicated petitioner did not carry a knife on those occasions, before or after the homicide. (13RT 1776-1778, 15RT 1780-1781, 16RT 1921-1923, 1925.) At an in limini hearing the trial court ruled the evidence of uncharged acts was admissible to show a common scheme or plan, but inadmissible with regard to identity, intent or motive. (1RT 58-60.)

Petitioner requested a jury instruction telling the jury how to use evidence of uncharged acts. It said, in pertinent part:

> Evidence has been introduced for the purpose of showing that the defendant committed acts other than that for which he is on trial. [...]
>
> Before you may consider such evidence, you must first determine whether the evidence shows a common plan, design or scheme by the defendant to enter into houses looking for Tracy; and/or shows a common plan, design or scheme to carry knives.
>
> If you determine that any of the acts have been established by a preponderance of the evidence, then you may consider such evidence for the limited purpose of determining whether, in furtherance of either common plan, design or scheme the defendant entered into the Crowe house looking for Tracy and/or possessed a knife on the evening of January 20, 1998.
>
> The evidence of past or subsequent acts may not be used to establish the identity of the killer nor as evidence of the intent of the killer. The evidence may not be considered on the issue whether the accused did or did not have a disposition or propensity to commit criminal acts.

(9CT 1958.) The trial court rejected that instruction. Instead, it gave a version of CALJIC No. 2.50 requested by the prosecution:

> Evidence has been introduced for the purpose of showing that the defendant committed other acts other (sic) than that for which he is on trial.
>
> Except as you will otherwise be instructed, this evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. <u>It may be considered by you only for the limited purpose of determining if it tends to show a characteristic method, plan or scheme in the commission of acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show</u>:

The defendant possessed the means that might have been useful or necessary for the commission of the crime charged;

**A clear connection between the other acts and the crime of which the defendant is accused so that it may be inferred that if defendant committed the other acts defendant also committed the crime charged in this case**.

For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. ¶ You are not permitted to consider such evidence for any other purpose.

(Emphasis added; 9CT 1902.)

In the California Court of Appeal, petitioner argued the highlighted language in CALJIC No. 2.50 created an unreasonable inference. That inference violated federal due process principles in the Fourteenth Amendment to the United States Constitution, as interpreted by the United States Supreme Court in *Francis v. Franklin,* 471 U.S. 307, 313-315, 105 S.Ct. 1965; 85 L.Ed.2d 344, 353-354 (1985). The California Court of Appeal rejected the argument. (Opinion 43-49.)

The highlighted language in CALJIC No. 2.50, above, created an unreasonable inference. That inference violated federal due process principles in the Fourteenth Amendment to the United States Constitution, as interpreted by the United States Supreme Court in *Francis v. Franklin, supra,* 471 U.S. 307, 313-315 [105 S.Ct. 1965; 85 L.Ed.2d 344, 353-354]. The decision the California Court of Appeal was contrary to, and involved an unreasonable application of, clearly established federal law.

**B. The instruction created an unreasonable permissive inference of guilt**

The inference of guilt articulated by the instruction given to the jury violated due process of law because it suggested a conclusion lacking reason and common sense in light of proven facts before the jury. (*Francis v. Franklin*, *supra*, 471 U.S. at pp. 314-315.) A jury instruction creates a permissive inference when it suggests to the jury a possible conclusion to be drawn if the prosecutor proves predicate facts, but does not require the jury to draw that conclusion. A permissive inference violates due process if the suggested conclusion is not one that reason and common sense would justify in light of the predicate facts. (*Ibid.*)

Petitioner was charged with one crime -- murder. The evidence of uncharged acts involved dramatically different kinds of conduct. The evidence showed that petitioner occasionally carried a knife, that he went to the homes of strangers asking for "Tracy," and sometimes entered or tried to enter those homes without permission. The evidence of uncharged acts involved no violence of any sort, against "Tracy" or anyone else. Conversely, the charged offense involved a brutal homicide.

