EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GARY W. SCHONS
Senior Assistant Attorney General
KEVIN VIENNA
Supervising Deputy Attorney General
LYNNE G. MCGINNIS, State Bar No. 101090
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
P.O. Box 85266
San Diego, CA 92186-5266
Telephone: (619) 645-2205
Fax: (619) 645-2191
Email: Lynne.McGinnis@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RICHARD RAYMOND TUITE,**<br>Petitioner,<br>**v.**<br>**MICHAEL MARTEL, Warden,**<br>Respondent. | 08-1101 J (CAB)<br>**ANSWER TO PETITION**<br>Judge: The Honorable Cathy Ann Bencivengo |

COMES NOW RESPONDENT, Michael Martel, Warden, Mule Creek State Prison, by and through his counsel, Edmund G. Brown, Jr., Attorney General for the State of California, and Lynne G. McGinnis, Deputy Attorney General, and makes this Answer pursuant to this Court's June 30, 2008, Order Requiring Response to Petition. Respondent hereby asserts:

1. Petitioner is lawfully in Respondent's custody at Ironwood State Prison, serving a term of thirteen years, following his conviction for voluntary manslaughter (Cal. Penal Code § 192(a)), with true findings that Petitioner personally used a deadly and dangerous weapon, a knife (Cal. Penal Code § 12022(b)) and that he served a prior prison term (Cal. Penal Code § 667.5).

2. Petitioner filed a direct appeal of his conviction and sentence with the California Court of Appeal, Fourth Appellate District, Division One, in case number D044943. The California Court of Appeal affirmed Petitioner's conviction and sentence.

3. Petitioner filed a petition for review in the California Supreme Court, case number S149645, raising all of the claims raised in the instant Petition. The petition for review was denied. Thus, those claims are exhausted.

4. The Petition is timely.

5. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), applicable to this case, the instant Petition should be denied as Petitioner has failed to allege or show that the claims raised here involved an unreasonable application of federal law as determined by the United States Supreme Court, or an incorrect or unreasonable determination of the facts by the state courts.

6. Petitioner has failed to rebut, by clear and convincing evidence, the presumption that the factual findings of the California state courts are correct. Petitioner is not entitled to an evidentiary hearing. 28 U.S.C. § 2254(e).

7. The relevant facts are set forth in the accompanying Memorandum of Points and Authorities which is incorporated herein by reference. Except as expressly admitted, Respondent denies each and every contention and allegation in the Petition, denies that Petitioner's confinement is, in any way, illegal, and denies that any of Petitioner's rights have been, or are being, violated in any way.

///

///

///

WHEREFORE, for the reasons set forth in this Answer and in the Memorandum of Points and Authorities filed in support of this Answer and incorporated herein by reference, Respondent respectfully requests that this Court deny Petitioner an evidentiary hearing, deny the Petition, dismiss the proceedings with prejudice, and decline to issue a certificate of appealability from its ruling.

Dated: August 19, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GARY W. SCHONS
Senior Assistant Attorney General

KEVIN VIENNA
Supervising Deputy Attorney General

s/Lynne G. McGinnis

LYNNE G. MCGINNIS
Deputy Attorney General
Attorneys for Respondent

LGM:ms
70134136.wpd
SD2008801733

**CERTIFICATE OF SERVICE**

Case Name: **Richard Raymond Tuite v. Michael Martel, Warden**

No.: **08-1101 J(CAB)**

I declare:

On August 21, 2008, I electronically filed the following document(s):

- **ANSWER TO PETITION**
- **MEMORANDUM OF POINTS AND AUTHORITIES**

## Electronic Mail Notice List

I have caused the above-mentioned document(s) to be electronically served on the following person(s), who are currently on the list to receive e-mail notices for this case:

Jerome P. Wallingford
jwallin2@san.rr.com

## Manual Notice List

The following are those who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing):

**NONE**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 21, 2008, at San Diego, California.

| Lynne G. McGinnis | s/Lynne McGinnis |
| --- | --- |
| Declarant | Signature |

SD2008801388
70134322.wpd

EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GARY W. SCHONS
Senior Assistant Attorney General
KEVIN VIENNA
Supervising Deputy Attorney General
LYNNE G. MCGINNIS, State Bar No. 101090
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
P.O. Box 85266
San Diego, CA 92186-5266
Telephone: (619) 645-2205
Fax: (619) 645-2191
Email: Lynne.McGinnis@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RICHARD RAYMOND TUITE,** Petitioner, **v.** **MICHAEL MARTEL, Warden,** Respondent. | 08-1101 J (CAB) **MEMORANDUM OF POINTS AND AUTHORITIES** Judge: The Honorable Cathy Ann Bencivengo |

EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GARY W. SCHONS
Senior Assistant Attorney General
KEVIN VIENNA
Supervising Deputy Attorney General
LYNNE G. MCGINNIS, State Bar No. 101090
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
P.O. Box 85266
San Diego, CA 92186-5266
Telephone: (619) 645-2205
Fax: (619) 645-2191
Email: Lynne.McGinnis@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RICHARD RAYMOND TUITE,**<br>Petitioner,<br>**v.**<br>**MICHAEL MARTEL, Warden,**<br>Respondent. | 08-1101 J (CAB)<br>**MEMORANDUM OF POINTS AND AUTHORITIES**<br>Judge: The Honorable Cathy Ann Bencivengo |

## INTRODUCTION

The night of January 20, 1998, during a desperate and increasingly-frenzied search for a former girl friend, Petitioner walked into the Crowe house in Escondido and stabbed twelve-year-old Stephanie Crowe to death in her bed as family members slept nearby.

Petitioner appealed his conviction and sentence to the California Court of Appeal, Fourth Appellate District, Division One, which upheld it. He has now filed a Petition for Writ of Habeas Corpus in this Court. The Petition, which merely re-alleges most of the claims made and rejected on direct appeal, is meritless and should be denied.

///

## STATEMENT OF THE CASE[1/]

On May 26, 2004, a San Diego County Superior Court jury found Petitioner guilty of voluntary manslaughter as a lesser-included offense to murder. (Cal. Penal Code § 192(a).) The jury also found true an allegation that Petitioner used a deadly or dangerous weapon, a knife. (Cal. Penal Code § 12022(b).) (63 RT 7540; 9 CT 1974; 11 CT 2403.)

At a bifurcated proceeding, the state trial court found that Petitioner served a prior prison term within the meaning of Cal. Penal Code § 667.5(b). (65 RT 7633-34; 11 CT 2591.)

On August 25, 2004, the court sentenced Petitioner to state prison for a total term of thirteen years. (65 RT 7651; 10 CT 2359; 11 CT 2592.)

Petitioner appealed his conviction and sentence. In an unpublished opinion filed on December 14, 2006, the California Court of Appeal, Fourth Appellate District, Division One, affirmed the judgment. (Lodgment 6.)

Petitioner filed a petition for review in the California Supreme Court, case number S149654. (Lodgment 7.) On March 28, 2007, the California Supreme Court denied the petition without comment. (Lodgment 8.)

On June 23, 2008, Petitioner filed the instant Petition for Writ of Habeas Corpus in this Court.

## STATEMENT OF FACTS[2/]

***Overview***

On January 21, 1998, at around 6:00 a.m., Stephanie Crowe was discovered lying in the doorway of her bedroom; she had been stabbed in her bed and had managed to crawl to the door before dying. Stephanie had nine stab wounds, two of which were fatal: one severed a major artery

---

1. Copies of the entire record of the proceedings in the state courts are being simultaneously lodged in this case. Citations to "CT" refer to the Clerk's Transcript, citations to "Supp. CT" refer to the Supplemental Clerk's Transcript, and citations to "RT" refer to the Reporter's Transcript. Additional description of the facts, with page references to the trial record, is in the respondent's brief from the direct appeal. (Lodgment 4.)

2. The Statement of Facts is taken form the Opinion of the California Court of Appeal, Fourth Appellate District, Division One. 28 U.S.C. § 2254(e)(1).

and caused external bleeding; and the other perforated a lung and caused blood to accumulate in the chest cavity. None of the nine wounds was below her chest. The condition of the body indicated Stephanie had died at least six hours before she was discovered.

Although Escondido police detained Petitioner, who was a transient, because of his strange behavior in the Crowes' neighborhood the previous evening, police soon focused their investigation on Stephanie's older brother, Michael Crowe, then fifteen years old, and two of his friends, Joshua Treadway and Aaron Houser.[3/]

In May 2002 the Attorney General charged Petitioner with murdering Stephanie.

In essence, Petitioner's trial, which began in February 2004, became a trial within a trial, as Petitioner primarily presented a third-party culpability defense-namely, that Stephanie's brother and his friends killed Stephanie. Thus, while the prosecution in its case-in-chief linked Petitioner to the homicide by presenting circumstantial evidence, including evidence that Stephanie's blood was on his clothes, Petitioner's case-in-chief consisted largely of evidence, developed by the Escondido police, that Michael and his two friends killed Stephanie. Petitioner also defended against the blood evidence by presenting evidence that Stephanie's blood was found on his clothes as a result of contamination caused by careless police work. In its rebuttal case, the prosecution essentially presented a defense of Michael and his friends. The following sets forth in greater detail the evidence presented in each party's case.

***Prosecution Case-In-Chief***

One afternoon in early January 1998, Petitioner knocked on the door of Cecilia Jachna's residence. Before Jachna responded, Petitioner turned the door handle and tried to enter the house. Jachna shut the door, locked it with a deadbolt and asked Petitioner why he was there. Petitioner asked if "Tracy" was home. Jachna told Petitioner no one named Tracy lived with her. Petitioner left after Jachna repeated herself a couple of times and ordered him off her property.

"Tracy" was Tracy Nelson, who became friends with Petitioner in 1987 or 1988; they had both used crystal methamphetamine at the time. The friendship lasted until 1994, when Nelson

---

3. These three teenagers will be referred to as Michael, Joshua, and Aaron, respectively.

moved to a residence on East Valley Parkway in an area commonly known as the "Ranch." The Ranch was located near the Crowe residence. The last time Nelson saw Petitioner was when he showed up at the Ranch. Nelson's then-husband told Petitioner to leave.

On the evening of January 20, 1998 - the night Stephanie was killed - Petitioner went to a home in the Ranch, which was then occupied by Danette Mogelinski, Frank Romanelli and Frank's daughter, Jessica. Petitioner knocked on the door. Assuming it was a neighbor, Mogelinski said, "It's open, come in." Petitioner opened the door and asked for "Tracy." When Mogelinski said she did not know anyone named Tracy, Petitioner shut the door. A few seconds later, Petitioner reopened the door without knocking and asked: "Are you sure you don't know where 'Tracy' is? Richard is looking for her." Petitioner stared into the house as Mogelinski closed and locked the door.

