UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

RICHARD RAYMOND TUITE,

                        Petitioner,

        v.

MICHAEL MARTEL, Warden,

                     Respondent.

Civil No.    08cv1101 J (CAB)

**REPORT AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS**

## I. INTRODUCTION

    Richard Raymond Tuite, a state prisoner with counsel, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction in case number SCD166932. Petitioner was convicted of voluntary manslaughter with an enhancement for use of a deadly or dangerous weapon. He contends his federal constitutional rights were violated as follows: (1) the trial court violated his rights under the Confrontation Clause when it precluded him from cross-examining a prosecution expert about his alleged bias against a defense expert he was called to rebut; (2) the trial court violated his rights under the Due Process Clause because a jury instruction that told the jury how it could use evidence of Petitioner's uncharged acts created an unreasonable inference of guilt; (3) the trial court violated his rights under the Due Process Clause when it denied his motion to continue the trial after the victim's DNA was discovered on Petitioner's white t-shirt less than two months before trial commenced; and (4) the cumulative effect of errors committed at the trial violated his right to Due Process. Petitioner requests an evidentiary hearing on all of his claims.

1   The Court has considered the Petition, Respondent's Answer, Petitioner's Traverse, and all the

2   supporting documents submitted by the parties.  Based upon the documents and evidence presented in

3   this case, and for the reasons set forth below, the Court recommends the Petition and the request for an

4   evidentiary hearing be **DENIED**.

5   ## II.  FACTUAL BACKGROUND

6   This Court gives deference to state court findings of fact and presumes them to be correct;

7   Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28

8   U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical

9   fact, including inferences properly drawn from such facts, are entitled to statutory presumption of

10   correctness).  The facts as found by the state appellate court are as follows:

11   *Overview*

12   On January 21, 1998, at around 6:00 a.m., Stephanie Crowe was discovered lying in the
    doorway of her bedroom; she had been stabbed in her bed and had managed to crawl to the
13   door before dying.  Stephanie had nine stab wounds, two of which were fatal: one severed
    a major artery and caused external bleeding; and the other perforated a lung and caused blood
14   to accumulate in the chest cavity.  None of the nine wounds was below her chest.  The
    condition of the body indicated Stephanie had died at least six hours before she was
15   discovered.

16   Although Escondido police detained Petitioner, who was a transient, because of his strange
    behavior in the Crowes' neighborhood the previous evening, police soon focused their
17   investigation on Stephanie's older brother, Michael Crowe, then fifteen years old, and two
    of his friends, Joshua Treadway and Aaron Houser.[1]

18   In May 2002 the Attorney General charged Petitioner with murdering Stephanie.

19   In essence, Petitioner's trial, which began in February 2004, became a trial within a trial, as
20   Petitioner primarily presented a third-party culpability defense-namely, that Stephanie's
    brother and his friends killed Stephanie.  Thus, while the prosecution in its case-in-chief
21   linked Petitioner to the homicide by presenting circumstantial evidence, including evidence
    that Stephanie's blood was on his clothes, Petitioner's case-in-chief consisted largely of
22   evidence, developed by the Escondido police, that Michael and his two friends killed
    Stephanie.  Petitioner also defended against the blood evidence by presenting evidence that
23   Stephanie's blood was found on his clothes as a result of contamination caused by careless
    police work.  In its rebuttal case, the prosecution essentially presented a defense of Michael
24   and his friends.  The following sets forth in greater detail the evidence presented in each
    party's case.

25

26   ///
    ///
27

28   ---
    [1] For the remainder of this opinion, these three teenagers will be referred to as Michael, Joshua,
    and Aaron, respectively.

2   08cv1101

*Prosecution Case-In-Chief*

One afternoon in early January 1998, Petitioner knocked on the door of Cecilia Jachna's residence. Before Jachna responded, Petitioner turned the door handle and tried to enter the house. Jachna shut the door, locked it with a deadbolt and asked Petitioner why he was there. Petitioner asked if "Tracy" was home. Jachna told Petitioner no one named Tracy lived with her. Petitioner left after Jachna repeated herself a couple of times and ordered him off her property.

"Tracy" was Tracy Nelson, who became friends with Petitioner in 1987 or 1988; they had both used crystal methamphetamine at the time. The friendship lasted until 1994, when Nelson moved to a residence on East Valley Parkway in an area commonly known as the "Ranch." The Ranch was located near the Crowe residence. The last time Nelson saw Petitioner was when he showed up at the Ranch. Nelson's then-husband told Petitioner to leave.

On the evening of January 20, 1998 - the night Stephanie was killed - Petitioner went to a home in the Ranch, which was then occupied by Danette Mogelinski, Frank Romanelli and Frank's daughter, Jessica. Petitioner knocked on the door. Assuming it was a neighbor, Moegelinski said, "It's open, come in." Petitioner opened the door and asked for "Tracy." When Mogelinski said she did not know anyone named Tracy, Petitioner shut the door. A few seconds later Petitioner reopened the door without knocking and asked: "Are you sure you don't know where 'Tracy' is? Richard is looking for her." Petitioner stared into the house as Mogelinski closed and locked the door.

Petitioner headed up a hill to a duplex near Valley Center Road and Lake Wohlford Road, which was occupied by Sheldon Homa, his son Shannon and his daughter-in-law Dawn. Petitioner pressed his face against the window of Sheldon's unit and looked inside. Grabbing an axe for protection, Sheldon ran outside and asked Petitioner what he wanted. Petitioner said he was searching for a girl named "Tracy" and that Mogelinski had suggested he check for her at the Homa residence. Sheldon told Petitioner he was lying and ordered him to leave.

Sheldon went to his son's unit and asked him to telephone the police. Shannon and Dawn decided to follow Petitioner in their car. Petitioner walked down Valley Center Road, went to the parking log of the Lutheran church, walked over to Lake Wohlford Road and stood in the road with his hands in the air, walking in circles.[2]

Escondido Police Officer Barry Ososkie responded to the Homas' call and arrived at the Lutheran church at 8:15 p.m. Ososkie did not see Petitioner and "closed out" the call.

Between 9:00 and 10:00 p.m., Petitioner approached the Green/West property, which was between one-quarter and one-half mile away from the Crowe residence, banged on the door of a trailer and yelled: "This is Richard, I want to see your daughter Tracy." Patrick Green, who lived in the trailer with his wife and daughters, told Petitioner no one named Tracy lived there and ordered him to leave. However, Petitioner, who appeared intoxicated, insisted Tracy was there and kept banging on the door. Green grabbed his pellet gun, and he and wife went outside to warn his father-in-law, Gary West, who lived in the main residence with his wife. Petitioner banged on the West's door and said, "I want to see the girl." West ordered Petitioner to leave and said he was calling the police. Petitioner walked backwards down the

///

---

[2] Other witnesses also testified that Tuite was behaving in a bizarre manner. For example, Rebecca McCaslin testified she saw an agitated Tuite at a bus stop at around 6:00 p.m. on January 20; he was walking around, talking to himself and pointing in the air.

driveway, staring at West and the Greens.  Then, he turned around and headed up the road leading to the Crowe residence.  West went inside and telephoned the police.

Responding to West's call, Escondido Police Officer Scott Walters drove around the area looking for Petitioner but did not see anyone.  Walters circled the West's driveway in his patrol car and then drove to the Crowe residence.  Walters noticed the door leading from the laundry room to the interior of the house was open.[3]  As Walters circled the Crowes' driveway, his patrol car activated the sensor light above the exterior laundry room door, and the door closed from the inside.  Because he did not see Petitioner, Walters considered it a no contact call, and left.  He listed the suspect as "gone on arrival."

Inside the Crowe residence, the evening of January 20 had been fairly routine.  Stephanie's uncle, Michael Kennedy, had visited the Crowes and left about 9:00 p.m. through the laundry room door.  Michael Kennedy left the door unlocked.  Stephanie watched television and later spoke on the telephone with her best friend until a few minutes past 10:00 p.m.  Stephanie's younger sister, Shannon Crowe (Shannon), also watched television.  Shannon shared a bedroom with her maternal grandmother, Judith Kenney; both of them went to bed about 9:00 p.m.  As he often did, Stephanie's brother, Michael, spent most of the evening in his bedroom.  Stephanie's father, Stephen Crowe (Stephen), had a headache when he got home after work and went to bed early.  Stephanie's mother, Cheryl Crowe (Cheryl), went to bed about 10:00 p.m.  The Crowes always shut their bedroom door at night as a fire precaution.

During the night, Cheryl heard a knocking or pounding on the wall, and the door to the master bedroom "was opened and shut and opened."  She did not investigate.  Michael also heard pounding on the laundry room door; he thought someone had answered the door, and he went back to sleep.

