1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11

RICHARD RAYMOND TUITE,

12

Petitioner,

13

14

v.

15

MICHAEL MARTEL, Warden,

16

17

Respondent.

18

Civil No.   08cv1101-J (CAB)

**ORDER:**

**(1) ADOPTING MAGISTRATE JUDGE BENCIVENGO'S REPORT AND RECOMMENDATION;**

**(2) DENYING PETITION FOR WRIT OF HABEAS CORPUS; and**

**(3) DENYING REQUEST FOR EVIDENTIARY HEARING**

19
20
21
22
23
24

Before the Court is Magistrate Judge Cathy Ann Bencivengo's Report and Recommendation ("R&R") recommending that the Court deny the Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254, of Petitioner Richard Raymond Tuite ("Petitioner").  [Doc. No. 1.]  This Court has considered the Petition, Respondent's Answer, Petitioner's Traverse, Petitioner's Objections to the R&R, and all the supporting documents the parties have submitted.  Having considered the documents, this Court **ADOPTS** the R&R and **DENIES** the Petition for the reasons stated below.

25

*Factual Background*

26
27
28

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of

1   historical fact, including inferences properly drawn from such facts, are entitled to statutory

2   presumption of correctness).  Because the facts as found by the state appellate court are set out in

3   detail in the R&R, the Court will only provide a brief summary here.  (*See* R&R at 2-12.)

4       On January 21, 1998, at around 6:00 a.m., Stephanie Crowe was discovered lying in the

5   doorway of her bedroom, the victim of a fatal stabbing.  The condition of the body indicated the

6   victim had died at least six hours prior to being discovered.  There were no signs of forced entry in

7   the home.

8       Petitioner was last seen on the night of the killing headed up the road leading to the victim's

9   home.  That same evening, Petitioner was reported to have approached several homes in the victim's

10  area, banging on doors, trying to find "Tracy" or the "the girl."  Earlier that month, Petitioner turned

11  the door handle and tried to enter the residence of Cecilia Jachna; Petitioner said he was looking for

12  "Tracy."

13      For a period of approximately three months following the killing, Petitioner was seen

14  peering into windows, attempting to make unauthorized entries through the doors of homes, and

15  searching for "Tracy."  Approximately a month and a half following the killing, while in the mental

16  health ward of the Vista jail on an unrelated matter, Petitioner was seen pacing back and forth,

17  raising his arms up in the air and yelling, "Tracy, you whore.  I am going to kill you."

18      The victim's DNA was discovered on two articles of Petitioner's clothing, although blood on

19  one article of clothing, the victim's white T-shirt, was not discovered until a period of time

20  following the initial examination.[1]  When the DNA evidence was discovered on the white T-shirt,

21  the defense moved for a continuance for further testing, but the motion was denied.  At trial, the

22  prosecution presented expert testimony explaining the DNA evidence found on the Petitioner's

23  shirts as well as the expert testimony of Gregg McCrary, who testified as to whether the crime scene

24  was organized or disorganized.  At trial, Petitioner presented expert testimony that the DNA

25  evidence on his shirts came about by contamination, and additionally presented the expert testimony

26  of Mary Ellen O'Tool to determine whether the crime scene was organized or disorganized.  The

27  bulk of the defense's case was directed toward establishing that the victim was murdered by her

28

[1] No DNA testing was conducted on the white T-shirt during the initial examination.

1    brother and his two friends.[2]

2                                    ***Procedural History***

3           On May 26, 2004, a jury convicted Petitioner of voluntary manslaughter, in violation of

4    Penal Code § 192(a), as a lesser included offense of murder in the stabbing death of 12-year-old

5    Stephanie Crowe. (Clerk's Transcript, Vol. 9 at 1973.)  The jury also found true the allegation that

6    Petitioner personally used a deadly and dangerous weapon, a knife, in violation of Penal Code §

7    12022.  (CT, Vol. 9 at 1974.)  In a separate proceeding, the trial court found Petitioner had a prior

8    prison term conviction within the meaning of Penal Code § 667.5(b).  (CT, Vol. 10 at 2359.)

9    Petitioner was sentenced to a total term of 13 years in prison.  (*Id.*)

10          Petitioner filed an appeal in the California Court of Appeal, Fourth Appellate District,

11   Division One.  (Lodgment No. 3.)  Petitioner argued the following:  (1) the trial court erred during

12   deliberations when it refused to permit a portion of a witness' direct testimony to be included in a

13   readback; (2) the trial court erred when it denied Petitioner's motion to continue the trial after

14   investigators discovered the victim's DNA on Petitioner's white T-shirt less than two months before

15   trial was set to commence; (3) the jury committed misconduct during deliberations when it

16   considered evidence not presented at trial; (4) the trial court erred when it instructed the jury how to

17   use evidence of uncharged acts because the instruction created an unreasonable inference that

18   violated federal due process; (5) the trial court violated Petitioner's federal and state confrontation

19   rights when it precluded him from cross-examining a prosecution witness about his efforts to

20   prevent a defense expert from testifying; (6) the trial court committed error by failing to give sua

21   sponte instructions on involuntary manslaughter as a lesser included offense of murder; and (7) the

22   cumulative effect of errors committed at Petitioner's trial rendered the proceedings fundamentally

23   unfair, in violation of federal due process.  (*Id.*)  On December 14, 2006, the Court of Appeal

24   affirmed the judgment.  (Lodgment No. 6.)

25          On January 19, 2007, Petitioner submitted a petition for review in the California Supreme

26   Court.  (Lodgment No. 7.)  The petition for review raised the same arguments as in his direct

27   _____

28          [2] The victim's brother and two friends were originally charged with murder, but those charges
     were dismissed in February 1999.

                                              -3-

1    appeal.  The California Supreme Court summarily denied the petition for review on April 2, 2007.

2    (Lodgment No. 8.)