Because the evidence of uncharged acts involved uniformly nonviolent events, the trial court needed to carefully tailor its instruction that told the jury how evidence of the uncharged acts could be used to resolve the murder charge. In furtherance of that goal, petitioner submitted a narrowly drawn version of CALJIC No. 2.50 that established careful limits. (9CT 1958.) It permitted the jury to use evidence showing petitioner carried a knife on other occasions to infer he may have been armed in a similar manner at the time of the homicide. It also permitted the jury to infer that because petitioner entered or attempted to enter other homes seeking Tracy, he may have likewise entered the Crowe home for that purpose. These suggested inferences had a reasonable relationship to the uncharged acts.

In stark contrast, the instruction given by the court permitted an inference that was illogical and lacked reason and common sense. The text of the instruction is set forth in section A, above. The highlighted language essentially told the jury to go through a three-step process. First, the jury should determine whether the uncharged acts tended to show a characteristic method, plan or scheme in the commission of acts similar to the method, plan or scheme used in the commission of the homicide. Second, the jury should determine whether there was a clear connection between the uncharged acts and the homicide. Third, if the jury made positive findings on the first two steps, it could infer that if petitioner committed the other acts he also committed the Stephanie Crowe homicide.

This instruction effectively told the jury that one plus one equals five. The instruction defied reason and common sense by creating an inference that permitted the jury to identify petitioner as the killer based on evidence that he sometimes carried knives, and that he went door to door and sometimes tried to enter houses in Escondido looking for "Tracy." It was illogical to permit the jury to infer from the uncharged acts that petitioner

entered the Crowe residence and commit a brutal homicide. Nothing about the uncharged acts suggested he would commit homicide. The instruction violated the trial court's in limini ruling that evidence of uncharged acts could not be used to prove the motive or identity of the killer. (Vol.1: RT 58-60.) The instruction violated federal due process because it created an unreasonable inference.

## C. <u>The conviction must be set aside using the *Brecht* standard.</u>

The unconstitutional inference was prejudicial. The prosecution needed all the help it could muster to convict petitioner. The primary factual issue was the identity of the killer or killers. Notes sent to the court indicate the jury spent most of its time making that determination. (See pages 34-37, *supra*.) It was far from certain that petitioner committed the homicide. Joshua Treadway confessed that he acted as a lookout while Michael Crowe and Aaron Houser killed her. Michael Crowe made damning admissions and confessions concerning his own involvement. (See fact summary, *supra*, pp. 26-30.)

The prosecutor had other problems to overcome. Circumstantial evidence at the crime scene suggested an "inside job," inconsistent with the prosecutor's theory that petitioner entered the Crowe home and committed the murder in a schizophrenic rage. There were no signs of forced entry. (Vol.17: RT 2166, 2255-2256.) The Crowe family failed to discover the homicide until the following morning. (Vol.26: RT 3653, 3697, 3717.) A lengthy crime scene investigation failed to discover a single piece of trace evidence to indicate petitioner had ever been inside the Crowe residence. (Vol.40: RT 5123-5128.) During deliberations, the jury sent a question asking, "May a lack of physical evidence of defendant at the crime scene (Crowe house) be a determining factor in creating reasonable doubt?" (11CT 2582.) FBI crime scene reconstruction expert O'Toole testified for the defense that the crime scene was organized, suggesting a planned murder rather than a random act. (See fact summary, *supra*, pp. 22-23.)

The strongest part of the prosecutor's case was DNA evidence found on two shirts seized from petitioner the day after the homicide. The prosecutor repeatedly argued to the jury that it could resolve the case based on DNA evidence. (Vol.56: RT.: 7112, 7134, 7192, 7222.) However, as explained at page 34 to top of page 37, *supra*, the jury had great

difficulty with that evidence. It is reasonable to believe that jurors attempting to resolve this case used the unconstitutional inference in CALJIC No. 2.50 to support the decision to find petitioner perpetrated the homicide. It provided the jury with an easy but improper way to resolve conflicts in the evidence that nearly caused a hung jury.

In this incredibly close case the constitutional error substantially and injuriously influenced the jury's verdict. Thus, the conviction must be set aside. (*Brecht v. Abrahamson, supra,* 507 U.S. 619, 637.)