Petitioner headed up a hill to a duplex near Valley Center Road and Lake Wohlford Road, which was occupied by Sheldon Homa, his son Shannon and his daughter-in-law Dawn. Petitioner pressed his face against the window of Sheldon's unit and looked inside. Grabbing an axe for protection, Sheldon ran outside and asked Petitioner what he wanted. Petitioner said he was searching for a girl named "Tracy" and that Mogelinski had suggested he check for her at the Homa residence. Sheldon told Petitioner he was lying and ordered him to leave.

Sheldon went to his son's unit and asked him to telephone the police. Shannon and Dawn decided to follow Petitioner in their car. Petitioner walked down Valley Center Road, went to the parking lot of the Lutheran church, walked over to Lake Wohlford Road and stood in the road with his hands in the air, walking in circles.[4/]

Escondido Police Officer Barry Ososkie responded to the Homas' call and arrived at the Lutheran church at 8:15 p.m. Ososkie did not see Petitioner and "closed out" the call.

Between 9:00 and 10:00 p.m., Petitioner approached the Green/West property, which was between one-quarter and one-half mile away from the Crowe residence, banged on the door of a

---

4. Other witnesses also testified that Petitioner was behaving in a bizarre manner. For example, Rebecca McCaslin testified she saw an agitated Petitioner at a bus stop at around 6:00 p.m. on January 20; he was walking around, talking to himself and pointing in the air.

trailer and yelled: "This is Richard, I want to see your daughter Tracy." Patrick Green, who lived in the trailer with his wife and daughters, told Petitioner no one named Tracy lived there and ordered him to leave. However, Petitioner, who appeared intoxicated, insisted Tracy was there and kept banging on the door. Green grabbed his pellet gun, and he and wife went outside to warn his father-in-law, Gary West, who lived in the main residence with his wife. Petitioner banged on the Wests' door and said, "I want to see the girl." West ordered Petitioner to leave and said he was calling the police. Petitioner walked backwards down the driveway, staring at West and the Greens. Then, he turned around and headed up the road leading to the Crowe residence. West went inside and telephoned the police.

Responding to West's call, Escondido Police Officer Scott Walters drove around the area looking for Petitioner but did not see anyone. Walters circled the Wests' driveway in his patrol car and then drove to the Crowe residence. Walters noticed the door leading from the laundry room to the interior of the house was open.[5/] As Walters circled the Crowes' driveway, his patrol car activated the sensor light above the exterior laundry room door, and the door closed from the inside. Because he did not see Petitioner, Walters considered it a no contact call, and left. He listed the suspect as "gone on arrival."

Inside the Crowe residence, the evening of January 20 had been fairly routine. Stephanie's uncle, Michael Kennedy, had visited the Crowes and left about 9:00 p.m. through the laundry room door. Michael Kennedy left the door unlocked. Stephanie watched television and later spoke on the telephone with her best friend until a few minutes past 10:00 p.m. Stephanie's younger sister, Shannon Crowe (Shannon), also watched television. Shannon shared a bedroom with her maternal grandmother, Judith Kennedy; both of them went to bed about 9:00 p.m. As he often did, Stephanie's brother, Michael, spent most of the evening in his bedroom. Stephanie's father, Stephen Crowe (Stephen), had a headache when he got home after work and went to bed early. Stephanie's mother, Cheryl Crowe (Cheryl), went to bed about 10:00 p.m. The Crowes always shut their

---

5. The laundry room door, which the family commonly used to go in and out of the house, was considered the front door to the house.

bedroom doors at night as a fire precaution.

During the night, Cheryl heard knocking or pounding on the wall, and the door to the master bedroom "was opened and shut and opened." She did not investigate. Michael also heard pounding on the laundry room door; he thought someone had answered the door, and he went back to sleep.

After Stephanie's body was discovered at around 6:30 the following morning by Judith, Stephen called 911. He then ran outside to direct the first emergency responders. Stephen was surprised to find the laundry room door locked - by both the knob lock and the deadbolt - because the door was normally unlocked.

The Crowe family gathered in the living room after the police arrived to begin their investigation. At one point, Michael told his family that he had awakened with a headache at 4:30 a.m. and went to the kitchen to get Tylenol and a glass of milk. Although Michael would have passed Stephanie's room on the way to the kitchen, he did not see her in the hallway; instead, he said he thought her door was closed.

Police took members of the Crowe family to the police station for interviews. Police began an extensive investigation of the homicide scene, looking for evidence in the Crowe residence; the Crowe family was not allowed to return for ten days. Investigators used a fluorescein process to locate bloodstains throughout the house, and they searched the house thoroughly for fingerprints. Police seized and impounded numerous items, including knives, tools, carpets, and portions of walls. Police found no sign of forced entry.

Also that morning, the detectives were informed that many nearby residents had telephoned 911 the previous evening, complaining that a transient had knocked on their doors, looking for someone. After Petitioner was identified in a photo lineup as that transient, police found him in a nearby strip mall. Petitioner agreed to go to the police station, where police questioned him, took hair samples and fingernail scrapings, took photographs and impounded his clothes, including a long-sleeved red turtleneck (the red shirt) and a white T-shirt, in exchange for new clothes. This took place while Petitioner was in a small holding cell with a concrete floor and no furniture. Petitioner handed his clothes to Officer Scott Christensen, who placed each item of clothing in a

separate bag. The bags sat open on the concrete floor before they were sealed. Earlier in the day, Christensen had been at the crime scene, where he videotaped the interior and exterior of the Crowe residence. Christensen had not placed protective booties over his shoes when he videotaped the Crowe residence, and did not change his shoes before walking into Petitioner's holding cell. Other police officers, who also had been at the crime scene and did not wear protective booties over their shoes, walked into the holding cell when Petitioner was present. After processing Petitioner, police released him.

Police sent trace evidence collected at the Crowe residence, such as strands of hair, for DNA analysis. In the first report, Petitioner was excluded as the donor of DNA found on any of thirty-seven items that were analyzed. Petitioner's fingernail scrapings also were analyzed; only Petitioner's DNA was found in those samples. Petitioner's fingerprints were not found in the Crowe house.

Because there were no signs of forced entry, police focused their investigation on Michael, Joshua and Aaron. Police linked a knife believed to have been used to kill Stephanie to Joshua and Aaron.

Petitioner had continued his bizarre search for Tracy after Stephanie's body was discovered on January 21. At 8:15 that morning, Petitioner approached Noralee Dremin as she was returning to her apartment. Dremin entered her apartment, shut the door and turned the deadbolt. Petitioner immediately knocked on the door, and Dremin told him to leave. Petitioner responded, "If you'll let me come in, we can talk more." Dremin called 911. Police responded and briefly detained Petitioner. The officers, who were not aware of any connection to the Stephanie Crowe homicide, did not see any blood on Petitioner's clothing and did not find any weapons on him.

Subsequently, Petitioner knocked on the door to apartment No. 26 in the same apartment complex. Sandra Freitas, who lived in the complex, told Petitioner that apartment No. 26 was vacant. Petitioner said he was looking for Tracy. Petitioner followed Freitas and tried to enter her apartment with her. Freitas' husband told Petitioner to leave, and he complied.

On January 22, Petitioner went to another apartment complex in Escondido, where he banged on the door of a vacant apartment, which had an eviction sign in a window. The maintenance

man asked Petitioner to leave; Petitioner said he was looking for Tracy. A police officer contacted Petitioner behind the complex. Petitioner did not have any weapon and seemed disoriented.

On January 26, Petitioner attempted to break into the residence of Frank Santibanez at night. Santibanez telephoned the police. Petitioner told a police officer that he was looking for an old friend. Petitioner did not have any weapon.

On January 27, Petitioner opened the front screen door and turned the doorknob to Joyce Fisher's home. Fisher asked who was there; Petitioner replied he was looking for someone named Richard or that he was Richard. Fisher told Petitioner to leave, but he kept trying to open the door. Fisher telephoned 911.

On February 12, Petitioner followed thirteen-year-old Somer Hall and her girlfriends as they took a bus trip from San Diego to Escondido, changing buses several times. When the girls arrived in Escondido, Petitioner followed them to Hall's apartment complex and repeatedly called out "Tracy" to Hall. An adult who lived in the complex told Petitioner that Hall was not Tracy and to leave the girls alone.

On February 17, before 7:00 a.m., Petitioner went to the residence of Patsy Walker, pounded on the door and kept repeating, "Tracy, Tracy ." Petitioner tried unsuccessfully to open the door.

On February 21, Petitioner peered into the window of Meredith Vezina's residence. Petitioner told Vezina he was looking for someone.

On February 26, Petitioner peered into the windows of various apartments in a complex. Petitioner was escorted off the property, but he returned and tried to force his way into one of the apartments. Petitioner said he was looking for a friend.

On February 25, at around 5:00 a.m., Petitioner knocked on the door and tried to enter the residence of Roxanne Neal. Petitioner next pressed his face against a window and looked inside.

On March 13, while Petitioner was in the mental health ward of the Vista jail on an unrelated matter, he paced back and forth, raised his arms up in the air, and yelled, "Tracy, you whore. I am going to kill you."

///

On April 28, police investigators examined Petitioner's impounded clothing for bloodstains. On the red shirt, they used a fluorescein process, which required the shirt to be completely wet. No bloodstains were found. During this process, Detective George Durgin photographed the red shirt before the fluorescein was applied. Durgin used the police department's only tripod, which he also had used at the Crowe residence crime scene. At that time, Durgin had not used protective covering for the legs of the tripod. Durgin testified that he could not recall if he placed a tripod leg in a blood stain at the crime scene. The wet red shirt was then placed in a paper bag.

Because the white T-shirt had visible blood stains, the police circled certain stains on the shirt with an ink pen and sent the shirt to serologist Thomas Fedor for DNA testing. Fedor kept the white T-shirt in a freezer until he analyzed it on May 18. Fedor tested the circled stains on the white T-shirt and found the bloodstains matched Petitioner's genetic type. Stephanie was excluded as a donor of DNA on that shirt. Fedor, however, did not test the stains on the bottom hem of the T-shirt because he did not believe they were of interest to police. He returned the white T-shirt to the Escondido Police Department.

In December, criminalist Jennifer Mihalovich tested Petitioner's red shirt for DNA. Mihalovich found Stephanie's blood on the red shirt. Mihalovich opined the blood was a blood drop and not a transfer.

In 1999, the district attorney arranged for further testing of the bloodstains on the red shirt by Orchid Cellmark DNA testing firm. Mark Stolorow, a forensic biologist and executive director of Orchid Cellmark, found five areas to be tested and sent the red shirt to Tia Fenton, a DNA analyst, for testing. Fenton found Stephanie's DNA and the DNA of a male on the red shirt. The teenagers were excluded as donors of the DNA,[6/] but Petitioner was not excluded as a donor. At trial, Stolorow testified the stains were not consistent with dried flakes of blood that were saturated with liquid and then penetrated the red shirt. Stolorow opined it was more likely the blood was wet when applied.