After Stephanie's body was discovered at around 6:30 the following morning by Judith, Stephen called 911.  He then ran outside to direct the first emergency responders.  Stephen was surprised to find the laundry room door locked - by both the knob lock and the deadbolt - because the door was normally unlocked.

The Crowe family gathered in the living room after the police arrived to begin their investigation.  At one point, Michael told his family that he had awakened with a headache at 4:30 a.m. and went to the kitchen to get Tylenol and a glass of milk.  Although Michael would have passed Stephanie's room on the way to the kitchen, he did not see her in the hallway; instead, he said he thought her door was closed.

Police took members of the Crowe family to the police station for interviews.  Police began an extensive investigation of the homicide scene, looking for evidence in the Crowe residence; the Crowe family was not allowed to return for ten days.  Investigators used a fluorescein process to locate bloodstains throughout the house, and they searched the house thoroughly for fingerprints.  Police seized and impounded numerous items, including knives, tools, carpets, and portions of walls.  Police found no sign of forced entry.

Also that morning, the detectives were informed that many nearby residents had telephoned 911 the previous evening, complaining that a transient had knocked on their doors, looking for someone.  After Petitioner was identified in a photo lineup as that transient, police found him in a nearby strip mall.  Petitioner agreed to go to the police station, where police questioned him, took hair samples and fingernail scrapings, took photographs and impounded his clothes, including a long-sleeved red turtleneck (the red shirt) and a white T-shirt, in exchange for new clothes.  This took place while Petitioner was in a small holding

---

[3] The laundry room door, which the family commonly used to go in and out of the house, was considered the front door to the house.

cell with a concrete floor and no furniture.  Petitioner handed his clothes to Officer Scott Christensen, who placed each item of clothing in a separate bag.  The bags sat open on the concrete floor before they were sealed.  Earlier in the day, Christensen had been at the crime scene, where he videotaped the interior and exterior of the Crowe residence.  Christensen had not placed protective booties over his shoes when he videotaped the Crowe residence, and did not change his shoes before walking into Petitioner's holding cell.  Other police officers, who also had been at the crime scene and did not wear protective booties over their shoes, walked into the holding cell when Petitioner was present.  After processing Petitioner, police released him.

Police sent trace evidence collected at the Crowe residence, such as strands of hair, for DNA analysis.  In the first report, Petitioner was excluded as the donor of DNA found on any of thirty-seven items that were analyzed.  Petitioner's fingernail scrapings also were analyzed; only Petitioner's DNA was found in those samples.  Petitioner's fingerprints were not found in the Crowe house.

Because there were no signs of forced entry, police focused their investigation on Michael, Joshua, and Aaron.  Police linked a knife believed to have been used to kill Stephanie to Joshua and Aaron.

Petitioner had continued his bizarre search for Tracy after Stephanie's body was discovered on January 21.  At 8:15 that morning, Petitioner approached Noralee Dremin as she was returning to her apartment.  Dremin entered her apartment, shut the door and turned the deadbolt.  Petitioner immediately knocked on the door, and Dremin told him to leave.  Petitioner responded, "If you'll let me come in, we can talk more."  Dremin called 911.  Police responded and briefly detained Petitioner.  The officers, who were not aware of any connection to the Stephanie Crowe homicide, did not see any blood on Petitioner's clothing and did not find any weapons on him.

Subsequently, Petitioner knocked on the door to apartment No. 26 in the same apartment complex.  Sandra Freitas, who lived in the complex, told Petitioner that apartment No. 26 was vacant.  Petitioner said he was looking for Tracy.  Petitioner followed Freitas and tried to enter her apartment with her.  Freitas' husband told Petitioner to leave, and he complied.

On January 22, Petitioner went to another apartment complex in Escondido, where he banged on the door of a vacant apartment, which had an eviction sign in a window.  The maintenance man asked Petitioner to leave; Petitioner said he was looking for Tracy.  A police officer contacted Petitioner behind the complex.  Petitioner did not have any weapons on him and seemed disoriented.

On January 26, Petitioner attempted to break into the residence of Frank Santibanez at night.  Santibanez telephoned the police.  Petitioner told a police officer that he was looking for an old friend.  Petitioner did not have any weapon.

On January 27, Petitioner opened the front screen door and turned the doorknob to Joyce Fisher's home.  Fisher asked who was there; Petitioner replied he was looking for someone named Richard or that he was Richard.  Fisher told Petitioner to leave, but he kept trying to open the door.  Fisher telephoned 911.

On February 12, Petitioner followed thirteen-year-old Somer Hall and her girlfriends as they took a bus trip from San Diego to Escondido, changing buses several times.  When the girls arrived in Escondido, Petitioner followed them to Hall's apartment complex and repeatedly called out "Tracy" to Hall.  An adult who lived in the complex told Petitioner that Hall was not Tracy and to leave the girls alone.

08cv1101

On February 17, before 7:00 a.m., Petitioner went to the residence of Patsy Walker, pounded on the door and kept repeating, "Tracy, Tracy." Petitioner tried unsuccessfully to open the door.

On February 21, Petitioner peered into the window of Meredith Vezina's residence. Petitioner told Vezina he was looking for someone.

On February 26, Petitioner peered into the windows of various apartments in a complex. Petitioner was escorted off the property, but he returned and tried to force his way into one of the apartments. Petitioner said he was looking for a friend.

On February 25, at around 5:00 a.m., Petitioner knocked on the door and tried to enter the residence of Roxanne Neal. Petitioner next pressed his face against a window and looked inside.

On March 13, while Petitioner was in the mental health ward of the Vista jail on an unrelated matter, he paced back and forth, raised his arms up in the air, and yelled, "Tracy, you whore. I am going to kill you."

On April 28, police investigators examined Petitioner's impounded clothing for bloodstains. On the red shirt, they used a fluorescein process, which required the shirt to be completely wet. No bloodstains were found. During this process, Durgin used the police department's only tripod, which he also had used at the Crowe residence crime scene. At that time, Durgin had not used protective covering for the legs of the tripod. Durgin testified that he could not recall if he placed a tripod leg in a blood stain at the crime scene. The wet red shirt was then placed in a paper bag.

Because the white T-shirt had visible blood stains, the police circled certain stains on the shirt with an ink pen and sent the shirt to serologist Thomas Fedor for DNA testing. Fedor kept the white T-shirt in a freezer until he analyzed it on May 18. Fedor tested the circled stains on the white T-shirt and found the bloodstains matched Petitioner's genetic type. Stephanie was excluded as a donor of DNA on that shirt. Fedor, however, did not test the stains on the bottom hem of the T-shirt because he did not believe they were of interest to police. He returned the white T-shirt to the Escondido Police Department.

In December, criminalist Jennifer Mihalovich tested Petitioner's red shirt for DNA. Mihalovich found Stephanie's blood on the red shirt. Mihalovich opined the blood was a blood drop and not a transfer.

In 1999, the district attorney arranged for further testing of the bloodstains on the red shirt by Orchid Cellmark DNA testing firm. Mark Stolorow, a forensic biologist and executive director of Orchid Cellmark, found five areas to be tested and sent the red shirt to Tia Fenton, a DNA analyst, for testing. Fenton found Stephanie's DNA and the DNA of a male on the red shirt. The teenagers were excluded as donors of the DNA, but Petitioner was not excluded as a donor.[4] At trial, Stolorow testified the stains were not consistent with dried flakes of blood that were saturated with liquid and then penetrated the red shirt. Stolorow opined it was more likely the blood was wet when applied.

In December 2002, a police officer reviewed photographs taken at the Crowe residence and photographs of items found in Petitioner's pockets on January 21, 1998. The contents of Petitioner's pockets included a Smith Brothers cough drop wrapper and a torn Snickers candy bar wrapper. During the initial investigation, police had found wrappers from Smith Brothers cough drops in Stephanie's and Michael's bedrooms, and a Smith Brothers cough

---

[4] Murder charges against the three boys were dismissed in February 1999.

drop package on the kitchen counter. Distribution of Smith Brothers cough drops is limited in Southern California. Police also had found a Snickers candy bar wrapper in Stephanie's closet.

In April 2003, the Attorney General's Office asked Fay Springer, a criminalist with the Sacramento County Forensic Services Laboratory who had an expertise in the microscopic examination of fibers, to examine Tuite's red shirt for blood spatter.[5] Springer agreed, but wanted to examine all of Tuite's outer clothing and shirts. Springer observed three blood smears near the bottom front hem of Tuite's white T-shirt and recommended they be tested for DNA. A DNA analysis showed that two of the smears shared the DNA of Tuite and Stephanie. Springer opined the blood was placed on the white T-shirt while the blood was wet. She testified the smears were inconsistent with the defense theory that police at the crime scene had picked up blood flakes on their shoes, transferred the blood flakes to Tuite's holding cell, where they were deposited on Tuite's clothing and later rehydrated onto his clothes.