3        Petitioner filed the instant federal petition ("Petition") on June 23, 2008.  [Doc. No. 1.]

4    Respondent answered on August 21, 2008.  [Doc. No. 5.]  Petitioner filed his traverse ("Traverse")

5    on September 17, 2008.  [Doc. No. 8.]   On October 9, 2008, Magistrate Judge Bencivengo filed an

6    R&R recommending that Petitioner's habeas petition be denied.  [Doc. No. 9.]  Petitioner filed

7    objections to the R&R on November 5, 2008.  [Doc. No. 10.]

8                          ***Legal Standard***

9    **I.  State Habeas Prisoner Standard**

10        A federal court must grant habeas relief to a petitioner in state prison if the petitioner is in

11    custody "in violation of the Constitution or other laws or treaties of the United States."  28 U.S.C. §

12    2254(a).  A federal court's duty in examining a state prisoner's habeas petition is governed by 28

13    U.S.C. § 2254 as amended by the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA").

14    Pursuant to section 2254, a federal court may grant habeas corpus relief from a state-court judgment

15    only if the adjudication was (1) "contrary to, or involved an unreasonable application of, clearly

16    established Federal law as determined by the Supreme Court of the United States," or (2) "was

17    based on an unreasonable determination of the facts in light of the evidence presented in the State

18    court proceeding."  28 U.S.C. § 2254(d).  State interpretation of state laws and rules cannot serve as

19    the basis for a federal habeas petition, as no federal or constitutional question would be implicated.

20    *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (stating that "federal habeas corpus relief does not

21    lie for errors of state law"; federal courts may not reexamine state court determinations on state law

22    issues).

23        A state-court decision is "contrary to clearly established federal law" if it (1) applies a rule

24    that contradicts the governing law set forth in Supreme Court cases, or (2) confronts a set of facts

25    that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives

26    at the opposite result.  *See Williams v. Taylor*, 529 U.S. 362, 405 (2000).  The inquiry into whether a

27    state court's interpretation of federal law is "contrary to" clearly established federal law is itself a

28    question of federal law as to which federal courts owe no deference to the state courts.  *See Cordova*

1    *v. Baca*, 346 F.3d 924 (9th Cir. 2003).

2          A state court decision is an "unreasonable application of" Supreme Court precedent if the

3    court "correctly identifies the governing legal rule but applies it unreasonably to the facts of the

4    case." *Luna v. Cambra*, 306 F.3d 954, 960 *as amended* 311 F.3d 928 (9th Cir. 2002); *Williams*,

5    529 U.S. at 412-13.  This is a "highly deferential standard for evaluating state-court rulings," *Lindh*

6    *v. Murphy*, 521 U.S. 320, 333 n.7 (1997), and "demands that state court decision be given the benefit

7    of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

8          Under section 2254(d)(1)'s "unreasonable application" clause, a writ of habeas corpus may

9    not issue simply because the reviewing district court concludes in its independent judgment that the

10   relevant state-court decision applied clearly established federal law "erroneously" or "incorrectly."

11   *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  Rather, that application also must be *objectively*

12   unreasonable.  *Id.* at 76.  Though this standard is not self-explanatory, it is a higher standard than

13   clear error, the old standard applied by the Ninth Circuit.  *Clark v. Murphy*, 331 F.3d 1062, 1068

14   (9th Cir. 2003).

15   **II. Reviewing Magistrate Judge's R&R**

16         The duties of a district court in connection with a magistrate judge's R&R are set forth in

17   Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1).  A district court must

18   "make a *de novo* determination of those portions of the report . . . to which objection is made," and

19   "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

20   magistrate judge."  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3) (2007); *see also United States v.*

21   *Raddatz*, 447 U.S. 667, 676 (1980) ("[I]n providing for a '*de novo*' determination . . . Congress

22   intended to permit whatever reliance a district judge, in exercise of sound judicial discretion, chose

23   to place on a magistrate's proposed findings and recommendations.").

24                                    ***Petitioner's Objections***

25         Because Petitioner has filed objections to the R&R, this Court must conduct a *de novo*

26   review of the portions of the R&R to which objections were made.  Petitioner objects generally to

27   the R&R and raises the following specific objections in support thereof:  (1) Petitioner objects to a

28   finding made by the Magistrate Judge that competing expert opinions of O'Toole and McCrary as to

whether the crime scene was "organized" or "disorganized" had almost no significance on the case as a whole, and thus the harmless error finding made by the California Court of Appeal was not objectively unreasonable; (2) Petitioner objects to the finding that the Confrontation Clause error had no impact on the decision the jury was required to make concerning how the victim's blood was placed onto petitioner's shirts; (3) Petitioner objects to the finding made by the Magistrate Judge that the modified version of CALJIC No. 2.50 given by the trial court did not create an inference of guilt that was objectively unreasonable; (4) Petitioner objects to the finding made by the Magistrate Judge that the trial court reasonably found that petitioner's counsel had adequate time and resources to deal with the newly discovered evidence; (5) Petitioner objects to the finding made by the Magistrate Judge that petitioner suffered no prejudice from denial of a continuance; and (6) Petitioner objects to the finding that there was no cumulative error.  (Objections at 2-9.)

### *Analysis*

Petitioner claims that his federal constitutional rights were violated for the following reasons:  (1) the trial court violated Petitioner's rights under the Confrontation Clause when it precluded him from cross-examining a prosecution expert about said expert's alleged bias against a defense expert he was called to rebut; (2) the trial court violated Petitioner's rights under the Due Process Clause because a jury instruction that told the jury how it could use evidence of Petitioner's uncharged acts created an unreasonable inference of guilt; (3) the trial court violated Petitioner's rights under the Due Process Clause when it denied his motion to continue the trial after the victim's DNA was discovered on Petitioner's white t-shirt less than two months before trial commenced; and (4) the cumulative effect of errors committed at the trial violated Petitioner's right to due process. (Petition at 10-14.)  Petitioner requests an evidentiary hearing on all of his claims.  (Objections at 9; Petition at 8.)

Respondent argues the Petition should be denied because the California Court of Appeal reasonably rejected all of the claims raised in the Petition.  [Doc. No. 5.]