## III.

## THE TRIAL COURT'S DENIAL OF PETITIONER'S MOTION TO CONTINUE THE TRIAL, AFTER DISCOVERY OF THE VICTIM'S DNA ON PETITIONER'S WHITE T-SHIRT LESS THAN TWO MONTHS BEFORE TRIAL COMMENCED, RENDERED THE TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF FEDERAL DUE PROCESS PRINCIPLES.

### A. Factual background leading to denial of the request for a continuance

The homicide occurred during January 1998, but the prosecutor continued to aggressively investigate the case late into 2003, as the trial date approached. A dramatic forensic discovery of Stephanie's DNA on petitioner's white T-shirt occurred during December 2003. Petitioner requested a continuance of the trial date, set for February 2, 2004. The continuance request arose out of events described in the following paragraphs.

The preliminary hearing ended on March 3, 2003. (10CT 2396) On April 3, a detective transported petitioner's clothing to Sacramento for an evaluation by Faye Springer. (3CT 563, 584) On June 27, Springer recommended testing the white T-shirt for DNA. (3CT 564, 590) In August, the prosecution notified the defense of its plans to conduct destructive testing on petitioner's clothing. (3CT 564; Vol. 6: RT 629) On September 19, defense expert Marc Taylor watched as cuttings were taken from the white T-shirt for later testing. (3CT 565; Vol. 6: RT 544-545, 552, 599-600, 608-609)

Connie Melton, a criminalist from the San Diego County Sheriff's Department, started the extraction process on the white T-shirt on December 8, with Taylor present. (3CT 568; Vol. 6: RT 558, 608) On December 10, the prosecution notified the defense

that Melton had found Stephanie Crowe's DNA on the white T-shirt. (3CT 568; Vol. 6: RT 559, 634) Trial was set for February 2, less than eight weeks later.

On December 18, the defense requested a continuance. The prosecution agreed. The court denied the request without comment. The defense then immediately moved to exclude the bloodstain evidence. The court set a date for a hearing on that motion. (Vol. 5: RT 533-534)

The motion to exclude evidence was heard and denied on January 14, 2004. (Vol. 5: RT 536-537.) Immediately after the court denied that motion, petitioner renewed his motion to continue the trial date. The motion was based in part on a sealed declaration submitted by petitioner's attorney William R. Fletcher. (3CT 605; Vol. 6: RT 682-683; Augment Vol. 1: CT 1-5) The defense requested 90 days in order to obtain expert analysis of the white T-shirt and to integrate the results of that analysis into petitioner's defense strategy. The defense informed the court that after the first continuance request was denied on December 18, the defense had received, on December 30, Connie Melton's report, together with printouts three to four inches thick. The defense did not receive Faye Springer's report, copies of her notes, and approximately 100 digitized photographs she took, until January 6. Springer's report was dated July 29, 2003. (Vol. 6: RT 684; Clerk's Transcript, Augment: CT 3-5)

Petitioner's trial attorneys told the court they were taking steps to get the documents and photographs received from the prosecution to defense experts for analysis. (Vol. 6: RT 684-685) Petitioner's counsel indicated that they had requested discovery of the analysis of the white T-shirt which was done in 1998 by the S.E.R.I. laboratory. The prosecution was in the process of complying with that request. Counsel argued that if forced to start the trial on February 2, the defense would not be fully apprised of factual issues regarding the white T-shirt. (Vol. 6: RT 685-686)

The prosecutor told the court that defense counsel's summary of the work that had been done up to that point was accurate. (Vol. 6: RT. 686) The prosecutor explained that the white T-shirt was "highly significant" to the prosecution's case. (Vol. 6: RT 686) The prosecutor admitted that he was surprised when he learned of the 2003 DNA test results on

the white T-shirt, because both the defense and the prosecution believed, based on the 1998 tests, that the white T-shirt was insignificant. (Vol. 6: RT 687) The prosecutor stated that he had no objection to a continuance for a reasonable amount of time. (Vol. 6: RT 687)

Judge Link then asked the prosecutor, "Do you want Justice Huffman's phone number? I'll give it to you." (Vol. 6: RT 687.)

The prosecutor replied, "I have no idea."

The court said, "I'll give it to you right now."

The prosecutor said, "I have never spoken to Justice Huffman, your honor."