---

6. Murder charges against the three boys were dismissed in February 1999.

In December 2002, a police officer reviewed photographs taken at the Crowe residence and photographs of items found in Petitioner's pockets on January 21, 1998. The contents of Petitioner's pockets included a Smith Brothers cough drop wrapper and a torn Snickers candy bar wrapper. During the initial investigation, police had found wrappers from Smith Brothers cough drops in Stephanie's and Michael's bedrooms, and a Smith Brothers cough drop package on the kitchen counter. Distribution of Smith Brothers cough drops is limited in Southern California. Police also had found a Snickers candy bar wrapper in Stephanie's closet.

In April 2003, the Attorney General's Office [7/] asked Faye Springer, a criminalist with the Sacramento County Forensic Services Laboratory who had an expertise in the microscopic examination of fibers, to examine Petitioner's red shirt for blood spatter. Springer agreed, but wanted to examine all of Petitioner's outer clothing and shirts. Springer observed three blood smears near the bottom front hem of Petitioner's white T-shirt and recommended they be tested for DNA. A DNA analysis showed that two of the smears shared the DNA of Petitioner and Stephanie. Springer opined the blood was placed on the white T-shirt while the blood was wet. She testified the smears were inconsistent with the defense theory that police at the crime scene had picked up blood flakes on their shoes, transferred the blood flakes to Petitioner's holding cell, where they were deposited on Petitioner's clothing and later rehydrated onto his clothes.

On the first day of his trial, February 2, 2004, Petitioner escaped from the courtroom holding tank during the lunch hour by freeing himself from handcuffs. Petitioner left the courthouse and boarded a bus. At 4:30 p.m., officers apprehended Petitioner in the Clairemont area.

In addition to the evidence concerning Petitioner's search for Tracy by knocking and opening doors to various residences, the prosecution presented evidence that police had found Petitioner in possession of a knife on four separate occasions - three before Stephanie's fatal stabbing and one afterward. The court admitted the evidence concerning Petitioner's search for Tracy and prior incidents of knife possession for the limited purpose of showing a characteristic

---

7. The Attorney General's Office was the agency that prosecuted Petitioner at trial because the San Diego County District Attorney's Office recused itself.

method, plan or scheme.

***Defense Case***

The bulk of the defense case was evidence directed toward establishing that Michael, Joshua and Aaron killed Stephanie. This evidence largely was presented by showing the videotapes and audiotapes of police interrogations of Michael and Joshua.

Police became suspicious of Michael after they interviewed him on January 21, 1998. Michael said he awoke at around 4:30 a.m., turned on his television, went to the kitchen to get milk and Tylenol and thereafter returned to his room. He further said Stephanie's door was shut and he did not see her body. This contradicted evidence that Stephanie died around midnight and her body was positioned in the doorway.

On January 22, when a police sergeant went to the Treadway residence to interview Joshua, the sergeant saw a survival-style knife on the couch. Joshua said it belonged to his brother, who said the knife belonged to Joshua.

On January 23, detectives interrogated Michael, starting at 6:00 p.m. and concluding around midnight. The detectives falsely told Michael that they found Stephanie's blood in his bedroom and accused him of killing her. Michael denied killing his sister and said he loved her and was a good brother. Eventually, Michael said he knew he killed Stephanie because the detectives said he did, but he had no memory of it. He attributed the killing and his loss of memory to rage. Michael said since the seventh grade he had resented Stephanie and blamed her for making him unpopular. Police arrested Michael after the interrogation and took him to juvenile hall.

On January 27, Aaron's mother reported that one of the knives from her son's collection was missing. Police obtained warrants and searched the Treadway and Houser residences. They found two knives under Joshua's bed. One of them - the "Best Defense knife"- looked like the knife observed on the couch five days earlier by the sergeant. Aaron identified it as the missing knife. Police arrested Joshua for stealing it. Joshua's mother said he had obtained the knife about January 16. The lead detective believed the knife could have been the murder weapon.

Police started interrogating Joshua that evening and continued for ten to twelve hours into the next morning. Joshua said Michael often talked about killing Stephanie because everything she

did made him angry, but he thought Michael was kidding. Joshua denied being involved in Stephanie's killing and said the Best Defense knife was not the murder weapon because it had been under his bed since early January when he stole it from Aaron. Police told Joshua he was lying when he said he stole the knife. Joshua changed his story and said Aaron gave him the knife, telling him to dispose of it because Michael used it to kill Stephanie. He took the knife home and put it under his bed. Joshua was allowed to go home.

On February 10, detectives again interrogated Joshua, who said Aaron admitted he helped Michael kill Stephanie: Michael held Stephanie and kept her quiet while Aaron "took care of the rest." Joshua said other than disposing of the knife, he did not participate in the killing. Joshua repeatedly denied being at the Crowe residence; he insisted that Aaron gave him the knife on Super Bowl Sunday and threatened to kill him if he told anyone. After the detective suggested Joshua acted as a lookout, he admitted he was at the Crowe residence the night of the killing and gave the following account. Joshua initially stayed outside as a lookout but then went to the kitchen. Michael rinsed the knife in the sink and gave it to Aaron. Joshua and Aaron left together. Aaron told Joshua that Michael went into Stephanie's room first and covered her mouth. Aaron then entered the room and stabbed her. Aaron took the knife home to clean it thoroughly and gave it to Joshua a few days later, on Super Bowl Sunday.

The defense also presented expert testimony from individuals who had been retained by the district attorney's office when it was prosecuting Michael, Joshua and Aaron for Stephanie's murder.

Brian Kennedy, one of those experts, assembled Stephanie's bed and used a forensic mannequin to analyze the stabbing attack. He concluded that Stephanie's comforter was used to restrain her. He said more than one person probably participated in the killing, but it could have been only one. He also opined that it was likely one person held the comforter while the other stabbed Stephanie.

Brian Kennedy also testified about the prosecution's blood evidence. Kennedy looked at a photograph of the bloodstain on the red shirt identified by Mihalovich as having Stephanie's DNA. Kennedy testified the bloodstain appeared to be physically altered, perhaps diluted, and looked like

a dry clot. Kennedy described a dry clot as a “dried piece of blood sitting on top of the material,” which then is diluted and fused into the material. Kennedy said the blood was either semi-dry when it was applied, or a water-based liquid came into contact with the shirt, causing the blood to be reconstituted and diffused into the material. Kennedy opined another bloodstain was transferred onto the red shirt; this blood stain appeared to be diluted and diffused into the material, unlike fresh blood. Kennedy said he would expect this type of pattern if dried blood came into contact with a wet piece of clothing or if dried blood was deposited on clothing that later became wet. Kennedy also opined that dried blood on the foot of a tripod could have transferred onto a nearby piece of clothing without directly contacting it.

As to Petitioner’s white T-shirt, Kennedy reviewed photographs of the shirt that had been taken in 1998 and in 2003. In the 1998 photograph, ink marks appeared only on the left shoulder of the shirt; however, in the photograph taken in 2003, ink marks appeared on both left and right shoulder areas of the shirt. Kennedy opined that the ink appearing on the left shoulder had transferred to the right shoulder sometime between the time the two photographs were taken. He further testified that a water-based product could have changed the appearance of the bloodstains on the white T-shirt, rendering Springer’s analysis and the subsequent DNA testing suspect. Kennedy also said freezing and thawing a garment causes condensation that can reconstitute bloodstains and affect forensic blood analysis.

Another defense expert originally contacted by the district attorney’s office was Special Agent Mary Ellen O’Toole of the FBI’s Behavioral Analysis Unit, who had been asked to investigate the homicide scene and determine whether it was organized or disorganized. O’Toole testified at Petitioner’s trial that Stephanie was a targeted victim because (1) of six people in the house, only she was attacked; (2) the attacker had to pass other rooms to reach her bedroom; (3) there was no evidence of sexual assault or theft; and (4) the nature of her injuries.

O’Toole opined it was an organized crime scene because (1) the crime involved planning, (2) all wounds were inflicted before death, (3) the perpetrator exhibited familiarity with the layout of the house and left no clue as to points of entry or exit, and (4) the attacker maintained control as evidenced by the fact no one else in the house was aroused and there were no self-inflicted injuries.

O'Toole also opined there were probably multiple perpetrators, although one person could have committed the crime.

Gene Lawrence, a criminalist in the sheriff's laboratory who spent 600 hours over two years examining trace evidence, testified he found nothing that connected Petitioner with the inside of the Crowe residence.

Psychiatrist Mark Kalish examined Petitioner's psychiatric records from various state mental institutions where Petitioner had received treatment since 1994. Kalish opined that Petitioner suffered from schizophrenia, organic brain syndrome and methamphetamine abuse. Schizophrenia typically causes hallucinations, primarily auditory. Schizophrenia can also cause delusions or false beliefs such as paranoia or grandiosity. Other typical symptoms are disorganized speech and grossly disorganized behavior. Symptoms of organic brain syndrome include impaired memory, deterioration of language function, impairment of motor activities, impaired ability to recognize or identify objects, impaired ability to think abstractly, and impaired ability to concentrate or focus on the task at hand.

***Prosecution Rebuttal***

The prosecution's rebuttal case attempted to refute the defense claim that Michael, Joshua and Aaron killed Stephanie. An expert on police interrogations testified the techniques used by police during Michael's and Joshua's interrogations were coercive. Michael, Joshua and Aaron testified they did not have any involvement in the killing of Stephanie. In addition, Michael and Joshua explained why they had made inculpatory statements to the police.

Retired FBI agent Gregg McCrary attacked O'Toole's crime scene evaluation. He opined the crime scene was more disorganized than organized. Among other things McCrary saw no evidence of control by the perpetrator. He opined Stephanie's killing was a "blitz" attack, involving immediate application of force.

Psychologist Paul Mattiuzzi met twice with Petitioner and reviewed his mental health records dating back to 1990. Mattiuzzi opined that Petitioner had suffered from chronic schizophrenia for at least fifteen years. The diagnosis did not mean Petitioner had all the symptoms associated with schizophrenia. Mattiuzzi disagreed with Kalish that Petitioner had been diagnosed

with organic brain damage.