On the first day of his trial, February 2, 2004, Tuite escaped from the courtroom holding tank during the lunch hour by freeing himself from handcuffs. Tuite left the courthouse and boarded a bus. At 4:30 p.m., officers apprehended Tuite in the Clairemont area.

In addition to the evidence concerning Tuite's search for Tracy by knocking and opening doors to various residences, the prosecution presented evidence that police had found Tuite in possession of a knife on four separate occasions-three before Stephanie's fatal stabbing and one afterward. The court admitted the evidence concerning Tuite's search for Tracy and prior incidents of knife possession for the limited purpose of showing a characteristic method, plan or scheme. (Evid.Code, § 1101, subd. (b).)

*Defense Case*

The bulk of the defense case was evidence directed toward establishing that Michael, Joshua and Aaron killed Stephanie. This evidence largely was presented by showing the videotapes and audiotapes of police interrogations of Michael and Joshua.

Police became suspicious of Michael after they interviewed him on January 21, 1998. Michael said he awoke at around 4:30 a.m., turned on his television, went to the kitchen to get milk and Tylenol and thereafter returned to his room. He further said Stephanie's door was shut and he did not see her body. This contradicted evidence that Stephanie died around midnight and her body was positioned in the doorway.

On January 22, when a police sergeant went to the Treadway residence to interview Joshua, the sergeant saw a survival-style knife on the couch. Joshua said it belonged to his brother, who said the knife belonged to Joshua.

On January 23, detectives interrogated Michael, starting at 6:00 p.m. and concluding around midnight. The detectives falsely told Michael that they found Stephanie's blood in his bedroom and accused him of killing her. Michael denied killing his sister and said he loved her and was a good brother. Eventually, Michael said he knew he killed Stephanie because the detectives said he did, but he had no memory of it. He attributed the killing and his loss of memory to rage. Michael said since the seventh grade he had resented Stephanie and blamed her for making him unpopular. Police arrested Michael after the interrogation and took him to juvenile hall.

_____

[5] The Attorney General's Office was the agency that prosecuted Petitioner at trial because the San Diego County District Attorney's Office recused itself.

On January 27, Aaron's mother reported that one of the knives from her son's collection was missing. Police obtained warrants and searched the Treadway and Houser residences. They found two knives under Joshua's bed. One of them-the "Best Defense knife"-looked like the knife observed on the couch five days earlier by the sergeant. Aaron identified it as the missing knife. Police arrested Joshua for stealing it. Joshua's mother said he had obtained the knife about January 16. The lead detective believed the knife could have been the murder weapon.

Police started interrogating Joshua that evening and continued for 10 to 12 hours into the next morning. Joshua said Michael often talked about killing Stephanie because everything she did made him angry, but he thought Michael was kidding. Joshua denied being involved in Stephanie's killing and said the Best Defense knife was not the murder weapon because it had been under his bed since early January when he stole it from Aaron. Police told Joshua he was lying when he said he stole the knife. Joshua changed his story and said Aaron gave him the knife, telling him to dispose of it because Michael used it to kill Stephanie. He took the knife home and put it under his bed. Joshua was allowed to go home.

On February 10, detectives again interrogated Joshua, who said Aaron admitted he helped Michael kill Stephanie: Michael held Stephanie and kept her quiet while Aaron "took care of the rest." Joshua said other than disposing of the knife, he did not participate in the killing. Joshua repeatedly denied being at the Crowe residence; he insisted that Aaron gave him the knife on Super Bowl Sunday and threatened to kill him if he told anyone. After the detective suggested Joshua acted as a lookout, he admitted he was at the Crowe residence the night of the killing and gave the following account. Joshua initially stayed outside as a lookout but then went to the kitchen. Michael rinsed the knife in the sink and gave it to Aaron. Joshua and Aaron left together. Aaron told Joshua that Michael went into Stephanie's room first and covered her mouth. Aaron then entered the room and stabbed her. Aaron took the knife home to clean it thoroughly and gave it to Joshua a few days later, on Super Bowl Sunday.

The defense also presented expert testimony from individuals who had been retained by the district attorney's office when it was prosecuting Michael, Joshua and Aaron for Stephanie's murder.

Brian Kennedy, one of those experts, assembled Stephanie's bed and used a forensic mannequin to analyze the stabbing attack. He concluded that Stephanie's comforter was used to restrain her. He said more than one person probably participated in the killing, but it could have been only one. He also opined that it was likely one person held the comforter while the other stabbed Stephanie.

Brian Kennedy also testified about the prosecution's blood evidence. Kennedy looked at a photograph of the bloodstain on the red shirt identified by Mihalovich as having Stephanie's DNA. Kennedy testified the bloodstain appeared to be physically altered, perhaps diluted, and looked like a dry clot. Kennedy described a dry clot as a "dried piece of blood sitting on top of the material," which then is diluted and fused into the material. Kennedy said the blood was either semi-dry when it was applied, or a water-based liquid came into contact with the shirt, causing the blood to be reconstituted and diffused into the material. Kennedy opined another bloodstain was transferred onto the red shirt; this blood stain appeared to be diluted and diffused into the material, unlike fresh blood. Kennedy said he would expect this type of pattern if dried blood came into contact with a wet piece of clothing or if dried blood was deposited on clothing that later became wet. Kennedy also opined that dried blood on the foot of a tripod could have transferred onto a nearby piece of clothing without directly contacting it.

As to Tuite's white T-shirt, Kennedy reviewed photographs of the shirt that had been taken in 1998 and in 2003. In the 1998 photograph, ink marks appeared only on the left shoulder of the shirt; however, in the photograph taken in 2003, ink marks appeared on both left and

right shoulder areas of the shirt. Kennedy opined that the ink appearing on the left shoulder had transferred to the right shoulder sometime between the time the two photographs were taken. He further testified that a water-based product could have changed the appearance of the bloodstains on the white T-shirt, rendering Springer's analysis and the subsequent DNA testing suspect. Kennedy also said freezing and thawing a garment causes condensation that can reconstitute bloodstains and affect forensic blood analysis.

Another defense expert originally contacted by the district attorney's office was Special Agent Mary Ellen O'Toole of the FBI's Behavioral Analysis Unit, who had been asked to investigate the homicide scene and determine whether it was organized or disorganized. O'Toole testified at Tuite's trial that Stephanie was a targeted victim because (1) of six people in the house, only she was attacked; (2) the attacker had to pass other rooms to reach her bedroom; (3) there was no evidence of sexual assault or theft; and (4) the nature of her injuries.

O'Toole opined it was an organized crime scene because (1) the crime involved planning, (2) all wounds were inflicted before death, (3) the perpetrator exhibited familiarity with the layout of the house and left no clue as to points of entry or exit, and (4) the attacker maintained control as evidenced by the fact no one else in the house was aroused and there were no self-inflicted injuries. O'Toole also opined there were probably multiple perpetrators, although one person could have committed the crime.

Gene Lawrence, a criminalist in the sheriff's laboratory who spent 600 hours over two years examining trace evidence, testified he found nothing that connected Tuite with the inside of the Crowe residence.

Psychiatrist Mark Kalish examined Tuite's psychiatric records from various state mental institutions where Tuite had received treatment since 1994. Kalish opined that Tuite suffers from schizophrenia, organic brain syndrome and methamphetamine abuse. Schizophrenia typically causes hallucinations, primarily auditory. Schizophrenia can also cause delusions or false beliefs such as paranoia or grandiosity. Other typical symptoms are disorganized speech and grossly disorganized behavior. Symptoms of organic brain syndrome include impaired memory, deterioration of language function, impairment of motor activities, impaired ability to recognize or identify objects, impaired ability to think abstractly, and impaired ability to concentrate or focus on the task at hand.

*Prosecution Rebuttal*

The prosecution's rebuttal case attempted to refute the defense claim that Michael, Joshua and Aaron killed Stephanie. An expert on police interrogations testified the techniques used by police during Michael's and Joshua's interrogations were coercive. Michael, Joshua and Aaron testified they did not have any involvement in the killing of Stephanie. In addition, Michael and Joshua explained why they had made inculpatory statements to the police.

Retired FBI agent Gregg McCrary attacked O'Toole's crime scene evaluation. He opined the crime scene was more disorganized than organized. Among other things McCrary saw no evidence of control by the perpetrator. He opined Stephanie's killing was a "blitz" attack, involving immediate application of force.

Psychologist Paul Mattiuzzi met twice with Tuite and reviewed his mental health records dating back to 1990. Mattiuzzi opined that Tuite had suffered from chronic schizophrenia for at least 15 years. The diagnosis did not mean Tuite had all the symptoms associated with schizophrenia. Mattiuzzi disagreed with Kalish that Tuite had been diagnosed with organic brain damage.