### I.    Judicial Notice

Petitioner asks the Court to take judicial notice of all records in *People v. Richard Raymond Tuite*, Superior Court case number SCD 166932, and *People v. Raymond Tuite*, Court of Appeal No.

D044943, pursuant to Federal Rules of Evidence, § 201(b) and (c).  (Petition at 8.)  Federal Rule of Evidence 201(b)(2) allows judicial notice of a fact that is "not subject to reasonable dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b)(2).  The Court may take judicial notice of court records.  *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980); see also *Wells v. United States*, 318 U.S. 257, 260 (1943).  Accordingly, the Court **GRANTS** Petitioner's request for judicial notice of the enumerated records.

**II.  Ground One - Cross Examination**

Petitioner claims that the trial court violated his confrontation rights when it precluded him from cross-examining prosecution expert Gregg McCrary about his bias against defense expert Mary Ellen O'Toole.  (Petition at 5, 38.)  Petitioner further argues that the California Court of Appeal made a harmless error decision that was contrary to, and an unreasonable application of, Supreme Court harmless error precedent.  (Petition at 40.)

**A.  Standard of Review - Harmless Error**

A federal court sitting in habeas jurisdiction may not grant relief on an error determined to be harmless by a state court unless the state court applied harmless-error review in an objectively unreasonable manner.  *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam); *see also Inthavong v. Lamarque*, 420 F.3d 1055, 1058-59 (9th Cir. 2005) (Under AEDPA, the federal habeas court must defer to a state appellate court's harmless error holding unless it was in conflict with the reasoning or the holdings of Supreme Court precedent or if it applied harmless-error review in an objectively unreasonable manner).  However, if the federal habeas court determines under AEDPA that the state court's harmless error holding is contrary to Supreme Court precedent or objectively unreasonable, then no deference is owed and the federal court reverts to the harmless error analysis it would apply had there been no state court holding.  *Inthavong*, 420 F.3d at 1059.   Thus, to grant relief where a state court has determined a constitutional error was harmless, the Court must both determine (1) that the state court's decision was "contrary to" or an "unreasonable application" of Supreme Court harmless error precedent, and (2) that the petitioner suffered prejudice under the *Brecht v. Abrahamson* harmless error standard as a result of the error.  *Inthavong*, 420 F.3d at 1059; *Brecht v.*

1   *Abrahamson*, 507 U.S. 619, 629 (1993).

2        The test for harmless error under AEDPA is whether the error had a "substantial and

3   injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.  An error is

4   prejudicial and requires the state court judgment be set aside if the habeas court has "grave doubt as

5   to the harmlessness of [the] error."  *California v. Roy*, 519 U.S. 2, 5 (1996).

6   **B.  Confrontation Rights**

7        On direct appeal, the California Court of Appeal ("CCA") found the trial court violated

8   Petitioner's constitutional right to confront adverse witnesses when it precluded the cross-

9   examination of McCrary.  (Lodgment No. 6.)  However, the state appellate court held the error was

10  harmless pursuant to *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), and *Chapman v.*

11  *California*, 386 U.S. 18, 24 (1967).  (*Id.*)  The state court of appeal focused its analysis on the

12  relative importance of the witness' testimony to the prosecution's case.  (*Id.* at 41.)  It determined

13  that although cross-examination on bias may have lent greater weight to O'Toole's testimony about

14  whether the crime scene was "organized," the competing experts' opinions as to whether to label the

15  crime scene "organized" or "disorganized" had almost no significance on the case as a whole.

16  (Lodgment No. 6 at 42-43.)

17       **Overall Strength of Case.**  Petitioner alleges that the CCA decision was objectively

18  unreasonable because it failed to consider that the case was "unbelievably close" and because the

19  CCA  ". . . failed to *discuss* or even *mention* the significant proof problems the prosecutor faced in

20  attempting to convict Petitioner."  (Objections at 3 (citing as supporting authority *Delaware v. Van*

21  *Arsdall*, 475 U.S. 673 (1986)) (emphasis added); Petition at 41-43.)  To support this contention,

22  Petitioner argues that  "[t]he prosecutor had no evidence" placing Petitioner in the Crowe residence

23  and that the condition of the doors and windows of the victim's home after the homicide provided

24  no reasonable explanation of how Petitioner exited without being detected.  (*See* Objections at 3.)

25  Further, Petitioner claims that the Magistrate Judge erred when finding that the competing expert

26  opinions of O'Toole and McCrary as to whether the crime scene was organized or disorganized had

27  almost no significance on the case as a whole, and thus the harmless error finding made by the CCA

28  was not objectively unreasonable.  (*Id.*)

First, Petitioner fails to show that the CCA's judgment was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court when it allegedly failed to discuss or mention the significant problems of the prosecution's case. *See* 28 U.S.C. § 2254(d). Petitioner argues that *Van Arsdell* required the CCA to consider "the overall strength of the prosecution's case" when conducting its harmless error analysis, and therefore when the CCA allegedly failed to discuss or mention the significant proof problems in the prosecution's case it made an objectively unreasonable application of federal law. Petitioner is correct in asserting that *Van Arsdall* states that a reviewing court, when conducting a *Chapman* harmless error analysis, should consider and weigh the overall strength of the prosecution's case as one factor when reaching its decision. *See Van Arsdall*, 475 U.S. at 684.[3] However, *Van Arsdall* did *not* hold that a reviewing court, in its opinion, must discuss or enumerate each factor contemplated. Here, *Van Arsdell*'s holding does not support Petitioner's argument that the CCA's judgement was contrary to, or involved an unreasonable application of, *clearly established* Federal law as determined by the Supreme Court when it allegedly failed to discuss or mention the significant

---

[3] *Van Arsdall* held that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis." *Van Arsdall*, 475 U.S. 673 at 684; *see also Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (recognizing *Van Arsdall*'s holding to be the following: "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness") (internal citations and quotations omitted). In *Van Arsdall*, the Court enumerated several factors "readily accessible to reviewing courts" when determining whether an error was harmless under a *Chapman* analysis, including: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, *the overall strength of the prosecution's case*." *Van Arsdall*, 475 U.S. 673 at 684. (internal citations omitted) (emphasis added)

1    problems of the prosecution's case.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).