The court persisted, "Or Justice O'Rourke. Maybe he would like to talk to you."

The prosecutor started to say, "I -- I --."

The court interrupted, "Look, you need somebody to talk to --"

The prosecutor said, "I am completely satisfied communicating with the court."

(Vol. 6: R.T. p. 688.) The court chastised all of the attorneys, saying,

> You want a continuance. ¶ You want a continuance. ¶ You guys, both sides, you want to put this thing off until I am off the bench and you guys are retired and new teams come in, and that's not going to happen. This thing has been (sic) over and over and over again.

The court continued,

> We were in here on [December] 18th. At that point I told you that we were going to trial. And I knew you guys might try to weasel out of it. And I am using that word "weasel," that is a legal term. So I sent you both an e-mail....

(Vol. 6: RT 688.) The court read the text of an e-mail it sent to counsel on December 22, 2003, to "make sure there are no misunderstandings about future dates involving the Tuite case." The e-mail told counsel the trial would start on February 2, 2004, no matter what. (Vol. 6: RT 689.) After reciting the e-mail, and counsels' responses to it, the court said,

> You guys had as of the 18th of December, you knew that these problems existed you, you talked to your expert, you knew what was going on, you knew

> what was out there, you had at least two months. ¶ I can make some rulings as to what you can do and what you can't do. You have got two attorneys on both sides; one is working on forensic, the other one is working on something else. ¶ I was here. Even though I was off during the holiday, I stayed in San Diego. I called my clerk every day: "What's going on?" You could have gotten ahold of me if you had any problem. Nobody got ahold of anybody. You are all sitting around sipping your eggnog and singing Christmas carols or whatever. The usual excuse that government employees use during the holidays, it's the holidays. Well, that's the way it goes. ¶ This case is starting February the 2nd. We are going to start selecting a jury on that date.

(Emphasis added; Vol. 6: RT 689-690.) The court said it would mitigate the problem by restricting comments about the white T-shirt during opening statement. (Vol. 6: RT 690.)

The refusal to grant a continuance violated petitioner's rights under the Sixth, Eighth and Fourteenth Amendments as interpreted by the United States Supreme Court in (*Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).)

**B. Denial of the request for a continuance violated petitioner's constitutional right to a fair trial and to due process.**

As the Supreme Court recognized in *Ungar v. Sarafite, supra*, 376 U.S. at p. 589, 84 S.Ct. 841, 11 L.Ed.2d 921, "[M]yopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." The trial court's denial of petitioner's request for a continuance in order to prepare a defense to the unexpected and critical evidence of DNA on petitioner's white T-shirt denied petitioner his constitutional rights to a fair jury trial and to due process. (U.S. Const, 6th and 14th Amends.)

While the grant or denial of a continuance is traditionally within the discretion of the trial judge, an insistence on expediting a case in the face of a reasonable and justifiable request for a continuance may violate a defendant's constitutional rights. Courts have determined that there is no mechanical test for determining if a denial of a continuance is so arbitrary as to violate due process. (*Ungar v. Sarafite*, 376 U.S. 575, 589.) The circumstances must be examined to determine if a due process violation has occurred.

In *United States v. Flynt,* 756 F.2d 1352 (9th Cir. 1985), the court outlined "four salient factors that appellate courts have considered in reviewing denials for requests for

continuances." (*United States v. Flynt, supra*, 756 F.2d at pp. 1358-1359.) First, the court should consider the extent of the party's diligence in efforts to prepare a defense prior to the date of the trial. Second, the court should consider how useful the continuance would be in addressing the need. Third, the court should consider how granting the continuance would have inconvenienced the court and the opposing party. Fourth, a court must consider the harm the petitioner suffered as a result of the court's denial of the continuance. (*Ibid.*) Each of these factors weighs in petitioner's favor.

**1) The diligence of petitioner and his counsel.**

The chronology of discovery of Stephanie's DNA on the white T-shirt, and the defense response to that discovery, is set out in the Declaration of William R. Fletcher in Support of Motion to Continue Trial Pursuant to Penal Code § 1050. (Augment Vol. 1: CT 1-5)) The prosecution did not contest the accuracy of that declaration. The prosecutor stated, "The amount of work that has been described by the defense counsel is entirely accurate." (Vol. 6: RT. 686) Thus, the prosecutor agreed that petitioner's trial counsel acted with diligence after the discovery of Stephanie's DNA on the white T-shirt.