**ARGUMENT**

**I.**

**STANDARD OF REVIEW**

Federal habeas corpus lies only to correct violations of the United States Constitution, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d); *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("*Estelle*"). Because Petitioner filed his Petition after April 24, 1996, it is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 336-38, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997). The enactment of AEDPA was intended to prevent federal habeas "retrials" and ensure that state court convictions are "given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

A petitioner may not receive relief unless the state-court decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were based on "an unreasonable determination" of the state court evidence. 28 U.S.C. § 2254(d). This "'highly deferential standard'" demands that federal courts give state court decisions "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002), *quoting Lindh v. Murphy*, 521 U.S. at 333, n.7; *Williams v. Taylor*, 529 U.S. 362, 404-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

In determining what constitutes federal law for purposes of the deference standard, only United States Supreme Court decisions, not circuit court authority, are controlling. *Williams v. Taylor*, 529 U.S. at 412. Moreover, a federal court may reverse only if the state decision is contrary to the holdings (as opposed to dicta) of the United States Supreme Court. *Tyler v. Cain*, 533 U.S. 656, 668, 121 S. Ct. 2478, 150 L. Ed. 2d 632 (2001) (O'Connor, J., concurring) (*citing Williams v. Taylor*, 529 U.S. at 412).

AEDPA also addresses state court factual findings in § 2254(e)(1), which provides that such findings "shall be presumed to be correct" and places on the petitioner "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The

presumption of correctness applies not only to express findings of fact, but also applies equally to unarticulated findings that are necessary to the state court's conclusions of mixed questions of fact and law. *See, e.g.*, *Marshall v. Lonberger*, 459 U.S. 422, 433, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983) (application of presumption to credibility determination which was implicit in rejection of habeas petitioner's claim); *Bell v. Jarvis*, 236 F.3d 149, 158-60 (4th Cir. 2000) (de novo, independent, or plenary review of state court adjudications is no longer appropriate).

Even if a state court decision fails to cite or acknowledge United States Supreme Court authority, a federal court may not grant habeas relief unless the state court's reasoning or result contradict clearly established Federal law as determined by the United States Supreme Court. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

Finally, when the state supreme court has summarily denied a claim, a federal court conducting habeas corpus review must "look through" the summary denial and consider the "last reasoned" state court decision. *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991). Here, since the California Supreme Court summarily denied review, the last reasoned decision is the opinion of the California Court of Appeal, Fourth Appellate District, Division One.

As demonstrated below, the California Court of Appeal reasonably rejected all of the claims raised by Petitioner here.

///

///

///

## II.

## THE DETERMINATION BY THE CALIFORNIA STATE COURTS THAT ANY ERROR IN LIMITING CROSS-EXAMINATION OF A PROSECUTION EXPERT WITNESS WAS HARMLESS BEYOND A REASONABLE DOUBT WAS NOT CONTRARY TO UNITED STATES SUPREME COURT PRECEDENT, WAS NOT AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT PRECEDENT TO THE FACTS OF PETITIONER'S CASE, AND WAS NOT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED

In his first claim for relief ("Ground One"), Petitioner contends that the state trial court violated his Sixth Amendment right to confrontation when it precluded him from cross-examining a prosecution expert witness about his possible bias against a defense expert witness. (Pet. at 4-5, 38-44.) Petitioner's claim was reasonably rejected by the California Court of Appeal within the meaning of 28 U.S.C. § 2254(d).

The facts surrounding Petitioner's claim are as follows. In a letter dated February 24, 2004, prosecution expert Gregg McCrary wrote a letter to the International Criminal Investigative Analysts Fellowship (ICIAF) about a potential ethical violation by defense expert Mary Ellen O'Toole. In the letter, McCrary complained that O'Toole was undermining the successful prosecution of Petitioner, whom he called the "true killer." McCrary also wrote that the San Diego County Sheriff's Office and the Attorney General were shocked and dismayed by O'Toole's proposed testimony, which they viewed as an attempt to obstruct justice. Additionally, McCrary's letter said O'Toole's analysis was "fundamentally flawed." McCrary also expressed the hope that "cooler, more rational thinking will prevail and Ms. O'Toole will not testify."[8/] (Lodgment 6 at 35-

---

8. The letter read in pertinent part: "I view the ethical issue inherent in this case to be the fact that an ICIAF member and an FBI Supervisory Special Agent, Ms. Mary Ellen O'Toole, is attempting to undermine the successful prosecution of Richard Tuite who has been charged and is being tried for the murder of twelve-year-old Stephanie Crowe. After Ms. O'Toole was prohibited from testifying in federal court in the civil case, she has now volunteered to testify in the criminal trial in state court for the defense. This appears to directly violate the missions of the ICIAF, the FBI and the NCAVC [National Center for the Analysis of Violent Crime]. These organizations are dedicated to supporting law enforcement in their efforts to protect the innocent while bringing the guilty before the bar of justice where they can be held accountable for their actions. [¶] The Office of the Attorney General for the State of California and the San Diego County Sheriff's Office are working jointly to see that justice is done in the case. After a thorough and meticulous investigation they have identified the true killer, Richard Tuite. They have linked Tuite to the murder of Stephanie

36; 3 CT 646.)

At a hearing held outside the jury's presence, Petitioner sought permission to cross-examine McCrary for bias using the letter. McCrary testified at the hearing that he had been asked to write the letter by the president of the organization. McCrary said he knew O'Toole had initially been contacted by the district attorney's office while it was prosecuting the three teenagers for Stephanie's murder. In response to a query from the court, McCrary agreed that O'Toole, as an FBI agent, could testify for the defense only with the agency's permission. When asked by defense counsel where he got the information about the Attorney General's Office and the sheriff's office being " 'shocked and dismayed' "and thinking O'Toole was trying to " 'obstruct justice,'" McCrary said his sources were two prosecutors handling the case for the Attorney General's Office. McCrary admitted he had not talked to the sheriff's detective who investigated the case until the morning of the hearing. McCrary also conceded that the prosecutors had not used the same words - for example, " 'obstruct justice and undermine the successful prosecution of Richard Tuite'" - that McCrary had used in his letter. (Lodgment 6 at 37; 50 RT 6747-6754.)

Petitioner's counsel argued the letter showed McCrary had "crossed over the line from being a witness to being an advocate." Counsel claimed that the letter addressed McCrary's

---

Crowe through incontrovertible physical, forensic and circumstantial evidence, not the least of which is having identified the blood spatter on both Tuite's shirt and undershirt as belonging to the victim (who had been stabbed to death). [¶] Neither the San Diego County Sheriff's Office nor the Office of the Attorney General for the State of California has requested the assistance of the NCAVC or [the] ICIAF in this matter. Both agencies are shocked and dismayed that Mary Ellen O'Toole, a representative of both the FBI and [the] ICIAF, has injected herself into this case in what they view as an attempt to obstruct justice and undermine the successful prosecution of Richard Tuite. [¶] The long range implications for this are both obvious and distressing. Ms. O'Toole's proposed testimony damages the relationship between the FBI, the ICIAF and law enforcement agencies when we should be working [to] build a sense of trust and rapport with those agencies. [¶] I have reviewed the multitude of underlying documents and evidence in this case and believe Ms. O'Toole's analysis to be fundamentally flawed, self-contradictory and not supported by the majority of the evidence in this case. [¶] . . . [¶] I have been subpoenaed by the State of California to testify for the prosecution, specifically to rebut the proposed testimony of Ms. O'Toole. I will do so if necessary, but remain hopeful that cooler, more rational thinking will prevail and Ms. O'Toole will not testify. This would remove an unnecessary obstacle to what is already a complicated and difficult prosecution."
(Lodgment 6 at 35, n.14; 3 CT 646.)

credibility because McCrary not only said he disagreed with O'Toole, but also tried to prevent her from testifying. (Lodgment 6 at 37; 50 RT 6760-6763.) At the conclusion of the hearing, the court said it would decide later whether the defense could use the letter during its cross-examination of McCrary. (Lodgment 6 at 37; 50 RT 6764.)

After McCrary testified on direct examination, the matter was brought up again outside the presence of the jury. Petitioner's counsel argued that McCrary's letter showed bias, and the jury was entitled to know he tried to prevent O'Toole from testifying. (Lodgment 6 at 38; 52 RT 6981-6982.) The court ruled that the defense could not cross-examine McCrary about the letter because it was irrelevant. (Lodgment 6 at 38; 52 RT 6983-6985.)

The California Court of Appeal found that under the Sixth Amendment right to cross-examination, as interpreted by the United States Supreme Court in *Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); and *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) ("*Van Arsdall*"), the trial court should have permitted the cross-examination. (Lodgment 6 at 38-40.) However, the California Court of Appeal continued, a constitutionally improper denial of a defendant's opportunity to impeach a witness for bias is subject to harmless error analysis. (Lodgment 6 at 40) (*citing Van Arsdall*, 475 U.S. at 684.) The California Court of Appeal found that, under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) ("*Chapman*"), the error in excluding the impeachment of McCrary with his letter was harmless beyond a reasonable doubt. (Lodgment 6 at 41-43.)

When a state court finds a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant relief unless the state court's harmless-error decision was objectively unreasonable. *Mitchell v. Esparza*, 540 U.S. 12, 18, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) (*citing, e.g., Chapman*, 386 U.S. 18 at 24). "A constitutional error is harmless when 'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained' (citation)." *Mitchell v. Esparza*, 540 U.S. at 17-18.

Here, the California Court of Appeal stated that under *Chapman*, "the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized . . . the

result would have been the same[.]" (Lodgment 6 at 41.) The California Court of Appeal held that pursuant to *Van Arsdall*, a reviewing court had to "tak[e] into consideration the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Lodgment 6 at 41) (*quoting Van Arsdall*, 475 U.S. at 684).

Applying the factors identified in *Van Arsdall* to the facts before it, the California Court of Appeal stated that its harmless error conclusion was based in large part on the "'minimal importance of the witness' testimony to the prosecution's case.'" (Lodgment 6 at 41) (*quoting Van Arsdall*, 475 U.S. at 674). The California Court of Appeal noted that the prosecution called McCrary in its rebuttal case to counter O'Toole's opinion that the crime scene was "organized." While impeachment with the letter may have lent more credence to O'Toole's opinion, the verdict would not have changed. (Lodgment 6 at 41.) The California Court of Appeal found that the jury was presented with extensive and undisputed factual evidence about what the Crowe family heard and saw on the night of the crime, and what the scene looked like in the morning. Specifically, the jury saw numerous crime scene photographs and a videotape of the scene. Thus, while a significant part of the defense was based on its assertion that the crime scene was fairly orderly and the killer was able to leave without detection, "*competing experts*' opinions as to whether to label the crime scene 'organized' or 'disorganized' had almost no significance." (Lodgment 6 at 42) (emphasis in original). The California Court of Appeal found that regardless of these conflicting opinions, the defense was able to present substantial evidence, and argue to the jury, that based on the facts, the murder was an inside job. The jury reached its conclusion about this issue based on its common sense application to the undisputed facts of the case, rather than on how the experts labeled those facts. (Lodgment 6 at 42.)