(Lodgment No. 6 at 3-19.)

08cv1101

### III.  PROCEDURAL HISTORY

On May 26, 2004, a jury convicted Petitioner of voluntary manslaughter, in violation of Penal Code § 192(a), as a lesser included offense of murder in the stabbing death of 12-year-old Stephanie Crowe.  (Clerk's Transcript, Vol. 9 at 1973.)  The jury also found true the allegation that Petitioner personally used a deadly and dangerous weapon, a knife, in violation of Penal Code § 12022.  (CT, Vol. 9 at 1974.)  In a separate proceeding, the trial court found Petitioner had a prior prison term conviction within the meaning of Penal Code § 667.5(b).  (CT, Vol. 10 at 2359.)  Petitioner was sentenced to a total term of 13 years in prison.  (*Id*.)

Petitioner filed an appeal in the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgment No. 3.)  Petitioner argued: (1) the trial court erred during deliberations when it refused to permit a portion of a witness' direct testimony to be included in a readback; (2) the trial court erred when it denied Petitioner's motion to continue the trial after investigators discovered the victim's DNA on Petitioner's white T-shirt less than two months before trial was set to commence; (3) the jury committed misconduct during deliberations when it considered evidence not presented at trial; (4) the trial court erred when it instructed the jury how to use evidence of uncharged acts because the instruction created an unreasonable inference that violated federal due process; (5) the trial court violated Petitioner's federal and state confrontation rights when it precluded him from cross-examining a prosecution witness about his efforts to prevent a defense expert from testifying; (6) the trial court committed error by failing to give sua sponte instructions on involuntary manslaughter as a lesser-included offense of murder; and (7) the cumulative effect of errors committed at Petitioner's trial rendered the proceedings fundamentally unfair, in violation of federal due process.  (*Id*.)  On December 14, 2006, the Court of Appeal affirmed the judgment.  (Lodgment No. 6.)

On January 19, 2007, Petitioner submitted a petition for review in the California Supreme Court.  (Lodgment No. 7.)  The petition for review raised the same arguments as in his direct appeal.  The California Supreme Court summarily denied the petition for review on April 2, 2007.  (Lodgment No. 8.)

///

///

10

1    Petitioner filed the instant federal petition on June 23, 2008.  [Doc. No. 1.]  Respondent

2  answered on August 21, 2008.  [Doc. No. 5.]  Petitioner filed his traverse on September 17, 2008.  [Doc.

3  No. 8.]

## IV.  DISCUSSION

5    Petitioner contends his federal constitutional rights were violated as follows: (1) the trial court

6  violated his rights under the Confrontation Clause when it precluded him from cross-examining a

7  prosecution expert about his alleged bias against a defense expert he was called to rebut; (2) the trial

8  court violated his rights under the Due Process Clause because a jury instruction that told the jury how it

9  could use evidence of Petitioner's uncharged acts created an unreasonable inference of guilt; (3) the trial

10  court violated his rights under the Due Process Clause when it denied his motion to continue the trial

11  after the victim's DNA was discovered on Petitioner's white t-shirt less than two months before trial

12  commenced; and (4) the cumulative effect of errors committed at the trial violated his right to due

13  process.  Petitioner requests an evidentiary hearing on all of his claims.

14    Respondent argues the Petition should be denied because the California Court of Appeal

15  reasonably rejected all of the claims raised in the Petition.

16  **A.    Standard of Review**

17    Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal

18  habeas corpus claims:

19    The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an
        application for a writ of habeas corpus in behalf of a person in custody pursuant to the
20    judgment of a State court only on the ground that he is in custody in <u>violation of the
        Constitution or laws or treaties of the United States.</u>

21

22  28 U.S.C. § 2254(a) (emphasis added).

23    The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996

24  ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  As amended, 28 U.S.C. § 2254(d) reads:

25    (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to
        the judgment of a State court shall not be granted with respect to any claim that was
26    <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –

27        (1) resulted in a decision that was contrary to, or involved an unreasonable
            application of, clearly established Federal law, as determined by the Supreme
28        Court of the United States; or

11

1          (2) resulted in a decision that was based on an unreasonable determination of
the facts in light of the evidence presented in the State court proceeding.

2

3  28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

4       To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2).  *See*

5  *Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) as follows:

6      Under the "contrary to" clause, a federal habeas court may grant the writ if the state court
arrives at a conclusion opposite to that reached by this Court on a question of law or if the

7      state court decides a case differently than this Court has on a set of materially indistinguish-
able facts.  Under the "unreasonable application" clause, a federal habeas court may grant

8      the writ if the state court identifies the correct governing legal principle from this Court's
decisions but unreasonably applies that principle to the facts of the prisoner's case.

9

10  *Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

11       Where there is no reasoned decision from the state's highest court, the Court "looks through" to

12  the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the

13  dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must

14  conduct an independent review of the record to determine whether the state court's decision is contrary

15  to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223

16  F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes*

17  *v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court

18  precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as

19  neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent],"

20  *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*

21      **B.**    **Ground One**

22       Petitioner contends the trial court violated his rights under the Sixth Amendment's Confrontation

23  Clause when it precluded him from cross-examining a prosecution expert, Retired FBI Supervisory

24  Special Agent Gregg McCrary ("McCrary"), about his alleged bias against a defense expert he was

25  called to rebut, Special Agent Mary Ellen O'Toole of the FBI's Behavioral Analysis Unit ("O'Toole").

26  On direct appeal, the California Court of Appeal found the trial court violated Petitioner's constitutional

27  right to confront adverse witnesses when it precluded the cross-examination.  However, the state

28  appellate court held the error was harmless pursuant to *Delaware v. Van Ardsall*, 475 U.S. 673, 684

08cv1101

(1986), and *Chapman v. California*, 386 U.S. 18, 24 (1967).  Petitioner argues the state appellate court's

decision was unreasonable because the error was not harmless under the applicable standard.

In regards to the trial court's decision to preclude the cross-examination, the facts found by the

state appellate court are as follows:

> At issue was a February 24, 2004 letter McCrary wrote to the International Criminal Investigative Analysts Fellowship (ICIAF) about a potential ethical violation by O'Toole. In the letter, McCrary complained that O'Toole was undermining the successful prosecution of Tuite, whom he called the "true killer." McCrary also wrote that the San Diego County Sheriff's Office and the Attorney General were shocked and dismayed by O'Toole's proposed testimony, which they viewed as an attempt to obstruct justice. Additionally, McCrary's letter said O'Toole's analysis was "fundamentally flawed." McCrary also expressed the hope that "cooler, more rational thinking will prevail and Ms. O' Toole will not testify."[6]

> At an Evidence Code section 402 hearing held during trial, Tuite sought permission to cross-examine McCrary for bias using the letter. McCrary testified at the hearing that he had been asked to write the letter by the president of the organization. McCrary said he knew O'Toole had initially been contacted by the district attorney's office while it was prosecuting the three teenagers for Stephanie's murder. In response to a query from the court, McCrary agreed that O'Toole, as an FBI agent, could testify for the defense only with the agency's permission. When asked by defense counsel where he got the information about the Attorney General's Office and the sheriff's office being " 'shocked and dismayed' " and thinking O'Toole was trying to " 'obstruct justice,' " McCrary said his sources were two prosecutors

---

[6] The letter read in pertinent part: "I view the ethical issue inherent in this case to be the fact that an ICIAF member and an FBI Supervisory Special Agent, Ms. Mary Ellen O'Toole, is attempting to undermine the successful prosecution of Richard Tuite who has been charged and is being tried for the murder of 12-year-old Stephanie Crowe. After Ms. O'Toole was prohibited from testifying in federal court in the civil case, she has now volunteered to testify in the criminal trial in state court for the defense. This appears to directly violate the missions of the ICIAF, the FBI and the NCAVC [National Center for the Analysis of Violent Crime]. These organizations are dedicated to supporting law enforcement in their efforts to protect the innocent while bringing the guilty before the bar of justice where they can be held accountable for their actions. [¶] The Office of the Attorney General for the State of California and the San Diego County Sheriff's Office are working jointly to see that justice is done in the case. After a thorough and meticulous investigation they have identified the true killer, Richard Tuite. They have linked Tuite to the murder of Stephanie Crowe through incontrovertible physical, forensic and circumstantial evidence, not the least of which is having identified the blood spatter on both Tuite's shirt and undershirt as belonging to the victim (who had been stabbed to death). [¶] Neither the San Diego County Sheriff's Office nor the Office of the Attorney General for the State of California has requested the assistance of the NCAVC or [the] ICIAF in this matter. Both agencies are shocked and dismayed that Mary Ellen O'Toole, a representative of both the FBI and [the] ICIAF, has injected herself into this case in what they view as an attempt to obstruct justice and undermine the successful prosecution of Richard Tuite. [¶] The long range implications for this are both obvious and distressing. Ms. O'Toole's proposed testimony damages the relationship between the FBI, the ICIAF and law enforcement agencies when we should be working [to] build a sense of trust and rapport with those agencies. [¶] I have reviewed the multitude of underlying documents and evidence in this case and believe Ms. O'Toole's analysis to be fundamentally flawed, self-contradictory and not supported by the majority of the evidence in this case. [¶] ... [¶] I have been subpoenaed by the State of California to testify for the prosecution, specifically to rebut the proposed testimony of Ms. O'Toole. I will do so if necessary, but remain hopeful that cooler, more rational thinking will prevail and Ms. O'Toole will not testify. This would remove an unnecessary obstacle to what is already a complicated and difficult prosecution." (CT, Vol. 3 at 645-57.)