2        Furthermore, the record evidences that the CCA *did* incorporate the *Van Arsdall* "overall

3    strength" factor into its harmless error analysis and, moreover, it discussed significant proof

4    problems in the prosecution's case.  When addressing whether or not the trial court error warranted

5    reversal, the CCA stated that "[t]he correct inquiry is whether . . . a reviewing court might . . . say

6    that the error was harmless beyond a reasonable doubt, taking into consideration . . . *the overall*

7    *strength of the prosecution's case*."  (*See* Lodgment No. 6 at 40-41 (quoting *Van Arsdall*, 475 U.S.

8    at 684) (internal quotations omitted) (emphasis added).)  Additionally, the CCA identified several

9    problems that the prosecutor faced when attempting to convict Petitioner.  The CCA noted *inter alia*

10   that the crime scene was relatively orderly and moreover that the killer was able to perpetrate the

11   crime without raising any alarm; both issues arguably called the identity of the killer into question

12   and were problematic to the prosecution's case.  (*See* Lodgment No. 6 at 42.)  However, the CCA

13   found that, despite the proof problems encountered by the prosecution, the error committed by the

14   trial court was ultimately harmless under *Chapman*.  Thus, the CCA did not fail to consider

15   significant problems in the prosecution's case when assessing the "overall strength" in its *Chapman*

16   harmful error analysis.

17       Petitioner additionally asserts that the prosecutor "had no evidence" placing Petitioner in the

18   Crowe residence.  (Objections at 3.)  This contention is not supported by the record.  Petitioner was

19   in the victim's neighborhood on the night of the murder searching for "the girl," and the victim was

20   a young girl (Reporter's Transcript, Vol. 13 at 1814-15); Petitioner was last seen on the night of the

21   murder headed up the road leading to the victim's home, which was the only residence on that part

22   of the road (RT, Vol. 13 at 1383); and the victim's DNA was discovered on Petitioner's clothing

23   (*see* lodgment no. 6 at 41).  This and other evidence support the prosecution's theory that Petitioner

24   was at the Crowe residence on the night of the murder.[4]  (*See* discussion in Ground Two - Jury

25

26       [4] Petitioner argues that the condition of the doors and windows after the homicide provided no

27   reasonable explanation of how he could have exited without being detected; however, Petitioner

28   acknowledges that the prosecution provided two different explanations as to how he could have exited

     the Crowes home.  (*See* Petition at 42.)  As noted by the CCA, "the jury was presented with extensive

                                            -10-

1    Instructions, *infra*.)

2          **Impact on the Jury.**   Petitioner asks this Court to review the material at pages 34-

3    37 and 42-44 of the Petition to show that it was difficult for the jury to reach its verdict, that

4    the competing expert opinions as to whether the crime scene was organized or disorganized

5    were of substantial weight to the outcome of the case, and therefore that the CCA made an

6    unreasonable decision when it found the trial court's error was harmless.  (*See* Objections at

7    3-4; *see also* Petition at 34-47, 42-44.)   If anything, the portion of the record to which

8    Petitioner points shows that the jury was generally focused on issues unrelated to whether or

9    not the crime scene was organized or disorganized.  As Petitioner points out, the jury

10   requested a partial read back of testimony given by Faye Springer, Brian Kennedy, and

11   Mark Stolorow (Petition at 34); however, Petitioner fails to point to anywhere in the record

12   where the jury requested a read back for or had expressed any particular interest in the

13   testimony of either O'Toole or McCrary.  (*See generally* Petition at 34-47, 42-44)

14   Furthermore, each read back requested by the jury highlighted by Petitioner is related to

15   blood evidence, *not* the level of organization of the crime scene.  (*See* Petition at 34-35.)

16   Petitioner himself concedes that the strongest aspect of the prosecutor's case was bloodspot

17   evidence on Petitioner's shirts (Petition at 42), *not* the level of organization of the crime

18   scene.  Finally, the Jury Notes suggest that the jury took its time deliberating, at least in

19   part, because its members wanted to make a prudent and thorough review of the record, not

20   because they were deliberating about the level of organization at the crime scene.[5]  (*See* CT,

21   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

22   and undisputed factual evidence depicting what the Crowe family heard and saw on the night of the

23   crime and what the crime scene looked like in the morning." (*See* Lodgment No. 6 at 42.).  In finding

24   Petitioner's guilt, the jury determined that at least one of the prosecution's explanations was plausible.

25

26          [5] In Jury Note Number 15, dated May 20, 2004, the jury sought to clarify an apparent

27   misunderstanding by the trial court that they had come to a complete deadlock; the jury clarified for the

28   court that, up to that point, they had merely not come to an agreement about Petitioner's shirts and the

     blood evidence.  In the conclusion of the Note, the foreperson wrote, "[n]o one of us wants to come

1  Vol. 9 at 1963-64.) Thus, it was not objectively unreasonable for the CCA to conclude that

2  the trial court's denial of defense counsel's request to cross-examine McCrary did not

3  prejudice Petitioner's defense in any way.

4        **Impact on DNA Evidence.**  Petitioner objects to the finding that the Confrontation

5  Clause error had no impact on the decision the jury was required to make concerning how

6  the victim's blood was placed onto Petitioner's shirts.  (Objections at 4.)  Petitioner alleges

7  that, "[h]ad McCrary's unimpeached testimony not destroyed O'Toole's credibility, the jury

8  would have undoubtedly given O'Toole's opinion great weight in deciding whether

9  petitioner could possibly have committed the homicide." (Objections at 5.)  First, Petitioner

10  fails to establish that the jury "would have undoubtedly" given O'Toole's testimony any

11  additional weight had the trial court's error not been committed; the record does not support

12  this contention.  (*See generally*, *e.g.*, discussion in Impact on the Jury, *supra* at 22-23.)