The discovery of Stephanie's DNA on petitioner's white T-shirt changed the dynamics of the case. Up to that point, Stephanie's DNA on the red shirt constituted the primary evidence that implicated petitioner in the homicide. Detection of Stephanie's DNA on the white T-shirt required the defense to re-think its strategy for attacking all of the DNA evidence. (Vol. 6: RT 687, Fletcher declaration, p. 4.) The prosecutor recognized that defense counsel needed a reasonable continuance to process the new evidence. (Vol.6: RT 686.) It was not the fault of petitioner's counsel that DNA was discovered on the white T-shirt less than two months before trial. The prosecution delivered petitioner's clothing to Faye Springer in April 2003 but did not complete the DNA test until December 10, 2003. Petitioner's counsel acted expeditiously after learning of the discovery.

**2) Usefulness of the continuance in addressing the need**

A showing of usefulness is established if the defendant probably could have found an expert to assist his defense had the continuance been granted. (See e.g. *United States v. Barrett*, 703 F.2d 1076, 1081 (9th Cir. 1983); cf. *United States v. Hoyos*, 573 F.2d 1111,

1114 (9th Cir. 1978) (party seeking the continuance could not show that prospective witnesses could be produced had the continuance been granted); *Powell v. United States*, 420 F.2d 799, 801 (9th Cir. 1969) (party seeking continuance could not show that witnesses could be found within a reasonable time); *United States v. Hernandez*, 608 F.2d 741, 746 (9th Cir. 1979) (proper to deny a continuance when party could not demonstrate the desired testimony could be obtained.) Here, petitioner demonstrated at a motion for new trial that he could have obtained extremely helpful testimony had the court granted a reasonable continuance.

After the guilty verdict, petitioner's counsel arranged for county funds to further evaluate DNA evidence on the white T-shirt. Counsel located MacDonell, an expert with good credentials. (Vol. 65: RT 7607.) Partly because of MacDonell's busy schedule, the process took about two-and-a-half months. (Vol. 65: RT 7608.) At the time of the motion for new trial MacDonell's evaluation was incomplete. However, he had determined the stain on the hem of the white T-shirt was consistent with three possible interpretations, not just two as Faye Springer opined. (Vol. 65: RT 7608.) This evidence established that the continuance would have been useful. The importance of McDonnell's opinion is further explained in section 4, below.

**3. Inconvenience to the court and the opposing party**

The prosecution did not oppose the motion for a continuance. The prosecutor informed the court, "If a continuance were granted by this court, and I realize this court has said many times that you don't want a continuance granted, but if one were to be granted, if it was for a reasonable period of time, the people would have – certainly have no objection." (Vol. 6:RT 689) There is no indication in the record that the prosecution would have been inconvenienced by a continuance.

With regard to the court, the record indicates that Judge Link was impetuously predisposed to deny the request for a continuance from the outset. (Vol. 6: RT 682) The judge seemed determined to have the trial begin on the scheduled date, no matter what reason might arise that would require a continuance. The frustration of a trial judge cannot outweigh petitioner's need for a reasonable amount of time to prepare for critical evidence

that was disclosed very near the commencement of trial. Neither the prosecution nor the trial court would have been inconvenienced by the continuance requested by petitioner.

**4. Petitioner was prejudiced by denial of the continuance**

In order to demonstrate that the trial court's denial of a continuance was reversible error, petitioner must show he suffered actual prejudice. (*United States v. Flynt, supra,* 756 F.2d at pp. 1361-1362.) Such "actual prejudice" is shown where the defense demonstrates that a continuance would have made relevant witnesses available or would have "added something to the defense." (*U.S. v. King*, 127 F.3d 483, 487 (6th Cir. 1997); see also *U.S. v. West*, 828 F.2d 1468, 1471 (10th Cir. 1987) [the defendant was prejudiced by the denial of a continuance where the denial resulted in the absence of potentially favorable testimony critical to the defense.].) In petitioner's case, prejudice has been shown.