Further, the California Court of Appeal stated, McCrary's letter had no impact on the key evidence against Petitioner, which was the DNA evidence showing he had Stephanie's blood on his clothing. Apart from the dry blood contamination theory presented by the defense, the only possible explanation for this evidence was that Petitioner was the killer. (Lodgment 6 at 42.)

The California Court of Appeal concluded:

> In sum, although allowing the defense to impeach McCrary with his letter would have detracted from his expert testimony and perhaps strengthened O'Toole's, we conclude the exclusion of the letter had a de minimis effect on the outcome. In other words, had the (trial) court allowed the defense to use the letter to impeach McCrary, the result would not have been different. We conclude beyond a reasonable doubt that the error was harmless.

(Lodgment 6 at 42-43) (*citing Van Arsdall*, 475 U.S. at 684 & *Chapman*, 386 U.S. at 24.)

As can be seen, the California Court of Appeal correctly identified the controlling United States Supreme Court precedent. The California Court of Appeal properly (and carefully) applied that precedent to the facts of Petitioner's case. Petitioner argues that the California Court of Appeal's harmless error analysis was "incorrect" and "unreasonable." (Pet. at 40.) Petitioner provides no basis for his assertion other than the fact that he disagrees with the California Court of Appeal's ruling. (Pet. at 41-44.) However, Petitioner has not met his burden of showing that the California Court of Appeal's decision was *objectively unreasonable*. *Price v. Vincent*, 538 U.S. 634, 641, 123 S. Ct. 1848, 155 L. Ed. 2d 877 (2002). For this reason alone, Petitioner is not entitled to habeas relief. *Mitchell v. Esparza*, 540 U.S. at 19; *Medina v. Hornung*, 386 F.3d at 878-79.

Finally, even if a state court's harmless error analysis is objectively unreasonable, the petitioner is not entitled to relief unless he shows that the error had a "substantial and injurious effect or influence" on the verdict. *Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th Cir. 2005) (*quoting Brecht v. Abrahamson*, 507 U.S. 619, 637, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993) ("*Brecht*")). *Brecht* is "a more forgiving standard than *Chapman*;" and is applied in all cases requesting collateral relief from state court convictions in order to avoid infringing on the States' sovereignty over criminal matters. *Frye v. Pliler*, __ U.S. __, 127 S. Ct. 2321, 2325, 168 L. Ed. 2d 16 (2007).

In determining whether an error is harmless under *Brecht*, the Ninth Circuit has identified various relevant considerations, including the strength of the People's case in the absence of the error and "whether the error involve(s) the more sensitive structural aspects of the trial, such as the use of peremptory challenges or the composition of the grand jury, such that the error might be said to have infected the entire process and rendered any outcome necessarily suspect (citation)." *Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000).

///

Here, as noted by the California Court of Appeal (Lodgment 6 at 42), the jury saw a videotape and crime scene photographs which allowed jurors to decide, on their own, whether the scene was "organized" or "disorganized." The experts' dueling opinions on this issue added little if anything to this debate. *A fortiori*, impeachment of McCrary with his letter would have made no difference to the outcome of this case. Furthermore, it can hardly be said that precluding cross-examination of this non-essential witness about one letter suggestive of possible bias infected the entire trial or cast doubt on its outcome. Thus, Petitioner has not shown that "'in light of the record as a whole,'" the error in precluding the requested cross-examination "resulted in 'actual prejudice.'" *Laboa v. Calderon,* 224 F.3d 972, 977 (9th Cir. 2000) (*quoting Brecht*, 507 U.S. at 638).

Accordingly, Petitioner's first claim for relief should be denied.

**III.**

**THE DETERMINATION BY THE CALIFORNIA STATE COURTS THAT CALJIC NO. 2.50 AS MODIFIED DID NOT VIOLATE PETITIONER'S DUE PROCESS RIGHTS WAS NOT CONTRARY TO UNITED STATES SUPREME COURT PRECEDENT, WAS NOT AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT PRECEDENT TO THE FACTS OF PETITIONER'S CASE, AND WAS NOT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED**

In his second claim for relief ("Ground Two"), Petitioner contends that the state trial court's instruction pursuant to a modified version of CALJIC No. 2.50 [Evidence of Other Acts] resulted in an unreasonable inference of guilt that violated his right to due process. (Pet. at 5-6, 44-49.) Petitioner's claim was reasonably rejected by the California Court of Appeal within the meaning of 28 U.S.C. § 2254(d).

The facts surrounding Petitioner's claim are as follows. With regard to evidence of acts Petitioner committed other than the charged crime, the jury was instructed as follows:

> Evidence has been introduced for the purpose of showing that the defendant committed other acts other than that for which he is on trial.
>
> Except as you will otherwise be instructed, this evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show a characteristic method, plan or scheme in the commission of acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show:
>
> The defendant possessed the means that might have been useful or necessary for the

commission of the crime charged;

A clear connection between the other acts and the crime of which the defendant is accused so that it may be inferred that if defendant committed the other acts defendant also committed the crime charged in this case.

For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

You are not permitted to consider such evidence for any other purpose.

(Lodgment 6 at 43-44; 55 RT 7084-7085; 9 CT 1902.)

The California Court of Appeal rejected Petitioner's claim that this instruction created an unreasonable inference of guilt which violated his Federal Constitutional right to Due Process. (Lodgment 6 at 43, 48-49.)

The Fourteenth Amendment's Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). As part of this protection, a state may not create evidentiary presumptions which relieve it of its burden of proving each element of the charged crime. *Sandstrom v. Montana*, 442 U.S. 510, 520-24, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979) ("*Sandstrom*"). Jury instructions which contain mandatory presumptions regarding an element of the offense, whether or not the presumption is rebuttable, violate due process. *Francis v. Franklin*, 471 U.S. 307, 315-17, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985) ("*Francis*") (instructions telling jurors that the "acts of a person of sound mind and discretion are presumed to be the product of the person's will," and that a person "is presumed to intend the natural and probable consequences of his acts"); *Sandstrom*, 442 U.S. at 515 (instruction telling jurors that "the law presumes that a person intends the ordinary consequences of his voluntary acts"). However, instructions which merely create permissive inferences are constitutional unless the suggested conclusion is not one which reason and common sense justify in light of the proven facts before the jury. *County Court of Ulster County v. Allen*, 442 U.S. 140, 157-63, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979) ("*Allen*") (upholding state statute which provided that if one occupant of vehicle possesses unlawful weapon, all occupants in vehicle presumed to know of weapon's presence).

In considering Petitioner's claim on direct appeal, the California Court of Appeal stated it had to determine "whether there is a reasonable likelihood that the jury has applied the challenged

instruction in a way that violates the Constitution." (Lodgment 6 at 44) (*quoting Estelle*, 502 U.S. at 72). The California Court of Appeal noted that the United States Supreme Court has held that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." (Lodgment 6 at 44) (*quoting Boyde v. California*, 494 U.S. 370, 378, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990) ("*Boyde*")). Also important to the determination was "whether there is a reasonable likelihood that the jury understood the charge as the defendant asserts (citation)." (Lodgment 6 at 44.)

The California Court of Appeal next noted that in *Allen*, the United States Supreme Court held that inferences and presumptions are "a staple of our adversary system," because the trier of fact is frequently required to determine the "ultimate" or "elemental" fact from one or more "evidentiary" or "basic" facts. (Lodgment 6 at 44-45) (*quoting Allen*, 442 U.S. at 156). However, the California Court of Appeal continued, despite the importance of inferences and presumptions, they violate the Fourteenth Amendment's Due Process Clause if they undermine the responsibility of the jury to find as true each element of the crime beyond a reasonable doubt. (Lodgment 6 at 44) (*citing Allen*, 442 U.S. at 156). The California Court of Appeal explained that under United States Supreme Court precedent, such inferences and presumptions are unconstitutional because "the Due Process Clause embodies the 'bedrock and elementary constitutional principal that protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" (Lodgment 6 at 45) (*quoting Francis*, 471 U.S. at 307 & *In re Winship*, 397 U.S. at 364).

The California Court of Appeal explained that the United States Supreme Court first determines whether the challenged instruction involves a mandatory presumption, or permissive presumption or inference. (Lodgment 6 at 45) (*citing Sandstrom*, 442 U.S. at 510). Unlike a mandatory presumption, a permissive inference allows the jury to infer an ultimate fact from the People's proof of a basic or evidentiary fact. (Lodgment 6 at 45) (*citing Allen*, 442 U.S. at 157). A jury given a permissive inference can accept or reject it, and a permissive inference does not shift the burden of proof. Thus, continued the California Court of Appeal, a permissive inference only violates due process if no rational jury can make the connection permitted by the inference, because

it is only in this circumstance where the inference would result in conviction based on an erroneous factual determination. (Lodgment 6 at 45) (*citing Allen*, 442 U.S. at 157).

The California Court of Appeal noted that Petitioner acknowledged in his briefing on appeal that modified CALJIC No. 2.50 created a permissive inference rather than a mandatory presumption. (Lodgment 6 at 45.) The California Court of Appeal stated that *Francis*, *Sandstrom* and *Allen* require a reviewing court to consider not only the particular instructional language under challenge, but in addition, the remainder of the instruction, the charge as a whole, and the inference created by the instruction as applied to the record in the case. (Lodgment 6 at 46) (*citing Francis*, 471 U.S. at 315; *Sandstrom*, 442 U.S. at 514; & *Allen*, 442 U.S. at 160-61).

Applying the rules of these United States Supreme Court decisions to modified CALJIC No. 2.50, the California Court of Appeal stated that there were three steps to the instruction. First, the jury had to decide if the uncharged acts evidence was believable. Second, if the jury answered this question in the affirmative, it could then determine from that evidence whether Petitioner had a characteristic method, plan or scheme in committing these acts which was similar to that used in killing Stephanie. Third, the jury was to decide whether the common plan or scheme tended to show: (1) Petitioner had a knife on the night of the killing; and (2) there was a clear connection between the other acts evidence and the killing of Stephanie, permitting the inference that if Petitioner committed the other acts, Petitioner also killed Stephanie. (Lodgment 6 at 47.)