13

1    handling the case for the Attorney General's Office. McCrary admitted he had not talked to
2    the sheriff's detective who investigated the case until the morning of the hearing. McCrary
     also conceded that the prosecutors had not used the same words-for example, " 'obstruct
3    justice and undermine the successful prosecution of Richard Tuite' "-that McCrary had used
     in his letter.

4    Tuite's counsel argued the letter showed McCrary had "crossed over the line from being a
5    witness to being an advocate." Counsel claimed that the letter addressed McCrary's
     credibility because McCrary not only said he disagreed with O'Toole, but also tried to
6    prevent him from testifying. At the conclusion of the hearing, the court said it would decide
     later whether the defense could use the letter during its cross-examination of McCrary.

7    After McCrary testified on direct examination, the matter was brought up again outside the
8    presence of the jury. Tuite's counsel argued that McCrary's letter showed bias, and the jury
     was entitled to know he tried to prevent O'Toole from testifying. The court ruled that the
9    defense could not cross-examine McCrary about the letter because it was irrelevant.

10   (Lodgment No. 6 at 35-38.)

11        As noted above, the state appellate court found that although the trial court's decision violated

12   Petitioner's rights under the Confrontation Clause, the error was harmless.  The state court of appeal

13   focused its analysis on the relative importance of the witness' testimony to the prosecution's case.

14   (Lodgment No. 6 at 41.)  It determined that although cross-examination on bias may have lent greater

15   weight to O'Toole's testimony about whether the crime scene was "organized," the competing experts'

16   opinions as to whether to label the crime scene "organized" or "disorganized" had almost no significance

17   on the case as a whole.  (*Id*. at 42-43.)  The California Court of Appeal's conclusion was not objectively

18   unreasonable.

19        Violation of the Confrontation Clause is trial error subject to harmless-error analysis, *see*

20   *Delaware*, 475 U.S. at 684, because its effect can be "quantitatively assessed in the context of other

21   evidence presented" to the jury,  *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991).  If the error did not

22   result in "actual prejudice," the writ should not issue.  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)

23   (adopting standard of *Kotteakos v. United States*, 328 U.S. 750 (1946)).  "Actual prejudice" is

24   demonstrated if the error in question had a "substantial and injurious effect or influence in determining

25   the jury's verdict." *Id*. at 623.  Additionally, a federal court may not grant a habeas petition simply

26   because it determines the state appellate court erred in concluding the trial court's errors were harmless.

27   *Mitchell*, 540 U.S. at 18.  Habeas relief is only appropriate if the state appellate court applied the

28   harmless-error review in an "objectively unreasonable" manner. *Id*.; *see also Williams v. Taylor*, 529

14

1  U.S. 362, 410 (2000) (stating an "*unreasonable* application of federal law is different from an *incorrect*
2  application of federal law").

3     Petitioner notes the jury deliberated for seven-plus days and appears to suggest that any error
4  would have been prejudicial.  However, Petitioner himself acknowledges the key evidence against him
5  was not the labeling of the crime scene as "organized" or "disorganized," but rather the bloodspot
6  evidence on Petitioner's shirts.  (Petition at 42.)  Any error in excluding McCrary's letter would have
7  had no impact on the DNA evidence that Petitioner had the victim's blood on his clothing.  As noted by
8  the state court of appeal, "[a]part from the defense's dry blood contamination theory, the only rational
9  explanation for how Tuite came to have Stephanie's blood on his clothing was that he killed her."
10  (Lodgment No. 6 at 42.)

11     Petitioner also argues the testimony of the two experts related directly to the two competing
12  theories of the case: whether Petitioner, a stranger, entered the house and killed Stephanie or whether
13  Stephanie was killed by her brother or another insider.  In support of its theory, O'Toole was called by
14  the defense to provide an assessment of the crime scene in terms of its level of organization or
15  disorganization.[7]  (Reporters Transcript, Vol. 38 at 4890.)  After reviewing police reports, medical
16  examiner's reports, photographs, sketches, aerials, and statements from witnesses, O'Toole opined the
17  crime scene was "organized." (RT, Vol. 38 at 4886.)  O'Toole believed the crime scene was "organized"
18  because the perpetrator appeared to have knowledge of the layout of the home, there were no obvious
19  signs of forced entry into the home, there was no indication any of the other occupants of the home heard
20  anything, the perpetrator maintained control over the scene and the victim, and the injuries occurred
21  before death.  (RT, Vol. 39 at 4915, 4916, 4921,4922,4927.)

22     McCrary was called by the prosecution to rebut O'Toole's opinion regarding the crime scene.[8]
23  McCrary opined the crime scene was "more disorganized than organized," (RT, Vol. 52 at 6986),

24  _____

25     [7] An "organized" crime scene typically involves the use of a con, a ruse, or a subterfuge to gain
   control over the victim, and the use of restraints are often observed.  (RT, Vol. 52 at 6965.)  An
26  "organized" crime scene also includes evidence of planning.  (RT, Vol. 51 at 6978.) A "disorganized"
   crime scene generally resembles a blitz attack, with the immediate application of injurious physical force
27  and results in a bloody, sloppy crime scene.  (RT, Vol. 52 at 6973.)

28     [8]  O'Toole also opined Stephanie Crowe was a targeted victim.  (RT, Vol. 38 at 4892.)
   However, McCrary agreed with O'Toole's opinion that Stephanie Crowe was a targeted victim.  (RT,
   Vol. 52 at 7009.)

08cv1101

1   because it appeared to be a sudden, violent attack where the victim was stabbed and slashed around the

2   head and shoulders several times, (RT , Vol. 52 at 6975).  Additionally, McCrary opined there was no

3   evidence of planning on the part of the perpetrator or an attempt to clean-up the crime scene.  (RT, Vol.

4   52 at 6977-78.)

5        While allowing the letter for impeachment on bias may have caused the jury to give more weight

6   to O'Toole's opinion that the crime scene was "organized," as opposed to McCrary's labeling of the

7   crime scene as "more disorganized than organized," any such speculative impact would have been

8   minimal when "quantitatively assessed in the context of other evidence presented" to the jury.  *See*

9   *Fulminante*, 499 U.S. at 308.  The jury was presented with all of the undisputed factual evidence, such as

10  medical examiner's reports, photographs, and statements from witnesses, upon which O'Toole and

11  McCrary based their opinions.  The defense was able to argue that, based on the facts of the case,

12  Petitioner was incapable of committing the crime and only an insider could have killed Stephanie.  (*See*

13  *generally* RT Vols. 56-57, at 7275-7433.)  Thus, regardless of the experts' differing opinions as to the

14  labeling of the crime scene, the jury was able to draw its own conclusions as to Petitioner's guilt from

15  the undisputed factual evidence presented in the case.

16       In sum, the impeachment value of the letter was limited to showing bias on the part of McCrary,

17  which may have lead the jury to give more weight to O'Toole's characterization of the crime scene as

18  "organized."  The letter did not have any impact on the DNA evidence against Petitioner, nor did it

19  impact the defense's ability to argue to the jury that, based on the facts of the case, Petitioner was

20  incapable of committing the crime and only an insider could have killed Stephanie.  The Court therefore

21  finds there has been an insufficient showing that the improper exclusion of letter had "a substantial and

22  injurious effect" on the jury's verdict.  Because the error did not have a "a substantial and injurious

23  effect" on the jury's verdict, the state appellate court's denial of Petitioner's claim was neither contrary

24  to, nor an unreasonable application of, controlling federal law and Petitioner is not entitled to federal

25  habeas relief on this claim.  *See Brecht*, 507 U.S. at 623.  Accordingly, this Court recommends

26  Petitioner's first ground for relief be **DENIED**.

27  ///

28  ///

1

### C.    Ground Two

2      Petitioner contends the trial court improperly instructed the jury with regards to the evidence of

3  Petitioner's uncharged acts, which consisted of his search for Tracy in the area around the victim's home

4  and his possession of a knife on several occasions.  Petitioner argues the trial court's modified version of

5  CALJIC No. 2.50 violated his rights under the Due Process Clause because it created a permissive

6  inference that was not reasonable in light of the facts before the jury.