13  Moreover, McCrary and O'Toole's testimony focused primarily on whether or not the

14  victim was "targeted" and the level of organization of the crime scene; notwithstanding

15  Petitioner's speculation that it would have had an overall impact on the identity of the killer,

16  the credibility of O'Toole was generally irrelevant to the more significant bloodspot

17  evidence on Petitioner's shirts.  (*See* Petition at 39, 42.)  Although allowing use of the letter

18  to impeach McCrary for bias might have had some impact on the jury when determining

19  whether or not the crime scene was organized, this alleged speculative effect would have

20  been objectively minimal when "quantitatively assessed in the context of other evidence

21  presented."  *See Fulminante*, 499 U.S. at 308.  Thus, it was not objectively unreasonable for

22  the CCA to conclude that the trial court's decision to bar the defense from cross-examining

23  McCrary about the letter did not prejudice Petitioner's defense.

24        Accordingly, this Court **FINDS** that the trial court did not violate Petitioner's

25  constitutional rights when it precluded him from cross-examining prosecution expert Gregg

26  McCrary about his bias against defense expert Mary Ellen O'Toole.  Therefore, this Court

27  **DENIES** relief based on this claim.

28

to a premature decision without weighing all of the evidence."

**III.  Ground Two - Jury Instructions**

Petitioner claims that the trial court violated his Due Process rights when it improperly instructed the jury with regard to evidence of Petitioner's uncharged acts, which consisted of his search for "Tracy" in the area around the victim's home and his possession of a knife on several occasions.  (Petition at 44.)  Petitioner argues that the trial court's modified version of CALJIC No. 2.50 violated his rights under the Due Process Clause because it created a permissive inference that was not reasonable in light of the facts before the jury.

The state court of appeal found the permissive inference, as applied to the facts of the case and in the context of the entire charge to the jury, was rational.  It concluded that a reasonable juror would not have understood the permissive inference of CALJIC No. 2.50, when considered with the remaining instructions, "to be either an invitation or a compulsion to use the uncharged acts evidence by itself to find Tuite guilty of murder, or a lesser included crime, regardless of whether it was satisfied beyond a reasonable doubt that he killed Stephanie."  (Lodgment No. 6 at 49.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  Evidentiary presumptions are "a staple of our adversary system of factfinding," and are constitutionally valid so long as they do not "undermine the factfinder's responsibility at trial . . . to find the ultimate facts beyond a reasonable doubt."  *Ulster County v. Allen*, 442 U.S. 140, 156 (1979).  A permissive inference, such as is presented here, allows, but does not require, the trier of fact to infer an ultimate fact from proof by the prosecutor of other facts.  *Id.* at 157.  It does not shift the burden of proof, and it leaves the trier of fact free to credit or reject the inference.  *See Francis v. Franklin*, 471 U.S. 307, 314 (1985) (stating "[a] permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion").  Therefore, it does not disrupt Due Process unless, under the facts of the case, there is no rational way the

-13-

1    trier could make the connection permitted by the inference.  *Ulster County*, 442 U.S. at 157.

2    In other words, a permissive inference violates Due Process "only if the suggested

3    conclusion is not one that reason and common sense justify in light of the proven facts

4    before the jury."  *Francis*, 471 U.S. at 314-15.

5              Additionally, even "[i]f a specific portion of the jury charge, considered in isolation,

6    could reasonably have been understood as creating a presumption that relieves the State of

7    its burden of persuasion on an element of an offense, the potentially offending words must

8    be considered in the context of the charge as a whole."  *Id.*  at 315.  Other jury instructions

9    might explain or clarify the infirm language so that a reasonable jury could not have

10   considered the charge to have created an unconstitutional presumption.  *Id.*  Thus, after

11   considering the challenged instruction in the context of the other instructions, a court must

12   determine "whether there is a reasonable likelihood that the jury has applied the challenged

13   instruction in a way" that violates the Constitution.  *Estelle v. McGuire*, 502 U.S. 62, 72

14   (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

15             At the close of trial, the jury was instructed pursuant to CALJIC No. 2.50 as follows:

16             Evidence has been introduced for the purpose of showing that the defendant
               committed other acts other than that for which he is on trial.
17

18             Except as you will otherwise be instructed, this evidence, if believed, may not be
               considered by you to prove that the defendant is a person of bad character or that he
               has a disposition to commit crimes.  It may be considered by you only for the limited
19             purpose of determining if it tends to show a characteristic method, plan or scheme in
               the commission of acts similar to the method, plan or scheme used in the
20             commission of the offense in this case which would further tend to show:

21             The defendant possessed the means that might have been useful or necessary for the
               commission of the crime charged;
22

23             A clear connection between the other acts and the crime of which the defendant is
               accused so that it may be inferred that if defendant committed the other acts
               defendant also committed the crime charged in this case.
24

25             For the limited purpose for which you may consider such evidence, you must weigh
               it in the same manner as you do all other evidence in the case.

26             You are not permitted to consider such evidence for any other purpose.

27   (CT, Vol. 9 at 1902.)

28             Petitioner fails to show that the CCA's decision was objectively unreasonable when

1   it rejected his argument that the language of CALJIC No. 2.50 created an unreasonable

2   inference that violated his Fourteenth Amendment Due Process rights.

3        **Cumulative Instructions.**  First, the instructions provided to the jury did not lessen

4   the prosecution's burden to establish each element of the crime beyond a reasonable doubt.

5   The jury was given a series of instructions that, when considered collectively, guarded

6   against misuse of CALJIC No. 2.50.  (*See* Lodgment No. 6 at 48-49; *see generally*, CT,

7   Vol. 9 at 1885-1949.)   Most notably, the trial court issued instruction CALJIC No. 2.50.1, a

8   companion instruction to CALJIC No. 2.50, which effectively cautioned and reminded the

9   jury not to use evidence of uncharged acts alone to find Petitioner's guilt, but rather that the

10  jurors must use "the evidence as a whole" to "persuade [them] beyond a reasonable doubt

11  that the defendant is guilty of [the] crime [charged]."  (*See* CT, Vol. 9 at 1903.)