At the hearing on the motion for new trial, petitioner presented the declaration of criminalist Herbert MacDonell. (10CT 2281-2282.) MacDonell opined that blood on the white T-shirt was consistent with a dampened shirt coming in contact with dried blood flakes. He could not eliminate Springer's theory that Stephanie's blood was applied to the white T-shirt either wet or semi-wet. (10CT 2358.) However, MacDonell's opinion provided much-needed support for petitioner's theory that dry blood flakes re-hydrated when they contacted the wet white T-shirt in the holding cell on January 21, 1998. Petitioner needed MacDonell's opinion at trial to counter Faye Springer's testimony that the bloodstains could not have been applied to the white T-shirt in that manner. (10CT 2284, 2357-2358; Vol.23: RT 3219-3221.) Counsel explained why absence of this evidence was prejudicial:

> At the time of the motion continuing up to trial the prosecution had in excess of 350 witnesses on its witness list. Ultimately, in excess of 170 witnesses testified at trial. Due to the breadth and enormity of the expected evidence, the defense did not have the opportunity to fully evaluate the new evidence concerning the "white shirt." The testimony of Brian Kennedy was offered challenging the reliability of the observations made by Faye Springer due to the degradation of the shirt over the previous five years. However, when the jury asked for read-back of this testimony, the court disallowed it.

> Based upon the witnesses presented by the prosecution, the arguments of the prosecution and the questions of the jury, the manner in which the blood on the "white shirt" was deposited became the central issue in the case. The defense was able to present evidence that two officers who had walked through the crime scene, thus likely stepping in Stephanie Crowe's blood, had come into contact with Mr. Tuite in the EPD holding cell the afternoon the body was discovered. However, the defense did not have sufficient time to obtain an independent evaluation of Faye Springer's findings so as to meaningfully challenge her "wet or semi-wet" opinion, thus the opinion went un-rebutted resulting in part in the guilty verdict reached by the jury.
>
> Since the verdict the defense sought out an independent criminalist previously unrelated to this case with a substantial nationally recognized reputation. Authorization for fees for this expert was sought from the county and materials were put together and sent off for his evaluation. Mr. MacDonell has not concluded his examination of all issues presented, however, one of his findings is that the microscopic photographs of the blood stain on the "white shirt" are consistent with the dampened shirt coming in contact with dried blood flakes. The significance of this conclusion is huge in the defense of Mr. Tuite. The evidence was clear and un-refuted that Mr. Tuite was transient living in the streets and alleys of Escondido. The evidence was clear and un-refuted from Cheryl Crowe that it rained during the day the body was found. Mr. Tuite was picked up in the afternoon and placed in the holding cell at EPD. Officer Sweeney and Christinsen (sic), both of whom walked through the crime scene, walked in the holding cell on multiple occasions over the course of several hours. Ms. Springer rejected the possibility that the bloodstains on the hem of the "white shirt" could have been the result of the dampened shirt coming into contact with dried blood. Mr. MacDonell refutes that opinion.

(10CT 2283-2284.)

The evidence of Stephanie Crowe's DNA on the white t-shirt was important prosecution evidence. As trial counsel explained, the defense sought a continuance in order to find a DNA expert with excellent credentials to rebut the opinion of prosecution expert Faye Springer. Had the court granted the requested continuance, the testimony of Herbert MacDonell would have been available.

Had petitioner presented that testimony to the jury, he would likely have obtained an acquittal. Notes sent to the court by the jury during deliberations indicate the jury likely decided to convict petitioner based upon Faye Springer's opinion that Stephanie's blood was applied to the white T-shirt in a wet or semi-wet condition. (See pp. 34-37, *supra.*)

The second jury note seeking read back of Springer's testimony demonstrated the jury had focused on that portion of her testimony. (9CT 1969, 11CT 2407.)