The California Court of Appeal then held that under the facts of Petitioner's case, the inference permitted by modified CALJIC No. 2.50 was a rational one. The California Court of Appeal noted that although there were no signs of forced entry, the jury found that an intruder entered the Crowe household and stabbed Stephanie to death. Various circumstances supported the jury's conclusion, specifically, the fact the Crowes' left open the laundry room door on the side of their house next to the driveway; on the evening of the crime, Petitioner was knocking on, and opening, doors to residences in the neighborhood searching for Tracy; and Petitioner was last spotted on the road leading to the Crowe residence. The evidence thus placed Petitioner in the area on the night of the crime and explained how he could have entered the Crowe home without leaving any sign of forced entry. Moreover, Petitioner often carried a knife, the murder weapon was a knife,

and it was never recovered. (Lodgment 6 at 47.) The inference the jury could draw was that Petitioner entered and left the Crowe home with a knife. (Lodgment 6 at 47-48.) Accordingly, stated the California Court of Appeal, "a rational jury could find that a clear connection between evidence of the uncharged acts and the stabbing death of Stephanie had been established." The California Court of Appeal added that modified CALJIC No. 2.50 did not require the jury to infer that Petitioner killed Stephanie, like other circumstantial evidence instructions, it merely permitted the jury to draw the inference. Moreover, the instruction cautioned jurors not to consider the uncharged acts evidence for any other purpose. (Lodgment 6 at 48.)

Finally, the California Court of Appeal found that when considered with other instructions, modified CALJIC No. 2.50 did not lessen the People's burden of proving each element of the charged crime beyond a reasonable doubt. Those other instructions included CALJIC No. 1.00 [Respective Duties of Judge and Jury] telling the jury that its duty was to decide all questions of fact; CALJIC No. 1.01 [Instructions to be Considered as a Whole] telling jurors to consider the charge as a whole and each instruction in light of the others; CALJIC No. 2.00 [Direct and Circumstantial Evidence-Inferences] defining "circumstantial evidence" as "evidence from which an inference *may* be drawn" and "inference" as a reasonable deduction which jurors may draw from proven facts; CALJIC No. 2.01 [Sufficiency of Circumstantial Evidence-Generally] informing jurors that Petitioner was entitled to the benefit of the doubt when there were two reasonable interpretations of circumstantial evidence; CALJIC No. 2.09 [Evidence Limited as to Purpose] warning jurors not to use limited purpose evidence for any other purpose; CALJIC No. 2.90 [Presumption of Innocence-Reasonable Doubt-Burden of Proof] telling the jury that the prosecution had the burden of proving Petitioner's guilt beyond a reasonable doubt; and CALJIC No. 2.50.1 [Evidence of Other Crimes by the Defendant Proved by a Preponderance of the Evidence] stating that if the jury found Petitioner committed the uncharged acts, it was important to remember that Petitioner could not be convicted of the charged offense or a lesser crime unless the evidence as a whole persuaded jurors that Petitioner was guilty beyond a reasonable doubt. (Lodgment 6 at 48-49) (emphasis in original). Thus, concluded the California Court of Appeal, the permissive inference contained in modified CALJIC No. 2.50 was constitutionally sound, as "a reasonable juror would not have understood [it],

when considered with the remaining instructions, to be either an invitation or a compulsion to use the uncharged acts evidence by itself to find [Petitioner] guilty of murder, or a lesser included crime, regardless of whether it was satisfied beyond a reasonable doubt that he killed Stephanie (citation)." (Lodgment 6 at 49.)

Conclusions similar to that drawn by the California Court of Appeal have been reached by the federal courts rejecting analogous challenges to jury instructions. *Brodit v. Cambra*, 350 F.3d 985, 990-91 (9th Cir. 2003) (in view of California court of appeal's "reasoned explanation" as to why CALJIC No. 2.20.1 [Evaluation of Testimony of Child Ten Years of Age of Younger] was constitutional, "state court's decision did not contravene or unreasonably apply clearly established Supreme Court precedent"); *Turner v. Marshall*, 63 F.3d 807, 819-20 (9th Cir. 1995), overruled on other grounds in *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (CALJIC No. 2.03 [Consciousness of Guilt-Falsehood] created permissive inference and was constitutionally sound); *Smith v. Pliler*, 278 F. Supp. 2d 1060, 1074-76 (N.D. Cal. 2003) (in light of other instructions, no reasonable likelihood jury applied CALJIC Nos. 2.50.1 and 2.50.02 [Evidence of Other Domestic Violence] in way which violated Constitution). In short, the California Court of Appeal's determination that it is not reasonably likely a reasonable juror would have understood modified CALJIC No. 2.50 as inviting or requiring the jury to use the uncharged acts evidence by itself to find Petitioner guilty of murder or a lesser crime regardless of whether there was proof beyond a reasonable doubt on the charged offense, was properly based on a "commonsense understanding of the instructions in the light of all that has taken place at the trial," *Boyde*, 494 U.S. at 381; and cannot be said to be "objectively unreasonable." *Williams v. Taylor*, 529 U.S. at 409. Furthermore, the factual findings of the California Court of Appeal regarding the evidence in this case which gave rise to the necessity for the instruction are presumed correct (28 U.S.C. § 2254(e)(1); *Sandgathe v. Maas*, 314 F.3d 371, 376 (9th Cir. 2002)); and Petitioner has not provided clear and convincing evidence, or any evidence, to rebut this presumption. *Sophathavong v. Palmateer*, 365 F.3d 726, 733 (9th Cir. 2004).

Accordingly, Petitioner's second claim for relief should be denied.

///

## IV.

## THE DETERMINATION BY THE CALIFORNIA STATE COURTS THAT DENIAL OF PETITIONER'S REQUEST FOR A CONTINUANCE OF THE TRIAL DATE DID NOT VIOLATE HIS DUE PROCESS RIGHTS WAS NOT CONTRARY TO UNITED STATES SUPREME COURT PRECEDENT, WAS NOT AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT PRECEDENT TO THE FACTS OF PETITIONER'S CASE, AND WAS NOT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED

In his third claim for relief ("Ground Three"), Petitioner contends that the state trial court's denial of his motion to continue the trial rendered his trial fundamentally unfair, in violation of his due process rights. (Pet. at 6-7, 49-57.) Petitioner's claim was reasonably rejected by the California Court of Appeal within the meaning of 28 U.S.C. § 2254(d).

The facts surrounding Petitioner's claim are as follows. In April 2003, Springer told the Attorney General she had located presumptive blood stains on the hem of Petitioner's white T-shirt, which had not previously been tested for DNA. On June 27, 2003, Springer recommended DNA testing for these stains, as well as for the stains on the red shirt. In August, the prosecution notified defense counsel of plans to conduct destructive testing on Petitioner's clothes and invited the defense to have an expert present.[9/] Defense counsel directed Marc Taylor, a defense expert, to observe the testing of the red shirt. (5 RT 524.) On September 19, Taylor watched Connie Milton of the sheriff's crime lab take two items of clothing from sealed evidence bags. The first item was the red shirt; Milton cut portions of the red shirt for further testing, and Taylor observed the cutting process and photographed the shirt. Milton then removed the white T-shirt from another evidence bag and cut portions of it for later testing. (Lodgment 6 at 20; 5 RT 522-24.) Taylor had not expected the white T-shirt to be tested; defense counsel had not told him the white T-shirt was to be tested, and Taylor was not aware that it had any evidentiary significance.[10/] Nonetheless, Taylor

---

9. There was a conflict between the prosecution and defense on this point. According to the defense, the Attorney General informed defense counsel that the red shirt would be tested. According to the Attorney General, the defense was told Petitioner's clothes would be tested. (Lodgment 6 at 20, n.7; 3 CT 540-56, 561-601.)

10. Had he known that Stephanie's blood would be found on the white T-shirt, Taylor declared he would have done several things before the shirt was cut. Taylor would have

photographed the white T-shirt and monitored the cutting process. Taylor agreed to delay the DNA analysis to December 8. (Lodgment 6 at 21; 5 RT 524-26.)

Taylor did not prepare a report of his observations of September 19. In November, Taylor received a fax request from defense counsel for the photographs of the red shirt. Taylor sent the requested photographs of the red shirt to defense counsel, but did not send the photographs of the white T-shirt at that time. (Lodgment 6 at 21-22; 5 RT 528-29.)

Milton started the extraction process on December 8, with Taylor present. On December 10, the prosecution notified defense counsel that Milton found Stephanie's DNA on the white T-shirt. Attorney William Fletcher, who handled the forensic evidence for the defense at trial, was surprised by those results because he had not known the white T-shirt had undergone DNA analysis. He did not discuss the white T-shirt with Taylor until December 10. (Lodgment 6 at 22; 5 RT 530-31.)

On December 18, defense counsel asked that the trial, scheduled to begin February 2, 2004, be continued. The prosecution did not oppose the continuance. The court denied the motion without comment. (Lodgment 6 at 22; 5 RT 533.) Defense counsel then moved to exclude the white T-shirt blood evidence. In support of the this motion, the defense filed declarations by Taylor and Fletcher. (Lodgment 6 at 22; 3 CT 540-56.)

On January 14, 2004, following an evidentiary hearing, the court denied the motion to exclude the evidence. (Lodgment 6 at 22; 6 RT 681-82.) The defense then renewed the continuance motion and filed a sealed declaration by Fletcher in support of the motion. (Lodgment 6 at 22; 3 CT 605; 11/17/05 Supp. CT 1-5.) The court told counsel that unless there was something new in the sealed declaration, it did not intend to continue the trial date. (Lodgment 6 at 22; 6 RT 682.)

---

recommended (1) a microscopic examination of the stains to reveal the nature of the staining on the fabric, (2) the taking of detailed photographs of the stains and the surrounding areas, (3) a wash from the suspected stains be analyzed for the presence of a blood preservative, and (4) a test for the enzyme Amylase to see if there were indications that saliva was present. Taylor said he would have more closely examined the stains to determine the possibility that they could have resulted from contamination. Taylor noted that by the time it was determined that Stephanie's blood was on the white T-shirt, it was too late to perform these procedures because the samples had been consumed in the testing. (Lodgment 6 at 21, n.8; 5 RT 524-26.)

In his sealed declaration, Fletcher said the first time he learned the white T-shirt had undergone DNA analysis was on December 10, 2003, when he was informed that Milton's recent testing revealed Stephanie's blood was in two stains on the white T-shirt. Until then, Fletcher believed, on the basis of the 1999 tests, that the white T-shirt "had no evidentiary value relat[ed] to the crime." Taylor had not mentioned to Fletcher that the white T-shirt was being tested. (Lodgment 6 at 23; 11/17/05 Supp. CT 1-5.)

Further, the defense did not receive a packet of information detailing Milton's DNA analysis until December 30, 2003. The defense did not receive Springer's report detailing her analysis of Petitioner's clothing, which was dated July 29, 2003, until January 6, 2004. Among other things, Springer's report disclosed she had microscopically viewed the stains on the white T-shirt. Fletcher said the defense did not similarly view the stains microscopically because the defense did not have Springer's report until after the samples had been consumed. (Lodgment 6 at 23; 11/17/05 Supp. CT 1-5.)