7      The state court of appeal found the permissive inference, as applied to the facts of the case and in

8  the context of the entire charge to the jury, was rational.  It concluded a reasonable juror would not have

9  understood the permissive inference of CALJIC No. 2.50, when considered with the remaining

10  instructions, "to be either an invitation or a compulsion to use the uncharged acts evidence by itself to

11  find Tuite guilty of murder, or a lesser included crime, regardless of whether it was satisfied beyond a

12  reasonable doubt that he killed Stephanie."  (Lodgment No. 6 at 49.)  The decision of the California

13  Court of Appeal was not objectively unreasonable.

14      The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction

15  except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which

16  he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  Evidentiary presumptions are "a staple of our

17  adversary system of factfinding," and are constitutionally valid so long as they do not  "undermine the

18  factfinder's responsibility at trial ... to find the ultimate facts beyond a reasonable doubt."  *Ulster County*

19  *v. Allen*, 442 U.S. 140, 156 (1979).  A permissive inference, such as is presented here, allows, but does

20  not require, the trier of fact to infer an ultimate fact from proof by the prosecutor of other facts.  *Id*. at

21  157.  It does not shift the burden of proof, and leaves the trier of fact free to credit or reject the inference.

22  *See Francis v. Franklin*, 471 U.S. 307, 314 (1985) (stating "[a] permissive inference suggests to the jury

23  a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to

24  draw that conclusion").  Therefore, it does not disrupt Due Process unless, under the facts of the case,

25  "there is no rational way the trier could make the connection permitted by the inference."  *Ulster County*,

26  442 U.S. at 157.  In other words, a permissive inference violates Due Process "only if the suggested

27  conclusion is not one that reason and common sense justify in light of the proven facts before the jury."

28  *Francis*, 471 U.S. at 314-15.

1    Additionally, even "[i]f a specific portion of the jury charge, considered in isolation, could

2    reasonably have been understood as creating a presumption that relieves the State of its burden of

3    persuasion on an element of an offense, the potentially offending words must be considered in the

4    context of the charge as a whole." *Id*. at 315.  Other jury instructions might explain or clarify the infirm

5    language so that a reasonable jury could not have considered the charge to have created an

6    unconstitutional presumption. *Id*.  Thus, after considering the challenged instruction in the context of

7    the other instructions, it is necessary for a court to determine "whether there is a reasonable likelihood

8    that the jury has applied the challenged instruction in a way" that violates the Constitution. *Estelle v.*

9    *McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

10    At the close of trial, the jury was instructed pursuant to CALJIC No. 2.50 as follows:

11    Evidence has been introduced for the purpose of showing that the defendant committed other
      acts other than that for which he is on trial.

12

13    Except as you will otherwise be instructed, this evidence, if believed, may not be considered
      by you to prove that the defendant is a person of bad character or that he has a disposition
      to commit crimes. It may be considered by you only for the limited purpose of determining

14    if it tends to show a characteristic method, plan or scheme in the commission of acts similar
      to the method, plan or scheme used in the commission of the offense in this case which

15    would further tend to show:

16    The defendant possessed the means that might have been useful or necessary for the
      commission of the crime charged;

17

18    A clear connection between the other acts and the crime of which the defendant is accused
      so that it may be inferred that if defendant committed the other acts defendant also
      committed the crime charged in this case.

19

20    For the limited purpose for which you may consider such evidence, you must weigh it in the
      same manner as you do all other evidence in the case.

21    You are not permitted to consider such evidence for any other purpose.

22    (CT, Vol. 9 at 1902.)

23    Petitioner argues the permissive inference of CALJIC No. 2.50 was irrational because Petitioner

24    was charged with murder, while the evidence of uncharged acts involved no violence on the part of

25    Petitioner.  However, the facts supporting the inference need not be identical to those of the crime

26    charged, so long as the suggested conclusion is reasonable and supported by common sense. *See*

27    *Francis*, 471 U.S. at 314-15. So it is here.

28    ///

18

1    The jury was presented with the following evidence relating to the permissive inference: there

2   was no sign of forced entry at the victim's home, (RT, Vol. 18 at 2255-62); the victim's family routinely

3   left their laundry room door unlocked, (RT, Vol. 26 at 3606); the laundry room door operated as and was

4   considered the front door/entry way of the home, (RT, Vol. 26 at 3605); Petitioner was engaged in an

5   ongoing search for "Tracy" or "the girl", knocking on and attempting to open doors of residences, (RT,

6   Vol. 13 at 1376, 1378-79; RT, Vol. 15 at 1814-15); if Petitioner found a door unlocked he attempted to

7   enter the house in question without permission, (RT, Vol. 15 at 1814-15); Petitioner was in the victim's

8   neighborhood on the night of the murder searching for "the girl", (RT, Vol. 13 at 1814-15); the victim,

9   Stephanie Crowe, was a young girl; and Petitioner was last seen on the night of the murder headed up the

10   road leading to the victim's home, which was the only residence on that part of the road, (RT, Vol. 13 at

11   1383).   Additionally, the victim was killed with a knife, which was never recovered, and the jury was

12   presented with evidence that police had found Petitioner in possession of a knife on four separate

13   occasions, three of which occurred prior to the victim's fatal stabbing.  (Lodgment No. 6 at 14.)

14    Based on this evidence, and following the language of CALJIC No. 2.50,  the jury could

15   reasonably determine Petitioner had a characteristic method of going to the homes of strangers, including

16   those in Petitioner's neighborhood, and opening the doors of those houses if they were unlocked and

17   entering or trying to enter without permission.  This method was *similar* to the method used in the

18   commission of the charged offense because the door to the victim's home was routinely unlocked, which

19   would explain how the perpetrator entered the home without any visible signs of forced entry.  The jury

20   could reasonably determine Petitioner's plan was to find "Tracy" or "the girl," and the victim was a

21   young girl.  The jury could also reasonably determine Petitioner possessed the means that might have

22   been useful or necessary for the commission of the crime charged because the victim was murdered with

23   a knife, which was never recovered, and Petitioner routinely carried a knife on his person.  In light of

24   these facts, the jury could reasonably find a clear connection between the prior acts and the crime

25   charged, so as to support an *inference* that Petitioner committed the charged acts.

26    Furthermore, the trial court guarded against possible misuse of the instruction by specifically

27   advising the jury that the "evidence [of other acts], if believed, may not be considered by you to prove

28   that the defendant is a person of bad character or that he has a disposition to commit crimes."  (CT, Vol.

9 at 1902.)  The trial court also instructed the jury that for the limited purpose for which they may

consider the prior acts, they "must weigh it in the same manner as [they] do all other evidence in the

case." (*Id.*)  Finally, the trial court instructed the jury with CALJIC No. 2.50.1, a companion instruction

to CALJIC No. 2.50, which stated that even if the jury found other the acts were committed by a

preponderance of the evidence, it could not find Petitioner guilty of the charged crime, or any lesser

included crime, unless "the evidence as a whole [] persuade[s] you beyond a reasonable doubt that the

defendant is guilty of that crime." (CT, Vol. 9 at 1903.)  Accordingly, because the inference permitted

by CALJIC No. 2.50 was reasonable in light of the evidence presented in the case, and because the jury

was properly instructed on how to weigh the inference in its deliberations, this Court recommends

Petitioner's second ground for relief be **DENIED**.

### D.    Denial of Continuance

Petitioner contends the trial court's denial of his motion for a continuance following the

discovery of the victim's blood on Petitioner's white shirt violated his Due Process rights because it

rendered his trial fundamentally unfair.  Specifically, he argues the trial court's denial of the motion

prevented his trial counsel from being able to adequately address the issue of how the victim's blood got

on the white shirt. In regards to the trial court's decision to deny the motion for a continuance, the facts

found by the state appellate court are as follows:

> In April 2003, Springer told the Attorney General she had located presumptive blood stains on the hem of Tuite's white T-shirt, which had not previously been tested for DNA. On June 27, 2003, Springer recommended DNA testing for these stains, as well as for the stains on the red shirt. In August, the prosecution notified defense counsel of plans to conduct destructive testing on Tuite's clothes and invited the defense to have an expert present.[9] Also in August, the prosecution notified defense counsel that Tuite's clothes, including the red shirt and white T-shirt, had been returned to the San Diego County Sheriff.
>
> Defense counsel directed Marc Taylor, a defense expert, to observe the testing of the red shirt. On September 19, Taylor watched Connie Milton of the sheriff's crime lab take two items of clothing from sealed evidence bags. The first item was the red shirt; Milton cut portions of the red shirt for further testing, and Taylor observed the cutting process and photographed the shirt. Milton then removed the white T-shirt from another evidence bag and cut portions of it for later testing. Taylor had not expected the white T-shirt to be tested; defense counsel had not told him the white T-shirt was to be tested, and Taylor was not

---

[9] There is a conflict between the prosecution and defense on this point. According to the defense, the Attorney General informed defense counsel that the red shirt would be tested. According to the Attorney General, the defense was told Tuite's clothes would be tested.

aware that it had any evidentiary significance.[10] Nonetheless, Taylor photographed the white T-shirt and monitored the cutting process. Taylor agreed to delay the DNA analysis to December 8.