12  Additionally, the trial court protected against misapplication of the jury instructions by

13  advising the jury that "evidence [of other acts], if believed, may not be considered by you to

14  prove that the defendant is a person of bad character or that he has a disposition to commit

15  crimes."  (CT, Vol. 9 at 1902.)  The trial court further advised the jury that for the limited

16  purpose for which they may consider prior acts, they "must weigh it in the same manner as

17  you do all other evidence in the case."  (*Id.*)

18       **Inference from Nonviolent Acts.**  Petitioner argues that it was illogical to permit

19  the jury to infer from the uncharged acts that Petitioner entered the Crowe residence and

20  committed the homicide because "[n]othing about the uncharged acts suggested [Petitioner]

21  would commit homicide."  (Petition at 48.)  He further claims that, because the evidence of

22  uncharged acts presented to the jury involved non-violent events, the trial court should have

23  adopted the more narrowly drawn version of CALJIC No. 2.50 that he submitted.

24  (Objections at 6.)  Petitioner still fails to establish that CALJIC 2.50 permitted an

25  unreasonable inference in violation of his Due Process rights with regard to these

26  allegations.

27       The jury was presented with the following evidence relating to the permissive

28  inference:  there was no sign of forced entry at the victim's home (RT, Vol. 18 at 225-62);

the Crowes often left the laundry room door unlocked (RT, Vol. 26 at 3605); Petitioner was searching for "Tracy" or "the girl" that evening, knocking on and opening doors to residences in the neighborhood (RT, Vol. 13 at 1376, 1378-79; RT, Vol. 15 at 1814-15); if Petitioner found a door unlocked he attempted to enter the house without permission (RT, Vol. 15 at 1814-15); Petitioner was in the victim's neighborhood on the night of the murder searching for "the girl" (RT, Vol. 13 at 1814-15); the victim was a young girl; and Petitioner was last seen on the road leading to the Crowe residence, where the victim's home was the only residence on that part of the road (RT, Vol. 13 at 1383). The evidence could rationally place Petitioner in the area of the crime on the night of the crime and reasonably supported an explanation as to how Petitioner could have entered the Crowe residence without leaving signs of forced entry. From this evidence, the jury could reasonably conclude that Petitioner had a characteristic method of going to the homes of strangers, opening doors if they were unlocked, and entering without permission.

Furthermore, the jury was presented with evidence that police had found Petitioner in possession of a knife on three occasions prior to the victim's stabbing, and on one occasion following (*see* lodgment no. 6 at 14); these facts could reasonably support an inference that Petitioner had a characteristic method of carrying a knife, and further that Petitioner was in possession of a knife as he walked up a road leading to the victim's home on the night of the murder. As the victim was killed with a knife, which was never recovered, it was reasonable for the jury to conclude from the cumulative evidence presented that Petitioner entered the home of the victim, a girl sleeping in a home with an unlocked door, committed the crime with the knife, and left with the unrecovered weapon.

Moreover, that the evidence of uncharged acts involved nonviolent events and the charged crime was a violent crime does not establish an instructional error, as the facts supporting an inference need not be identical to those of the crime charged, so long as the suggested conclusion is reasonable and supported by common sense. *See Francis*, 471 U.S. at 314-15 ("A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts

-16-

1   before the jury." (internal citation omitted)).  Here, the facts were sufficient to support a

2   reasonable conclusion by the jury.

3        Finally, Petitioner argues that because the evidence of uncharged acts involved

4   uniformly nonviolent events, the trial court needed to carefully tailor its instruction that told

5   the jury how evidence of uncharged acts could be used to resolve the murder trial.

6   However, as the instruction did not permit an unreasonable inference by the jury, a more

7   narrowly tailored instruction was not necessary to meet constitutional muster.  The

8   instructions as given did not constitute a violation of Petitioner's Due Process rights.

9   Accordingly, this Court **FINDS** that the trial court did not violate Petitioner's constitutional

10  rights by instructing the jury with the modified version of CALJIC No. 2.50.  Therefore, this

11  Court **DENIES** relief based on this claim.

12  **IV.  Ground Three - Denial of Continuance**

13        Petitioner contends the trial court's denial of his motion for a continuance following

14  the discovery of the victim's blood on Petitioner's white shirt violated his Due Process

15  rights because it rendered his trial fundamentally unfair.  Specifically, he argues the trial

16  court's denial of the motion prevented his trial counsel from being able to adequately

17  address the issue of how the victim's blood got on the white shirt.  (Petition at 56-57.)  With

18  regard to the trial court's decision to deny the motion for a continuance, the facts found by

19  the state appellate court are set out in detail.  Therefore, the Court will only provide a brief

20  summary here.  (*See* R&R at 20-23.)

21        In August 2003, the prosecution notified defense counsel of plans to conduct

22  destructive  testing on Tuite's clothes and invited the defense to have an expert present.[6]

23  Defense counsel directed Marc Taylor, a defense expert, to observe the testing of the red

24  shirt.  Taylor observed testing of both shirts.   On December 10, the prosecution notified

25  defense counsel that Milton found Stephanie's DNA on the white T-shirt.  Attorney William

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27        [6] There is a conflict between the prosecution and defense on this point. According to the defense,
    the Attorney General informed defense counsel that the red shirt would be tested. According to the

28  Attorney General, the defense was told Tuite's clothes would be tested.

-17-

1  Fletcher, who handled the forensic evidence for the defense at trial, was surprised at the

2  finding and did not discuss the white T-shirt with Taylor until December 10.  The defense

3  did not receive a packet of information detailing Milton's DNA analysis until December 30,

4  2003 and did not receive Springer's report detailing her analysis of Tuite's clothing, which

5  was dated July 29, 2003, until January 6, 2004.