Had the trial court granted a continuance, petitioner's trial counsel would have been prepared to address the pivotal question of how Stephanie's blood was applied to the white T-shirt. MacDonell's declaration contained an opinion not available to the defense at trial -- that blood on the white T-shirt was consistent with a dampened shirt coming in contact with dried blood flakes. (10CT 2358.) That opinion supported a defense theory debunked by Springer -- that dry blood flakes touched petitioner's wet shirt at the holding cell and re-hydrated. (10CT 2283-2284, 2358; Vol. 23: RT 3219-3221.) In this close case the error in denying a continuance substantially and injuriously affected the jury's verdict. Thus, the conviction must be set aside. (*Brecht v. Abrahamson, supra,* 507 U.S. 619, 637.)

## IV.

## THE CUMULATIVE EFFECT OF ERRORS COMMITTED AT PETITIONER'S TRIAL RENDERED THE PROCEEDINGS FUNDAMENTALLY UNFAIR, IN VIOLATION OF FEDERAL DUE PROCESS PRINCIPLES.

The cumulative effect of errors committed at trial violated petitioner's right to Due Process of Law under the Fourteenth Amendment to the United States Constitution, as interpreted by the United States Supreme Court in *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [94 S.Ct. 1868, 40 L.Ed.2d 431]. The trial court committed multiple errors. It refused to continue the trial date to provide adequate time to prepare a defense to newly discovered prosecution evidence. The court included in its jury instructions an unreasonable inference that gave the jury an unconstitutional theory to convict petitioner. The court violated petitioner's confrontation rights when it refused to permit impeachment of prosecution witness McCrary with evidence of his efforts to keep defense expert O'Toole from testifying. Prejudice resulting from these errors is explained in each individual argument.

The impact of these errors should also be considered cumulatively. The errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (*Donnelly v. DeChristoforo, supra,* 416 U.S. at 643, and see *Matlock v. Rose* (6th Cir. 1984) 731 F.2d 1236, 1244 ["Errors that might not be so prejudicial as to amount

to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair"].)

## CONCLUSION

For all the foregoing reasons, petitioner respectfully requests that his petition for writ of habeas corpus be granted.

Respectfully submitted,

JEROME P. WALLINGFORD
Attorney for Petitioner,
Richard Raymond Tuite

PROOF OF SERVICE

I am over the age of 18 years and not a party to the subject action. My business address is 13223-1 Black Mountain Road, PMB-297; San Diego, California 92129. I served the foregoing PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254 AND ATTACHED MEMORANDUM OF POINTS AND AUTHORITIES by placing copies thereof in separate envelopes for each addressee named hereafter, addressed as follows:

Attorney General of the State of California
P.O. Box 85266
San Diego, CA 92186-5266

Each envelope was then sealed and with postage thereon fully prepaid deposited in the United States mail by me at San Diego, California, on June 23, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: June 23, 2008 ____________________

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED
2008 JUN 23 AM 11:09
CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ____ DEPUTY

**I. (a) PLAINTIFFS**
Tuite, Richard Raymond

**(b)** County of Residence of First Listed Plaintiff Amador
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Jerome P. Wallingford, 13223-1 Black Mountain Road, PMB 297; San Diego, CA 92129 Tel. 858-484-2387

**DEFENDANTS**
Martel, Michael; Warden Mule Creek State Prison

County of Residence of First Listed Defendant Amador
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known) '08 CV 1101 J CAB
California Attorney General, P.O. Box 85266, San Diego, CA 92186-5266 Tel. 619 645-2275

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☒ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
28 U.S.C § 2254
Brief description of cause:
habeas corpus petition by a prisoner in state custody

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
**DEMAND $** Set aside State criminal conviction
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): n/a
JUDGE ____ DOCKET NUMBER ____

DATE June 23 2008
SIGNATURE OF ATTORNEY OF RECORD [signature]

**FOR OFFICE USE ONLY**

RECEIPT # 152169 AMOUNT $5.00 APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____

<-i,Ac 6/23/08

Cf

**UNITED STATES**
**DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 152169 - TC**
*** * C O P Y * ***
**June 23, 2008**
**11:07:49**

**Habeas Corpus**

Amount.: $5.00 CA

**Total--> $5.00**

FROM: TUITE, RICHARD RAYMOND
VS.
MARTEL MICHAEL; WARDEN MULE
CREEK STATE PRISON