Fletcher declared that he was in the process of duplicating the discovery materials and sending them to defense experts for review. The defense needed to interview both Fedor, the serologist who had tested the white T-shirt for DNA in 1999, and Springer. Those interviews could not be conducted until the defense experts had reviewed the discovery materials. Fletcher also said further DNA testing of areas close to the stains needed to be conducted to determine the validity of the procedures used in Milton's DNA analysis and decide whether the defense should request a foundational hearing under Cal. Evidence Code § 402. Fletcher said the defense needed at least sixty days for its experts to complete the review of Springer's and Milton's results and conduct additional testing. (Lodgment 6 at 23-24; 11/17/05 Supp. CT 1-5.)[11/]

---

11. In his sealed declaration, Fletcher also said the presence of Stephanie's "blood on the 'white shirt' could materially affect the defense theory of contamination. Until the investigation, analysis, and review of this new information regarding the 'white shirt' are completed, it will be impossible to present an opening statement and proceed with a defense with such potentially devastating information left unresolved. The Attorney General's Office will present the evidence of blood on the 'white shirt' in their opening statement. They will urge that this evidence refutes any suggestion by the defense that the blood present on the red shirt was a result of contamination. . . . [¶] I cannot competently represent Mr. Tuite with respect to the evidence of the stains on the 'white

When the court asked the prosecution to address the defense motion to continue the trial date, the prosecution indicated it was a reasonable request under the circumstances and suggested failure to grant the motion might present a viable appellate issue. (Lodgment 6 at 24; 6 RT 685-87.) The court and the prosecutor then engaged in a colloquy in which the court took issue with the prosecutor's comment. (Lodgment 6 at 24 & n.8; 6 RT 688.) Addressing all the attorneys, the court said, "You want a continuance. [¶] You guys, both sides, you want to put this thing off until I am off the bench and you guys are retired and new teams come in, and that's not going to happen. This thing has been [continued] over and over and over again." (Lodgment 6 at 25; 6 RT 688.)

The court reminded counsel that it (1) had made it clear when it denied the continuance motion in December, 2003, that the parties had two more months to prepare for trial; and (2) had sent the parties an e-mail later that month, confirming the trial would start on February 2, to "make sure there are no misunderstandings about future dates involving the Tuite case." The court said it was not going to let the attorneys "weasel out" of the February 2 trial date. (Lodgment 6 at 25; 6 RT 689.) The court added:

> You guys had as of the 18th of December, you knew that these problems existed ..., you talked to your expert, you knew what was going on, you knew what was out there, you had at least two months.
>
> I can make some rulings as to what you can do and what you can't do. You have got two attorneys on both sides; one is working on forensic, the other one is working on something else.
>
> I was here. Even though I was off during the holiday, I stayed in San Diego. I called my clerk every day [and asked] "What's going on?" You could have gotten a hold of me if you had any problem. Nobody got a hold of anybody. You are all sitting around sipping your eggnog and singing Christmas carols or whatever. The usual excuse that government employees use during the holidays, it's the holidays. Well, that's the way it goes.
>
> This case is starting February the 2d. We are going to start selecting a jury on that date.

(Lodgment 6 at 25; 6 RT 689-90.)

Although the court denied the continuance motion, it precluded the prosecution from mentioning the white T-shirt evidence during its opening statement. Since the presentation of evidence would commence around February 18, the court said the defense would have two months

---

shirt' without sufficient time to complete the analysis and investigation. . . ." (Lodgment 6 at 21, n.8; 11/17/05 Supp. CT 1-5.)

from the time the court had made it clear there would be no further continuances. (Lodgment 6 at 25-26; 6 RT 690-91.)

While a refusal to continue proceedings may deny a criminal defendant his due process right to obtain and consult with counsel (*Chandler v. Fretag*, 348 U.S. 3, 10, 75 S. Ct. 1, 99 L. Ed. 4 (1954)), the question of whether to grant a continuance is traditionally within the trial judge's discretion. *Avery v. Alabama*, 208 U.S. 444, 450, 60 S. Ct. 321, 84 L. Ed. 377 (1940). A denial of a request for more time does not necessarily violate due process even if it results in the failure of a party to offer evidence or requires the party to defend without counsel. *Ungar v. Sarafite*, 376 U.S. 575, 590, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964) ("*Ungar*"). ""[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the [Constitution]." *Morris v. Slappy*, 461 U.S. 1, 12, 103 S. Ct. 1610, 75 L. Ed 2d 610 (1985) (*quoting Ungar*, 376 U.S. at 589).

> There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied (citations).

*Ungar*, 376 U.S. at 590-91.

Under the AEDPA, the issue before the federal courts is whether the California state courts' determination that there was no due process violation was objectively unreasonable. *Drake v. Portundo*, 321 F.3d 338, 344 (2d Cir. 2003).

Here, the California Court of Appeal first found that there was no abuse of discretion under California state law. The California Court of Appeal noted that the state trial court addressed the primary concerns of defense counsel, i.e., that he could not be ready to counter evidence regarding the white T-shirt by the February 2, 2004 trial date and that the prosecution would have an advantage during opening statement, by precluding the prosecution from mentioning the evidence in its opening remarks. (Lodgment 6 at 27.) Thus, the defense had a total of two months, or at minimum, accepting everything the defense had stated as true, six weeks, to counter the evidence. This was a reasonable amount of time for the defense to perform those tasks counsel said they

needed to do. (Lodgment 6 at 27-29.) The California Court of Appeal further noted that the record showed the trial court considered all of the relevant facts before ruling on the motion. (Lodgment 6 at 29-30.) The California Court of Appeal noted that under California law, a continuance is not required simply because both sides agree to it. (Lodgment 6 at 30) (*citing* Cal. Penal Code § 1050(e)). The California Court of Appeal found the trial court's frustration with getting the case to trial understandable, since at the time of Petitioner's motion, it had been six years since Stephanie's murder and one and one-half years since charges were filed against Petitioner. (Lodgment 6 at 30-31 & n.13.)

The California Court of Appeal then discussed Petitioner's due process claim. The California Court of Appeal cited United States Supreme Court authority holding that a criminal defendant is entitled to a fair trial, not a perfect one, because no trial is perfect. (Lodgment 6 at 28) (*citing, e.g., Brown v. United States*, 411 U.S. 223, 231-32, 93 S. Ct. 1565, 36 L. Ed. 208 (1973). Quoting, *inter alia*, *Ungar*, the California Court of Appeal stated that it had considered the relevant factors outlined in that case and had concluded, for the same reason it found no abuse of discretion, that Petitioner was not denied due process of law by the trial court's ruling. (Lodgment 6 at 31) (citing *Ungar*, 376 U.S. at 591.)

The California Court of Appeal also found no denial of Petitioner's constitutional right to counsel "by the denial of the eleventh-hour continuance request," because the discovery of Stephanie's blood on the white T-shirt required only a refinement of an existing defense theory (contamination) to a new set of facts, the defense had at least six weeks to accomplish this revision, and the trial record demonstrated that this was ample time as shown by the expert testimony that the defense ultimately did present with regard to the issue. (Lodgment 6 at 31-32.) Thus, nothing in the record suggested that the denial of the request for a continuance so limited preparation by Petitioner's counsel as to deny him his constitutional right to counsel. (Lodgment 6 at 32.)

Petitioner does not discuss the California Court of Appeal's opinion. Instead, he outlines factors the Ninth Circuit has found relevant to a determination of whether a federal district court has abused its discretion in denying a request for a continuance of a criminal proceeding. Petitioner then argues how each of these factors supported his continuance request in the present case. (Pet. at 52-

57.) Petitioner relies upon *United States v. Flynt*, 756 F.2d 1352 (9th Cir. 1985). *Flynt* is inapposite because it was a direct appeal from a judgment of a lower federal court. *United States v. Flynt*, 756 F.2d at 1354. The California Court of Appeal reasonably applied controlling Supreme Court precedent to the facts of Petitioner's case. Petitioner's dispute with the California Court of Appeal's rejection of his claim simply does not warrant habeas relief. *Womack v. Del Papa*, 497 F.3d 998, 1001-04 (9th Cir. 2007).

Moreover, the California Court of Appeal held that assuming the trial court abused its discretion in denying the continuance request, any error would be harmless beyond a reasonable doubt. (Lodgment 6 at 32) (*citing Chapman* at 24). The California Court of Appeal noted that in his new trial motion, Petitioner based his claim of prejudice on the fact that he could not call criminalist Herbert MacDonell as an expert witness to counter the white T-shirt evidence. (Lodgment 6 at 32.)[12/] It was unclear whether MacDonell would have been available to testify had the defense been given more time. Additionally, it could be concluded beyond a reasonable doubt that MacDonell's testimony would not have affected the outcome of the case. MacDonell admitted in a declaration he submitted in support of Petitioner's new trial motion that he could not refute Springer's theory, and he largely adopted the contamination theory which the defense already presented to the jury through other experts. (Lodgment 6 at 32, 35, n.14.) The California Court of Appeal's harmless error analysis was not objectively unreasonable. *Mitchell v. Esparza*, 540 U.S. at 18-19. And, because any error was harmless beyond a reasonable doubt, it did not have a substantial or injurious effect or influence on jury's verdict. *Brecht*, 507 U.S. at 637.

Accordingly, Petitioner's third claim for relief should be denied.

## V.

## PETITIONER IS NOT ENTITLED TO RELIEF BASED ON CUMULATIVE ERROR BECAUSE THERE WAS NEITHER CONSTITUTIONAL ERROR NOR PREJUDICE

In his fourth claim for relief ("Ground Four"), Petitioner contends that the cumulative effect of the errors committed at his trial rendered it fundamentally unfair, in violation of his due

---

12. Petitioner makes the same argument here. (Pet. at 55-57.)

process rights. (Pet. at 7, 57-58.) Petitioner's claim was reasonably rejected within by the California Court of Appeal within the meaning of 28 U.S.C. § 2254(d).

For purposes of federal habeas corpus, the "cumulative error" doctrine recognizes that "even if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal' (citation)." *Killian v. Poole*, 282 F.3d 856, 858 (9th Cir. 2002).

However, unless there is a specific constitutional violation, habeas review of trial error is limited to whether the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). A federal court may not grant the writ on the basis of errors of state law whose combined effect does not violate the federal constitution. *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990); *Pulley v. Harris*, 465 U.S. 37, 42, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984).