Taylor did not prepare a report of his observations of September 19. In November, Taylor received a fax request from defense counsel for the photographs of the red shirt. Taylor sent the requested photographs of the red shirt to defense counsel, but did not send the photographs of the white T-shirt at that time.

Milton started the extraction process on December 8, with Taylor present. On December 10, the prosecution notified defense counsel that Milton found Stephanie's DNA on the white T-shirt. Attorney William Fletcher, who handled the forensic evidence for the defense at trial, was surprised by those results because he had not known the white T-shirt had undergone DNA analysis. He did not discuss the white T-shirt with Taylor until December 10.

On December 18, defense counsel asked that the trial, scheduled to begin February 2, 2004, be continued. The prosecution did not oppose the continuance. The court denied the motion without comment. Defense counsel then moved to exclude the white T-shirt blood evidence. In support of the this motion, the defense filed declarations by Taylor and Fletcher.

On January 14, following an evidentiary hearing, the court denied the motion to exclude the evidence. The defense then renewed the continuance motion and filed a sealed declaration by Fletcher in support of the motion.[11] The court told counsel that unless there was something new in the sealed declaration, it did not intend to continue the trial date.

In his sealed declaration, Fletcher said the first time he learned the white T-shirt had undergone DNA analysis was on December 10, 2003, when he was informed that Milton's recent testing revealed Stephanie's blood was in two stains on the white T-shirt. Until then, Fletcher believed, on the basis of the 1999 tests, that the white T-shirt "had no evidentiary value relat[ed] to the crime." Taylor had not mentioned to Fletcher that the white T-shirt was being tested.

Further, the defense did not receive a packet of information detailing Milton's DNA analysis until December 30, 2003. The defense did not receive Springer's report detailing her analysis of Tuite's clothing, which was dated July 29, 2003, until January 6, 2004. Among other things, Springer's report disclosed she had microscopically viewed the stains on the white T-shirt. Fletcher said the defense did not similarly view the stains microscopically because the defense did not have Springer's report until after the samples had been consumed.

Fletcher declared that he was in the process of duplicating the discovery materials and sending them to defense experts for review. The defense needed to interview both Fedor, the serologist who had tested the white T-shirt for DNA in 1999, and Springer. Those interviews

---

[10] Had he known that Stephanie's blood would be found on the white T-shirt, Taylor declared he would have done several things before the shirt was cut. Taylor would have recommended (1) a microscopic examination of the stains to reveal the nature of the staining on the fabric, (2) the taking of detailed photographs of the stains and the surrounding areas, (3) a wash from the suspected stains be analyzed for the presence of a blood preservative, and (4) a test for the enzyme Amylase to see if there were indications that saliva was present. Taylor said he would have more closely examined the stains to determine the possibility that they could have resulted from contamination. Taylor noted that by the time it was determined that Stephanie's blood was on the white T-shirt, it was too late to perform these procedures because the samples had been consumed in the testing.

[11] Pursuant to the request of appellate counsel, we unsealed the declaration on November 17, 2005.

21

could not be conducted until the defense experts had reviewed the discovery materials. Fletcher also said further DNA testing of areas close to the stains needed to be conducted to determine the validity of the procedures used in Milton's DNA analysis and decide whether the defense should request an Evidence Code section 402 hearing. Fletcher said the defense needed at least 60 days for its experts to complete the review of Springer's and Milton's results and conduct additional testing.[12]

When the court asked the prosecution to address the defense motion to continue the trial date, the prosecution indicated it was a reasonable request under the circumstances and suggested failure to grant the motion might present a viable appellate issue. The court and the prosecutor then engaged in a colloquy, set forth in the margin, in which the court took issue with the prosecutor's comment.[13]

Addressing all the attorneys, the court said:

"You want a continuance. [¶] You guys, both sides, you want to put this thing off until I am off the bench and you guys are retired and new teams come in, and that's not going to happen. This thing has been [continued] over and over and over again."

The court reminded counsel that it (1) had made it clear when it denied the continuance motion in December that the parties had two more months to prepare for trial; and (2) had sent the parties an e-mail later that month, confirming the trial would start on February 2, to "make sure there are no misunderstandings about future dates involving the Tuite case." The court said it was not going to let the attorneys " 'weasel out' " of the February 2 trial date. The court added:

"You guys had as of the 18th of December, you knew that these problems existed ..., you talked to your expert, you knew what was going on, you knew what was out there, you had at least two months.

---

[12] In his sealed declaration, Fletcher also said the presence of Stephanie's "blood on the 'white shirt' could materially affect the defense theory of contamination. Until the investigation, analysis, and review of this new information regarding the 'white shirt' are completed, it will be impossible to present an opening statement and proceed with a defense with such potentially devastating information left unresolved. The Attorney General's Office will present the evidence of blood on the 'white shirt' in their opening statement. They will urge that this evidence refutes any suggestion by the defense that the blood present on the red shirt was a result of contamination.... [¶] I cannot competently represent Mr. Tuite with respect to the evidence of the stains on the 'white shirt' without sufficient time to complete the analysis and investigation...."

[13] On appeal, Tuite complains that the following colloquy between the court and the prosecutor demonstrated the arbitrary nature of the court's refusal to grant a continuance:
"THE COURT: Do you want Justice Huffman's phone number? I'll give it to you.

"[THE PROSECUTOR]: I have no idea.

"THE COURT: I'll give it to you right now.

"[THE PROSECUTOR]: I have never spoken to Justice Huffman, Your Honor.

"THE COURT: Or Justice O'Rourke. Maybe he would like to talk to you."

"THE COURT: Look, you need somebody to talk to-

"[THE PROSECUTOR]: I am completely satisfied communicating with the court."

"I can make some rulings as to what you can do and what you can't do. You have got two attorneys on both sides; one is working on forensic, the other one is working on something else.

"I was here. Even though I was off during the holiday, I stayed in San Diego. I called my clerk every day [and asked] 'What's going on?' You could have gotten a hold of me if you had any problem. Nobody got a hold of anybody. You are all sitting around sipping your eggnog and singing Christmas carols or whatever. The usual excuse that government employees use during the holidays, it's the holidays. Well, that's the way it goes.

"This case is starting February the 2d. We are going to start selecting a jury on that date."

Although the court denied the continuance motion, it precluded the prosecution from mentioning the white T-shirt evidence during its opening statement. Since the presentation of evidence would commence around February 18, the court said the defense would have two months from the time the court had made it clear there would be no further continuances.

(Lodgment No. 6 at 20-26.)

On direct appeal, the state appellate court found the trial court did not abuse its discretion in denying the motion to continue. (Lodgment No. 6 at 27.) The state appellate court determined it was reasonable for the trial court to believe a continuance was not warranted because the defense had adequate time prior to the trial date to address the new developments with respect to the white shirt. (*Id*.) Specifically, the appellate court noted the similarity, both in substance and materiality, between the new forensic evidence on the white shirt and the already existing blood evidence against Petitioner that had been found on his red shirt. (*Id*. at 31.) Finally, the appellate court found that even if the trial court had abused its discretion, any error was harmless because Petitioner's expert of choice, had a continuance been granted, largely adopted the same contamination theory presented at trial in regards to the white shirt, and he admitted he was not able to refute the prosecution's theory as to how the blood was applied to the white shirt. (*Id*. at 32.) The California Court of Appeal's decision was not objectively unreasonable.

The United States Supreme Court has recognized that "broad discretion must be granted trial courts on matters of continuances; only an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" will violate a defendant's rights. *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (internal quotation marks and citation omitted). The denial of a motion for a continuance can serve as a basis for federal habeas relief only in those rare cases where the trial court's action "is so arbitrary as to violate due process." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). There are no

1  "mechanical tests" for deciding when a denial of a continuance is so arbitrary as to violate due process.

2  *Id*.  Rather, a court must analyze "the circumstances present in every case, particularly in the reasons

3  presented to the trial judge at the time the request is denied." *Id*.  At a minimum, some showing of actual

4  prejudice must be made.  *Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997).