6       On December 18, defense counsel asked that the trial, scheduled to begin February

7  2, 2004, be continued. The prosecution did not oppose the continuance.  The court denied

8  the motion without comment.  Defense counsel then moved to exclude the white T-shirt

9  blood evidence.  On January 14, following an evidentiary hearing, the court denied the

10  motion to exclude the evidence. The defense then renewed the continuance motion and filed

11  a sealed declaration by Fletcher in support of the motion.  The court told counsel that unless

12  there was something new in the sealed declaration, it did not intend to continue the trial

13  date.  The court asked the prosecution to address the defense motion to continue the trial

14  date, and thereafter the court and the prosecutor then engaged in a colloquy, partially set

15  forth in the margin, in which the court took issue with the prosecutor's comments.[7]

16  _____

17       [7] On appeal, Tuite complained that the following colloquy between the court and the prosecutor

18  demonstrated the arbitrary nature of the court's refusal to grant a continuance:

19
20  "THE COURT: Do you want Justice Huffman's phone number? I'll give it to you.

21
22  "[THE PROSECUTOR]: I have no idea.

23
24  "THE COURT: I'll give it to you right now.

25
26  "[THE PROSECUTOR]: I have never spoken to Justice Huffman, Your Honor.

27
28  "THE COURT: Or Justice O'Rourke. Maybe he would like to talk to you."

On direct appeal, the state appellate court found the trial court did not abuse its discretion in denying the motion to continue. (Lodgment No. 6 at 27.)  The state appellate court determined it was reasonable for the trial court to believe a continuance was not warranted because the defense had adequate time prior to the trial date to address the new developments with respect to the white shirt.  (*Id*.)  Specifically, the appellate court noted the similarity, both in substance and materiality, between the new forensic evidence on the white shirt and the already existing blood evidence against Petitioner that had been found on his red shirt.  (*Id*. at 31.)  Finally, the appellate court found that even if the trial court had abused its discretion, any error was harmless because Petitioner's expert of choice, had a continuance been granted, largely adopted the same contamination theory presented at trial with regard to the white shirt, and he admitted he was not able to refute the prosecution's theory as to how the blood was applied to the white shirt. (*Id*. at 32.)  The California Court of Appeal's decision was not objectively unreasonable.

The United States Supreme Court has recognized that "broad discretion must be granted trial courts on matters of continuances; only an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" will violate a defendant's rights. *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (internal quotation marks and citation omitted).  The denial of a motion for a continuance can serve as a basis for federal habeas relief only in those rare cases where the trial court's action "is so arbitrary as to violate due process."  *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  There are no "mechanical tests" for deciding when a denial of a continuance is so arbitrary as to violate due process.  *Id*.  Rather, a court must analyze "the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."  *Id*.

---

"THE COURT: Look, you need somebody to talk to-

"[THE PROSECUTOR]: I am completely satisfied communicating with the court."

A more detailed record of this discussion is set forth in the R&R.  (*See* R&R at 22-23.)

-19-

1    At a minimum, some showing of actual prejudice must be made. *Gallego v. McDaniel*, 124

2    F.3d 1065, 1072 (9th Cir. 1997).

3           Petitioner claims that the denial of the continuance violated his Due Process rights

4    because the detection of the victim's DNA on the white T-shirt required the defense to re-

5    think its strategy for attacking all of the DNA evidence. (Objections at 7.)   However, the

6    victim's blood had been discovered on Petitioner's red shirt since 1999, and based on that

7    discovery the defense had a strategy in play at the time of the December 18, 2003 motion

8    that was essentially the same strategy Petitioner claims he would have used to challenge the

9    DNA discovered on the white T-shirt if granted the continuance.  At the time of the

10   discovery of the victim's DNA on the white T-shirt, the defense had already developed the

11   theory that dry blood flakes were accidentally transferred onto the red shirt, via a camera

12   tripod, while the red shirt was in the police holding cell.  (CT, Vol. 37 at 4685.)   The

13   defense had retained Brian E. Kennedy, an expert witness on bloodstains to testify in

14   support of this theory, who opined that dry blood could be applied to a garment,

15   subsequently become reconstituted by a water-based product, and then appear as a blood

16   spatter. (CT, Vol. 37 at 4685.)   Given that the white T-shirt was stored in the same manner

17   as the red shirt and that both garments were similarly marked with blood drops containing

18   the victim's DNA, it was reasonable for the trial judge to conclude that the defense would

19   apply the same contamination strategy that it had already developed and thus that the

20   amount of time provided would be sufficient.

21          Petitioner argues that the denial of the continuance prevented his trial counsel from

22   being able to adequately address the issue of how the victim's blood got on the white shirt.

23   As defense counsel received the packet detailing Milton's DNA analysis on December 30,

24   2003 and Springer's report detailing her analysis of Petitioner's clothing on January 6,

25   2004, defense counsel had, *at a minimum*, six weeks to prepare and organize its defense

26   with regard to the white shirt.  Given that Petitioner had two attorneys working on the case

27   at the time, one of whom was specifically designated to handle forensic evidence, it was

28   reasonable for the trial court to conclude that six weeks would be a sufficient amount of

1    time to address the DNA evidence discovered on the white shirt.  Furthermore, because the

2    bloodstains on the white shirt were destroyed during the testing process, any independent

3    forensic analysis of those stains conducted by the defense would be minimal, and the trial

4    court could reasonably conclude that additional time would be of little additional benefit to

5    the defense.  Moreover, as noted by the CCA, the prosecution's actual test of the white shirt

6    only took a two-day period, therefore it would be objectively reasonable for the court to

7    conclude that any DNA testing that could be conducted by the defense would not take much

8    longer.  (Lodgment No. 6 at 28 n. 12.)  Thus, it was not objectively unreasonable for the

9    court to conclude the February 18 deadline would provide a sufficient amount of time for

10    the defense to prepare and address the DNA evidence discovered on the white shirt.