Here, the California Court of Appeal rejected Petitioner's assertion that the cumulative effect of the errors alleged in his opening brief on appeal constituted a due process violation and their result was a fundamentally unfair trial. The California Court of Appeal noted that it had found only one error, the limitation of the cross-examination of McCrary, and this error was harmless beyond a reasonable doubt. (Lodgment 6 at 67.) Thus, the California Court of Appeal concluded, even assuming there was other error, "any so-called cumulative error was harmless even under the most exacting standard of review (citation)." (*Id.*)

As detailed in Arguments II through IV, above, the California Court of Appeal reasonably concluded that the error in precluding cross-examination of McCrary with his letter was harmless beyond a reasonable doubt; and that the state trial court did not violate Petitioner's federal constitutional rights when it instructed the jury with a modified version of CALJIC No. 2.50 and when it denied Petitioner's motion to continue the trial. Thus, there was "neither error nor cumulative error that influenced the outcome under *Brecht*." *Fields v. Woodford*, 309 F.3d 1095, 1107 (9th Cir. 2002).

Accordingly, Petitioner's fourth claim for relief should be denied.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that this Court deny the Petition for Writ of Habeas Corpus with prejudice, deny all other relief, and deny any request for a certificate of appealability.

Dated: August 19, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GARY W. SCHONS
Senior Assistant Attorney General

KEVIN VIENNA
Supervising Deputy Attorney General

s/ Lynne G. McGinnis

LYNNE G. MCGINNIS
Deputy Attorney General

Attorneys for Respondent

LGM:ms
70134137.wpd
SD2008801733

## TABLE OF CONTENTS

**Page**


INTRODUCTION 1

STATEMENT OF THE CASE 2

STATEMENT OF FACTS 2

*Overview* 2

*Prosecution Case-In-Chief* 3

*Defense Case* 11

*Prosecution Rebuttal* 14

ARGUMENT 15

**I. STANDARD OF REVIEW** 15

**II. THE DETERMINATION BY THE CALIFORNIA STATE COURTS THAT ANY ERROR IN LIMITING CROSS-EXAMINATION OF A PROSECUTION EXPERT WITNESS WAS HARMLESS BEYOND A REASONABLE DOUBT WAS NOT CONTRARY TO UNITED STATES SUPREME COURT PRECEDENT, WAS NOT AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT PRECEDENT TO THE FACTS OF PETITIONER'S CASE, AND WAS NOT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED** 17

**III. THE DETERMINATION BY THE CALIFORNIA STATE COURTS THAT CALJIC NO. 2.50 AS MODIFIED DID NOT VIOLATE PETITIONER'S DUE PROCESS RIGHTS WAS NOT CONTRARY TO UNITED STATES SUPREME COURT PRECEDENT, WAS NOT AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT PRECEDENT TO THE FACTS OF PETITIONER'S CASE, AND WAS NOT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED** 22

**IV. THE DETERMINATION BY THE CALIFORNIA STATE COURTS THAT DENIAL OF PETITIONER'S REQUEST FOR A CONTINUANCE OF THE TRIAL DATE DID NOT VIOLATE HIS DUE PROCESS RIGHTS WAS NOT CONTRARY TO UNITED STATES SUPREME COURT PRECEDENT, WAS NOT AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT PRECEDENT TO THE FACTS OF PETITIONER'S CASE, AND WAS NOT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED** 28

**TABLE OF CONTENTS (continued)**

**Page**

**V. PETITIONER IS NOT ENTITLED TO RELIEF BASED ON CUMULATIVE ERROR BECAUSE THERE WAS NEITHER CONSTITUTIONAL ERROR NOR PREJUDICE** 34

CONCLUSION 36

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Avery v. Alabama*
208 U.S. 444
60 S. Ct. 321
84 L. Ed. 377 (1940) 32

*Bains v. Cambra*
204 F.3d 964 (9th Cir. 2000) 21

*Bell v. Cone*
535 U.S. 685
122 S. Ct. 1843
152 L. Ed. 2d 914 (2002) 15

*Bell v. Jarvis*
236 F.3d 149 (4th Cir. 2000) 16

*Boyde v. California*
494 U.S. 370
110 S. Ct. 1190
108 L. Ed. 2d 316 (1990) 24, 27

*Brecht v. Abrahamson*
507 U.S. 619
123 L. Ed. 2d 353
113 S. Ct. 1710 (1993) 21, 22, 34

*Brodit v. Cambra*
350 F.3d 985 (9th Cir. 2003) 27

*Brown v. United States*
411 U.S. 223
93 S. Ct. 1565
36 L. Ed. 208 (1973) 33

*Chandler v. Fretag*
348 U.S. 3
75 S. Ct. 1
99 L. Ed. 4 (1954) 32

*Chapman v. California*
386 U.S. 18
87 S. Ct. 824
17 L. Ed. 2d 705 (1967) 19, 21, 34

*County Court of Ulster County v. Allen*
442 U.S. 140
99 S. Ct. 2213
60 L. Ed. 2d 777 (1979) 23-25

**TABLE OF AUTHORITIES (continued)**


| | Page |
|---|---|
| *Davis v. Alaska*<br>415 U.S. 308<br>94 S. Ct. 1105<br>39 L. Ed. 2d 347 (1974) | 19 |
| *Delaware v. Van Arsdall*<br>475 U.S. 673<br>106 S. Ct. 1431<br>89 L. Ed. 2d 674 (1986) | 19-21 |
| *Donnelly v. DeChristoforo*<br>416 U.S. 637<br>94 S. Ct. 1868<br>40 L. Ed. 2d 431 (1974) | 35 |
| *Drake v. Portundo*<br>321 F.3d 338 (2d Cir. 2003) | 32 |
| *Early v. Packer*<br>537 U.S. 3<br>123 S. Ct. 362<br>154 L. Ed. 2d 263 (2002) | 16 |
| *Estelle v. McGuire*<br>502 U.S. 62<br>112 S. Ct. 475<br>116 L. Ed. 2d 385 (1991) | 15, 24 |
| *Fields v. Woodford*<br>309 F.3d 1095 (9th Cir. 2002) | 35 |
| *Francis v. Franklin*<br>471 U.S. 307<br>105 S. Ct. 1965<br>85 L. Ed. 2d 344 (1985) | 23-25 |
| *Frye v. Pliler*<br>__ U.S. __<br>127 S. Ct. 2321<br>168 L. Ed. 2d 16 (2007) | 21 |
| *In re Winship*<br>397 U.S. 358<br>90 S. Ct. 1068<br>25 L. Ed. 2d 368 (1970) | 23, 24 |
| *Inthavong v. Lamarque*<br>420 F.3d 1055 (9th Cir. 2005) | 21 |
| *Killian v. Poole*<br>282 F.3d 856 (9th Cir. 2002) | 35 |

**TABLE OF AUTHORITIES (continued)**


| | Page |
|---|---|
| *Laboa v. Calderon*<br>224 F.3d 972 (9th Cir. 2000) | 22 |
| *Lewis v. Jeffers*<br>497 U.S. 764<br>110 S. Ct. 3092<br>111 L. Ed. 2d 606 (1990) | 35 |
| *Lindh v. Murphy*<br>521 U.S. 320<br>117 S. Ct. 2059<br>138 L. Ed. 2d 481 (1997) | 15 |
| *Marshall v. Lonberger*<br>459 U.S. 422<br>103 S. Ct. 843<br>74 L. Ed. 2d 646 (1983) | 16 |
| *Medina v. Hornung*<br>386 F.3d 872 (9th Cir. 2004) | 16, 21 |
| *Mitchell v. Esparza*<br>540 U.S. 12<br>124 S. Ct. 7<br>157 L. Ed. 2d 263 (2003) | 19, 21, 34 |
| *Morris v. Slappy*<br>461 U.S. 1<br>103 S. Ct. 1610<br>75 L. Ed 2d 610 (1985) | 32 |
| *Pointer v. Texas*<br>380 U.S. 400<br>85 S. Ct. 1065<br>13 L. Ed. 2d 923 (1965) | 19 |
| *Price v. Vincent*<br>538 U.S. 634<br>123 S. Ct. 1848<br>155 L. Ed. 2d 877 (2002) | 21 |
| *Pulley v. Harris*<br>465 U.S. 37<br>104 S. Ct. 871<br>79 L. Ed. 2d 29 (1984) | 35 |
| *Sandgathe v. Maas*<br>314 F.3d 371 (9th Cir. 2002) | 27 |

**TABLE OF AUTHORITIES (continued)**


| | Page |
|---|---|
| *Sandstrom v. Montana*<br>442 U.S. 510<br>99 S. Ct. 2450<br>61 L. Ed. 2d 39 (1979) | 23-25 |
| *Smith v. Pliler*<br>278 F. Supp. 2d 1060 (N.D. Cal. 2003) | 27 |
| *Sophathavong v. Palmateer*<br>365 F.3d 726 (9th Cir. 2004) | 27 |
| *Tolbert v. Page*<br>182 F.3d 677 (9th Cir. 1999) | 27 |
| *Turner v. Marshall*<br>63 F.3d 807 (9th Cir. 1995) | 27 |
| *Tyler v. Cain*<br>533 U.S. 656<br>121 S. Ct. 2478<br>150 L. Ed. 2d 632 (2001) | 15 |
| *Ungar v. Sarafite*<br>376 U.S. 575<br>84 S. Ct. 841<br>11 L. Ed. 2d 921 (1964) | 32, 33 |
| *United States v. Flynt*<br>756 F.2d 1352 (9th Cir. 1985) | 33, 34 |
| *Williams v. Taylor*<br>529 U.S. 362<br>120 S. Ct. 1495<br>146 L. Ed. 2d 389 (2000) | 15, 27 |
| *Womack v. Del Papa*<br>497 F.3d 998 (9th Cir. 2007) | 34 |
| *Woodford v. Visciotti*<br>537 U.S. 19<br>123 S. Ct. 357<br>154 L. Ed. 2d 279 (2002) | 15 |
| *Ylst v. Nunnemaker*<br>501 U.S. 797<br>111 S. Ct. 2590<br>115 L. Ed. 2d 706 (1991) | 16 |

**TABLE OF AUTHORITIES (continued)**


| | Page |
|---|---|
| **Constitutional Provisions** | |
| United States Constitution, | |
| Sixth Amendment | 17 |
| Fourteenth Amendment | 24 |
| **Statutes** | |
| 28 U.S.C., | |
| § 2254(d) | 15, 17, 22, 28, 35 |
| § 2254(e)(1) | 2, 16, 27 |
| Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”) Pub. L. No. 104-132, 110 Stat. 1214 (1996) | 15, 16, 32 |
| Cal. Penal Code, | |
| § 192(a) | 2 |
| § 667.5(b) | 2 |
| § 1050(e) | 33 |
| § 12022(b) | 2 |
| **Other Authorities** | |
| CALJIC Nos. | |
| 1.00 | 26 |
| 1.01 | 26 |
| 2.00 | 26 |
| 2.01 | 26 |
| 2.03 | 27 |
| 2.09 | 26 |
| 2.20.1 | 27 |
| 2.50 | 22, 25-27, 35 |
| 2.50.02 | 27 |
| 2.50.1 | 26, 27 |
| 2.90 | 26 |