5       Here, Petitioner argues the denial of the continuance prevented his trial counsel from being able

6  to adequately address the issue of how the victim's blood got on the white shirt.[14]  On January 14, 2004,

7  the defense submitted a renewed motion for a continuance, requesting ninety days in order to obtain

8  expert analysis of the white shirt and to integrate the results of that analysis into the defense strategy.

9  The trial court denied the renewed motion, but precluded the prosecution from mentioning the white

10  shirt evidence during its opening statement.  Thus, even if it is assumed the defense could not have

11  adequately begun preparations to address the new evidence until it received Ms. Springer's report on

12  January 6, 2004, the defense still had approximately *six weeks* of preparation time prior to the

13  presentation of the evidence, which began on February 18, 2004.  Petitioner had two defense attorneys,

14  one of which was specifically working on the forensic evidence.  Furthermore, the defense was not

15  required to develop an entirely new defense theory during this time.

16       While the victim's blood was first discovered on Petitioner's white shirt on December 10, 2003,

17  the victim's blood had already been discovered on Petitioner's red shirt dating back to 1999.  To counter

18  the blood evidence on the red shirt, the defense had retained Brian E. Kennedy, an expert witness on

19  bloodstains, and developed a theory that dry blood flakes were accidentally transferred onto the red shirt,

20  via a camera tripod, while the red shirt was in the police station holding cell.  (CT, Vol. 37 at 4680-82,

21  4685.)  Mr. Kennedy opined that dry blood could be applied to a garment, subsequently become

22  reconstituted by a water-based product, and then appear as a blood spatter.  (CT, Vol. 37 at 4685.)

23  Given that both garments were stored in the same manner in the police station holding cell, the trial

24  _____

25  [14] Petitioner also cites to the exchange between the prosecutor and the judge, reproduced in the
above recitation of facts, to show the trial court was predisposed to deny any request for a continuance,
regardless of merit. This exchange appears to be the trial court's reaction to the prosecutor's suggestion

26  that the denial of a continuance, after five continuances had already been granted in the case, would
create an appealable issue. At the time of the exchange, there was no jury present, and the comment was
directed at the prosecutor, not the defendant or his counsel. Accordingly, this Court agrees with the state

27  appellate court's determination that "[a]lthough it would have made for a more dignified record had the
[trial court] kept its annoyance to itself, the colloquy was essentially innocuous." (Lodgment No. 6 at

28  30.)

1   court could have reasonably determined the contamination theory would have applied equally to both the

2   red and white shirts.  In light of the above circumstances, the trial court could have reasonably concluded

3   six weeks was an adequate amount of time to address the new evidence and that the denial of the motion

4   would not substantially impact the defense.[15]  As a result, the trial court's decision was not "so arbitrary

5   as to violate due process."  *See Ungar*, 376 U.S. at 589.

6        Finally, assuming *arguendo* the trial court abused its discretion in denying the motion for a

7   continuance, Petitioner has failed to demonstrate he was prejudiced by the decision because it did not

8   prevent him from putting forth essentially the same defense he claims would have offered had he been

9   granted a continuance.  *See Brecht*, 507 U.S. 619 at 623 (stating actual prejudice requires a "substantial

10  and injurious effect or influence in determining the jury's verdict").  In order to apply the contamination

11  theory to the white shirt, Mr. Kennedy, the defense bloodstain expert, examined photographs of the

12  white shirt that had been taken in 1998 and 2003.  (CT, Vol. 37 at 4684.)  He said the photographs were

13  adequate for him to form an opinion because they were "very good detailed photographs of the area in

14  question." (CT, Vol. 37 at 4766.)  He noted that something appeared to cause some ink on the left

15  shoulder of the white shirt in the 1998 picture to go to the right shoulder in the 2003 picture.  (CT, Vol.

16  37 at 4684.)  He stated that if any water-based product had been introduced to the garment, it would alter

17  the appearance of the blood and make it difficult to determine whether the blood was wet or dry when it

18  came into contact with the white shirt.  (*Id*.)  He also noted that freezing a garment, as was done with the

19  white shirt, would cause some condensation when the garment was later thawed, which would

20  reconstitute some of the bloodstains and may affect the forensic analysis.  (CT, Vol. 37 at 4685.)

21  However, based on the actual photographs, Mr. Kennedy agreed with Ms. Springer's opinion that the

22  blood appeared to be either wet or semi-wet when applied to the white shirt.  (CT, Vol. 37 at 4767.)

23       Petitioner argues that had he been granted a continuance, he could have presented the testimony

24  of an additional expert, Herbert MacDonell, to refute Ms. Springer's determination that the blood was

25

26       [15] Because the bloodstains on the white shirt that were tested were destroyed during the testing process, it was not possible for the defense to conduct its own forensic analysis of those stains.

27  However, as noted by the state appellate court, to the extent the defense may have wanted to conduct an independent test of other areas of the white shirt, the trial court could have reasonably concluded such a

28  test would only take a few days because the prosecution's actual test of the white shirt only took a two-day period.  (Lodgment No. 6 at 28 n.12.)

08cv1101

1    either wet or semi-wet when applied to the white shirt.  Mr. MacDonell, after reviewing the photographs

2    of the white shirt, opined in a declaration that the blood transfer on the white shirt was consistent with a

3    dampened shirt coming into contact with dried blood flakes.  (CT, Vol. 10 at 2358.)  However, Mr.

4    MacDonell also conceded he could not rule out Ms. Springer's finding that the blood was either wet or

5    semi-wet when applied to the white shirt.  (*Id*.)   Thus, the decision by the trial court did not prevent the

6    defense from presenting to the jury a viable theory, supported by expert testimony, as to how the

7    victim's blood could have been transferred to Petitioner's clothes.  While the testimony of Mr.

8    MacDonnell may have been slightly more favorable to the defense, it was essentially duplicative of Mr.

9    Kennedy's opinion and still could not refute Ms. Springer's determination that the blood was wet or

10   semi-wet when applied to the white shirt.  As a result, Petitioner has failed to demonstrate that any

11   alleged error by the trial court had a "substantial and injurious effect or influence in determining the

12   jury's verdict." *See Brecht*, 507 U.S. 619 at 623.

13          In sum, the trial court's denial of a continuance was neither contrary to, nor an unreasonable

14   application of, controlling federal law.  The trial court could have reasonably determined that six weeks

15   was an adequate amount of time for the defense to address the issue of the victim's blood on the white

16   shirt.  Furthermore, assuming *arguendo* the trial court erred in denying the motion, Petitioner has failed

17   to demonstrate he was prejudiced by the error because it did not substantially impact Petitioner's

18   defense.  Accordingly, this Court recommends Petitioner's third ground for relief be **DENIED**.

19          **E.    Cumulative Error**

20          Petitioner asserts the impact of the trial court's errors should be considered cumulatively, and the

21   cumulative effect of those errors resulted in a fundamentally unfair trial.  In cases where there are a

22   number of trial errors, the Court may look at "the overall effect of all the errors in the context of the

23   evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th

24   Cir.1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir.1988)).  "In other words,

25   'errors that might not be so prejudicial as to amount to a deprivation of due process when considered

26   alone, may cumulatively produce a trial setting that is fundamentally unfair.' " *Alcala v. Woodford*, 334

27   F.3d 862, 883 (9th Cir.2003) (quoting *Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir.2001)).

28   Therefore, in conducting a cumulative error analysis, a court must look at the combined effect of each

1   error that occurred during a petitioner's trial. The Court has already found the trial error alleged in

2   Ground One did not prejudice Petitioner.  Because the Court found no other trial errors, a cumulative

3   error analysis is not appropriate.  Accordingly, this Court recommends Petitioner's fourth ground for

4   relief be **DENIED**.

5       **F.**    **Evidentiary Hearing**

6         Petitioner requests an evidentiary hearing on all of his claims.  For the reasons discussed above,

7   this Court has determined Petitioners' claims are without merit.  "[I]f the record refutes the applicant's

8   factual allegations or otherwise precludes habeas relief, a district court is not required to hold an

9   evidentiary hearing." *Schriro v. Landrigan*, 127 S.Ct. 1933, 1940 (2007).  Accordingly, this Court

10  recommends Petitioner's request for an evidentiary hearing be **DENIED**.

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

08cv1101

# V.  CONCLUSION

The Court submits this Report and Recommendation to United States District Judge Napoleon A. Jones, Jr. under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and Recommendation, (2) **DENYING** the request for an evidentiary hearing, and (3) directing that Judgment be entered **DENYING** the Petition in its entirety.

**IT IS ORDERED** that no later than **November 10, 2008**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **10 days after being served with the objections**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  October 9, 2008

_____
**CATHY ANN BENCIVENGO**
United States Magistrate Judge

28                                                                                      08cv1101