11          Petitioner argues that a colloquy between the trial court and the prosecution shows

12    that the trial court was impetuously predisposed to deny the request for a continuance from

13    the outset, that the trial court's decision was based on the trial judge's personal frustration,

14    and therefore the court's decision to deny the continuance was wholly arbitrary and

15    ultimately unconstitutional. (*See* Petition at 54-55; *see also* n.7, *supra*.)  Petitioner's

16    contention is not supported by the record.  First, as noted by the CCA, while the trial court

17    used colloquial language to articulate its frustration at the time, the language was used

18    outside of the presence of the jury, was not directed at defense counsel, and, in the context

19    of the situation, fell short of being intemperate.  (Lodgment No. 6 at 30.)  Moreover, the

20    record shows that, at the time of the defense's motion for a continuance, the trial court had

21    already suffered considerable delay.   Defense counsel presented this motion for a

22    continuance approximately six years following the victim's killing.  Further, the court

23    proceedings in Petitioner's case had already been continued five times.  (*See id*. n.13; *see*

24    *also Flynt*, 756 F.2d at 1358-59.)   Given these circumstances, it was not objectively

25    unreasonable for the trial court to be motivated to expedite the proceedings so as to alleviate

26    any burden on the court that would result from additional delay.  Thus, the trial court's

27    decision denying the motion for a continuance was not "so arbitrary as to violate due

28    process." *Ungar*, 376 U.S. at 589.

Finally, Petitioner points to defense criminalist Herbert MacDonnell's declaration, which opines that the blood transfer on the white T-shirt is consistent with a dampened shirt coming in contact with dried blood flakes (*see* CT, Vol. 10 at 2358), to support his contention that the denial of a continuance prejudiced his defense (Objections at 8; Petition at 55-57).  Petitioner argues that, because the case was so close, MacDonnell's testimony showing an alternate innocent means by which the victim's blood could have stained Petitioner's shirt would have effectively refuted the testimony of prosecution witness Springer and thus led to an acquittal.  (*See* Objections at 8.)   However, Petitioner acknowledges that MacDonnell could not eliminate Springer's theory of wet or semi-wet blood applied to the white shirt.  (*See* Petition at 55.)  Moreover, MacDonnell's theory was essentially duplicative of Kennedy's opinion that the blood was transferred accidentally to Petitioner's shirt.  Kennedy said that photographs of the white shirt that had been taken in 1998 and 2003 were adequate for him to form an opinion because they were "very good detailed photographs of the area in question."  (CT, Vol. 37 at 4766.)  Furthermore, he agreed with Springer's opinion that the blood appeared to be either wet or semi-wet when applied to the white shirt.  (CT, Vol. 37 at 4767.)  Considering that neither MacDonnell nor Kennedy could eliminate the possibility of Springer's theory that the victim's blood was applied to the white T-shirt either wet or semi-wet, because MacDonnell's testimony was essentially duplicative of Kennedy's, and absent any additional showing of prejudice, Petitioner has failed to show the actual prejudice necessary to constitute a reversible error. *See Gallego*, 124 F.3d at 1072; *Brecht*, 507 U.S. 619 at 623.

While it is arguable whether other judges in other courts would have granted the continuance under the given circumstances, "the fact that something is arguable does not make it unconstitutional."  *Ungar*, 376 U.S. at 591.  The trial court's denial of a continuance was neither contrary to, nor an unreasonable application of, controlling federal law. Moreover, Petitioner fails to establish that his defense was prejudiced as the result of the denial of the continuance.  Accordingly, this Court **FINDS** that the trial court did not violate Petitioner's constitutional rights by denying his motion for a continuance.  Therefore, this

1   Court **DENIES** relief based on this claim.

2   **V.  Cumulative Error**

3          Petitioner asserts the impact of the trial court's errors should be considered

4   cumulatively, and the cumulative effect of those errors resulted in a fundamentally unfair

5   trial.  In cases where there are a number of trial errors, the court may look at "the overall

6   effect of all the errors in the context of the evidence introduced at trial against the

7   defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United*

8   *States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).  "In other words, 'errors that might

9   not be so prejudicial as to amount to a deprivation of due process when considered alone,

10  may cumulatively produce a trial setting that is fundamentally unfair.'" *Alcala v. Woodford*,

11  334 F.3d 862, 883 (9th Cir. 2003) (quoting *Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th

12  Cir. 2001)).  Therefore, in conducting a cumulative error analysis, a court must look at the

13  combined effect of each error that occurred during a petitioner's trial. This Court **FINDS**

14  that the trial error alleged in Ground One did not prejudice Petitioner. Because this Court

15  **FINDS** no other trial errors, a cumulative error analysis is not appropriate.  Accordingly,

16  this Court **FINDS** that the overall effect of all the errors in the context of the evidence

17  introduced at trial against the defendant did not result in a fundamentally unfair trial.  *See*

18  *Frederick*, 78 F.3d at 1381.  Therefore, this Court **DENIES** relief based on Petitioner's

19  claim that the cumulative effect of the errors amounted to a fundamentally unfair trial.

20  **VI. Evidentiary Hearing**

21         Petitioner requests an evidentiary hearing on all of his claims.  (Objections at 9;

22  Petition at 8.)  For the reasons discussed above, this Court has determined Petitioners'

23  claims are without merit.  "[I]f the record refutes the applicant's factual allegations or

24  otherwise precludes habeas relief, a district court is not required to hold an evidentiary

25  hearing." *Schriro v. Landrigan*, 127 S.Ct. 1933, 1940 (2007).  Accordingly, this Court

26  **DENIES** Petitioner's request for an evidentiary hearing.

27                                  ***Conclusion***

28         For the reasons above, the Court: (1) **ADOPTS** the R&R; (2) **DENIES** Petitioner's

Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in its entirety; and (3) **DENIES**

Petitioner's request for an evidentiary hearing.

**IT IS SO ORDERED.**


DATED: June 30, 2009

HON. NAPOLEON A. JONES, JR.
United States District Judge

cc:     Magistrate Judge Bencivengo
        All Counsel of Record